**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ADVANCED MEMORY TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SK HYNIX INC.,<br><br>Defendant. | Civil Action No. 2:24-CV-1078-JRG-RSP<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF AMT'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS


I. Legal Standard ....................1

A. General Claim Construction Principles ....................1

B. There is a High Bar to Show Indefiniteness ....................2

II. Disputed Claim Terms ....................2

A. Booster Circuit Patents ('557 & '018 Patents) ....................2

1. "[The] at least one analog comparison circuit" ....................3

2. "Switching elements having the same potential of the first well region of the first and second boosting cell rows" ....................5

3. "Share a common first well region" ....................9

4. "Switching circuit" ....................12

5. "The at least one boosting cell of the first and second boosting cell rows" ....................13

B. Charge Pump Circuit Patent ('231 Patent) ....................15

1. The Court Should Adopt AMT's Proposed Construction ....................15

2. SK hynix's Construction Is Wrong ....................17

C. Simultaneous Writing Patent ('835 Patent) ....................18

1. "Memory Cells" ....................18

2. "Each of the M switch circuits includes N switches, where N is an integer of one or more" ....................20

D. Single Regulator Patent ('888 Patent) ....................23

E. Neither the '835 Patent's Preamble Nor the '888 Patent's Preamble is Limiting ....................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
618 F.3d 1354 (Fed. Cir. 2010)....................27

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
919 F.3d 1320 (Fed. Cir. 2019)....................27

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017)....................12

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)....................27

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
35 F.4th 1345 (Fed. Cir. 2022) ....................2

*Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*,
34 F.3d 1048 (Fed. Cir. 1994)....................17

*Indect USA Corp. v. Park Assist, LLC*,
2026 WL 41173 (Fed. Cir. Jan. 7, 2026) .................... *passim*

*IQRIS Techs. LLC v. Point Blank Enters., Inc.*,
130 F.4th 998 (Fed. Cir. 2025) ....................20, 21

*Maxell, Ltd. v. Amperex Tech. Ltd.*,
94 F.4th 1369 (Fed. Cir. 2024) ....................22

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....................2

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
981 F.3d 1015 (Fed. Cir. 2020)....................14

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ....................13

*Novo Indus. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003)....................26

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................18

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)....................................................................................2

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017)....................................................................................2

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)...............................................................................1, 19

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016)....................................................................................5

*In re Xencor, Inc.*,
130 F.4th 1350 (Fed. Cir. 2025) .................................................................................25

# TABLE OF COMMON TERMS

| **Term** | **Abbreviation/Note** |
|---|---|
| Advanced Memory Technologies, LLC | AMT |
| SK hynix Inc. | SK hynix |
| Person of ordinary skill in the art | POSITA |

| **Asserted Patents** | |
|---|---|
| U.S. Patent No. 7,777,557 | ’557 Patent |
| U.S. Patent No. 7,920,018 | ’018 Patent |
| U.S. Patent No. 7,969,231 | ’231 Patent |
| U.S. Patent No. 8,400,835 | ’835 Patent |
| U.S. Patent No. 8,593,888 | ’888 Patent |

Plaintiff AMT respectfully submits this opening claim construction brief concerning the '557 Patent, '018 Patent, '231 Patent, '835 Patent, and '888 Patent.[1] All five of the asserted patents relate to the design and operation of semiconductor memory devices. The Court should adopt AMT's proposed constructions, which are faithful to the claim language and intrinsic evidence, over SK hynix's artificially manufactured or indefinite constructions.

## I. Legal Standard

### A. General Claim Construction Principles

Claim terms must be "given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). There are only "two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.*

Courts "'strive, where[ever] possible, to avoid nonsensical results in construing claim language.'" *Indect USA Corp. v. Park Assist, LLC*, 2026 WL 41173, at *5 (Fed. Cir. Jan. 7, 2026) (quoting *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011)). Indeed, "[c]onstruction[s] that render[] all embodiments inoperable" are viewed "skeptically." *Id.* (citation omitted). But courts are also cautious in using the specification to limit the scope of the claims by importing limitations from the embodiments into the claims. To read "a limitation from the written description into the claims" is "one of the cardinal sins of patent law." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340–41 (Fed. Cir. 2001).

[1] *See* Exhibits A–E. All exhibits are attached to and described in the accompanying declaration.

### B. There is a High Bar to Show Indefiniteness

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). A patent claim is indefinite only if, "read in light of the specification delineating the patent, and the prosecution history, [the claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

But "[j]ust because a term is susceptible to more than one meaning does not render it indefinite." *ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022). If "there is a reasonable interpretation of the claims that leads to a sensible result," it is sufficient to defeat an indefiniteness challenge. *Indect USA Corp. v. Park Assist, LLC*, 2026 WL 41173, at *5 (Fed. Cir. Jan. 7, 2026).

## II. Disputed Claim Terms

### A. Booster Circuit Patents ('557 & '018 Patents)

The '557 and '018 Patents share a common specification and disclose a booster circuit with two rows of boosting cells that "boost" voltages in stages through an energy-efficient operation that minimizes power consumption.[2] At any given stage, an analog comparison circuit compares the outputs (or inputs, in the '018 Patent) of the boosting cells in the two rows, selects one of their well bias potentials, and then transfers that bias to a region where certain transistors are located, thereby maintaining a greater minimum voltage.

[2] Because the patents share a common specification, this Brief cites the '557 Patent's specification for simplicity.

### 1. "[The] at least one analog comparison circuit"

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "at least one analog comparison circuit" | **<u>'557:</u>** 1<br>**<u>'018:</u>** 1 | No construction required: plain and ordinary meaning | "one or more analog comparison circuits" |
| "the at least one analog comparison circuit" | **<u>'557:</u>** 1, 2, 7, 12<br>**<u>'018:</u>** 1, 2, 7, 10 | No construction required: plain and ordinary meaning | "all of the one or more analog comparison circuits" |

The Court should reject SK hynix's two-step maneuver that first, unnecessarily rephrases clear claim terms, and second, uses that rewritten language to improperly narrow the scope of the patents' claims.

#### a. The Claim Terms Do Not Require Construction

The first term—"at least one analog comparison circuit"—does not require construction because its plain and ordinary meaning is clear: *one or more* analog comparison circuits. SK hynix apparently agrees because that is its proposed "construction." Curiously, however, SK hynix does not attempt similar edits to parallel phrases such as "at least one switching element," "at least one backflow preventing circuit," or "at least one of the boosting cells" seen elsewhere in the patents' claims. *See*, *e.g.*, '557 Pat. 11:53-56, 12:7-8, 14:1-2; '018 Pat. 11:14-17. This inconsistency demonstrates that SK hynix's proposed construction is not motivated by genuine ambiguity.

Instead, SK hynix's construction of "at least one analog comparison circuit" appears designed to facilitate an outcome-driven, and incorrect, construction of a second term. It proposes that "the at least one analog comparison circuit" should mean "*all* of the one or more analog comparison circuits."[3] This reading is incompatible with the patent.

#### b. SK hynix's Construction Is Wrong

[3] Unless otherwise noted, all emphases in this Brief are added.

First, SK hynix's construction would rewrite claim 1 to require the well bias potential of ***all analog comparison circuits*** to be applied to the first well region of the switching element—a requirement the patent does not impose. The antecedent article "the" refers the reader to the earlier claim requirement that there be "at least one or more analog comparison circuits *for outputting a well bias potential*." '557 Pat. & '018 Pat., at 11:62-63. In other words, when the claims refer to "the at least one" analog comparison circuit, they refer only to the analog comparison circuits "for outputting a well bias potential." *Id.* SK hynix's construction, however, would apply to *every* analog comparison circuit (regardless of whether it outputs a bias potential of the boosting cell or serves a different function entirely), resulting in a much narrower claim.

Second, SK hynix's construction contradicts the patent specification and claims, which contemplate instances where multiple analog comparison circuits have their well bias potentials applied to *different* first well regions. *See* '557 Pat. at 12:18-21 (dependent claim 2 stating potential "is applied to a first well region of a switching element included in the at least *one backflow preventing circuit*"). The patent does not require that all analog circuits apply their well bias potentials to the *same* region, as SK hynix's construction would require. All that the claims require is for the well bias potentials of the analog comparison circuits ("for outputting a well bias potential generated by an input potential…") to be applied to some corresponding first well regions, not necessarily the *same* first well region.

Third, SK hynix's proposed construction violates a core tenet of claim construction by ascribing different meanings to the same term ("the at least one") across the patent. *In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016) (noting the general rule that "the same phrase in different claims of the same patent should have the same meaning"). The patents consistently use the phrase "the at least one" to refer not just to "the analog comparison circuit," but also to "the switching

element" ('557 Pat. 12:56-57), "the boosting cell" ('018 Pat. 12:10-11), "the backflow preventing circuit" (*id.* at 12:20), and "the switching circuit" ('557 Pat. 12:65-66). SK hynix's selective reinterpretation lacks justification.

### 2. "Switching elements having the same potential of the first well region of the first and second boosting cell rows"

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "switching elements having the same potential of" | **<u>'557:</u>** 10, 11 | No construction required: plain and ordinary meaning | Indefinite |

SK hynix's assertion that this claim term is indefinite rests on a misreading of the claim language that intrinsic evidence confirms is wrong. The claims are not about *switching elements* whose potential is the same as the first well region. They are about switching elements ***whose first well regions have the same potential***.

#### a. The Term Fits Within Its Context

To understand at-issue claims 10 and 11, start with claim 1, the independent claim on which they depend. Claim 1 discloses a booster circuit comprising, among other things, two rows of booster cells. Critically, each booster cell has a triple-well structure, as shown in a figure from the prior art below.

A triple-well structure is composed of a substrate and two well regions: on the **substrate 100**, there is a "**first well region**" **110** with one conductivity type (N, in the illustration below); and, in that first well region, there is a "**second well region**" **120** with a different conductivity type (P, below). '557 Pat. 11:51-53.




**Illustration 1: Excerpt of Ex. F (Fig. 2 of U.S. Patent 6,121,821 (Prior Art))**

According to claim 1 of the '557 Patent, the "first" well region is the one formed "on a substrate," and then the "second" is the one formed "in the first well region." *Id.* Claim 1 also requires there to be "at least one switching element in either or both of the first well region and the second well region." *Id.* at 11:53-54.

Turning to dependent claims 10 and 11, they recite different arrangements of the two-row booster circuit from claim 1. Claim 10 states that the "switching elements" of the booster circuit "share a common first well region" (*i.e.*, they are located in the same N-well **110** in the illustration above). *Id.* at 12:56-59. Claim 11 then provides that the switching elements *and* the "at least one analog comparison circuit" "share a common first well region." *Id.* at 12:60-64.

Here is where the disputed language appears: "having the same potential of." Claims 10 and 11 recite that certain potentials (electrical properties) are the "same," and the parties dispute which potentials those are. Looking at language, the claims recite that the potential is "the same" between the first well regions in which the switching elements are located. *Id.* at 12:57, 61.

| Claim 10 of the ’557 Patent | Claim 11 of the ’557 Patent |
|---|---|
| The booster circuit of **claim 1**, wherein<br><br>the at least one switching elements<br><br>having the **same potential** of the first well region of the first and second boosting cell rows<br><br>share a common first well region. | The booster circuit of **claim 1**, wherein<br><br>the at least one switching elements<br><br>having the **same potential** of the first well region of the first and second boosting cell rows<br><br>and the at least one analog comparison circuit<br><br>share a common first well region. |

The claims show that the “same potential” limitations relate to the **first well regions** in which the switching elements (in the first row and second row) are located; it does not show that the switching elements have the same potential as first well regions, as SK hynix claims. Recall that the “first well region” refers to an area of the substrate, as shown in Illustration 1 of the Brief above. With two rows of boosting cells, the disputed claims recite that the switching element of the first row cell and the switching element of the second row cell “share a common first well region”—*i.e.*, they are located in the same portion of a substrate. The claim’s explanation that the switching elements’ “first well regions” have the same potential reflects a consequence of the switching elements *sharing a common first well region*. As SK hynix’s expert put it, Claim 10 describes a “shared first well region,” and “[i]f there’s a shared first well region, then … there’s only one potential” because there the first well regions are “combined” into one. Ex. G (Deposition Transcript of Dr. Alyssa Apsel), at 108:21-109:10.

To crystallize the above: claims 10 and 11 describe switching elements that are located in a shared first well region—*i.e.*, the same portion of a substrate. The switching elements “hav[e]” first well regions that have “the same potential” as each other. ’557 Pat. 12:56-57.

### b. SK hynix Misreads the Claim Terms

SK hynix and its expert Dr. Apsel artificially parse the claim language and interpret it to mean something it does not. They read these claims to involve a comparison between the potential of the *switching elements* and the potential of a first well region. But nowhere does the patent refer to the potential of "switching elements," which Dr. Apsel admits would be nonsensical. *See* Ex. H (Apsel Declaration), at ¶¶ 36–37. Indeed, only after reaching the mistaken conclusion that the claims require the switching elements to have the same potentials as the first well regions does Dr. Apsel assert that the claim must be indefinite because it would not make sense to speak about "switching elements" having a singular potential. *Id.*

Dr. Apsel's conclusion is wrong because the premises underlying her argument show that the claims do not refer to the potential of switching elements at all. First, Dr. Apsel asserts that "a switching element does not inherently possess a single, unitary potential" because it consists of multiple terminals (*e.g.*, a gate, source, drain, body), and each terminal has its own potential. *Id.*, at ¶ 36. Rather than take that as a clue that the claim is not referring to the potential of switching elements, Dr. Apsel reasons that the potential must be the potential of a *terminal* of the switching element. But neither the claims nor the specification refer to the potentials of terminals. Despite this additional clue that the patent is not referring to the potentials of switching elements, Dr. Apsel arrives at the conclusion that the patent is indefinite because it "fails to inform a POSITA with reasonable certainty what it means for 'switching elements' to 'have the same potential of the first well region.'" *Id.* at ¶ 40.

Dr. Apsel's professed inability to understand the claim is a consequence of her misinterpretation of the language, not the claims' indefiniteness. The specification repeatedly refers to the potential of well regions and *nowhere* refers to the potential of a "switching element." *See*, *e.g.*, '557 Pat. abstract; 2:36-37 ("potential of an N well"); 10:40-41 ("potential of the P well").

Moreover, the claims themselves describe switching elements sharing a common first well region, and Dr. Apsel admitted that a shared well implies a singular, common potential. Apsel Dep. Tr. at 109:6-8 ("If there's a shared first well region, then … there's only one potential.").

SK hynix's argument is also belied by its unsuccessful petitions for *inter partes* review. Last year, SK hynix petitioned for IPR of all asserted patents, and the Director declined to institute review on any of the challenged claims. *See* IPR2025-01449, IPR2025-01450, IPR2025-01451, IPR2025-01452, and IPR2025-01453. SK hynix's arguments during IPR proceedings of the '557 show its own expert, Carl Sechen, had no difficulty understanding it when SK hynix argued another patent showed the same limitation. Ex. I ('557 IPR Sechen Decl.), at ¶ 73.

Because "there is a reasonable interpretation of the claims that leads to a sensible result," the Court should reject SK hynix's attempt at construing the term to be indefinite. *Indect USA Corp.*, 2026 WL 41173, at *5.

### 3. "Share a common first well region" [4]

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "share a common first well region" | **'557:** 12<br>**'018:** 10 | No construction required: plain and ordinary meaning | Indefinite |

SK hynix's indefiniteness argument for the next term rests on a similarly strained reading of the claims. It asserts that the phrase "share a common first well region" is indefinite because the *details* of that shared common first well region are unclear: must a single well be shared across rows or are there two shared common first well regions, one in each row? *See* Apsel Decl., at

[4] Although the same phrase appears in asserted claims 10 and 11 of the '557 patent, SK hynix has not asserted that they are indefinite.

¶¶ 41–42. As the specification and claim language demonstrate, both arrangements satisfy the claim elements.

The claims at issue use the patents' definition of the term "first well region." As described above, the term "first well region" is the portion of a triple-well structure that is formed "on a substrate" and in which a *second* well region can be formed. *See* '557 Pat., 11:51-53; '018 Pat., 2:52-56.

Here, claim 12[5] recites two parallel conditions involving a common first well region: (1) a switching circuit of the boosting cell of the **first** row shares a common first well region with a **first** element of the analog comparison circuit; and (2) a switching circuit of the boosting cell of the **second** row shares a common first well region with a **second** element of the analog comparison circuit. *See* '557 Pat. at 12:65-13:6. Figure 20, annotated below, shows exactly that: two switching circuit-analog comparison circuit pairs are located in the same first well regions.




[5] Claim 10 of the '018 Patent differs only in its use of the term switching "element," so claim 12 of the '557 Patent is discussed here for simplicity.

Nevertheless, SK hynix's claim construction expert insists the claims are indefinite because they are "susceptible to multiple, mutually exclusive interpretations." Apsel Decl., ¶ 43. Notably, SK hynix's *IPR* expert, Dr. Sechen, purported to understand the term well enough to compare the '557 Patent to prior art. *See* Ex. I ('557 IPR Sechen Decl.), at ¶¶ 76–77.

Dr. Apsel's argument is wrong for two reasons. First, Figure 15—which Dr. Apsel claims reflects this ambiguity—does not even depict claim 12: neither of the two switching circuits **906** (one in each row) "share[s] a common first well region" with *either* of the analog comparison circuit elements **120**, **121**.

Second, a different embodiment, shown in Figure 18, demonstrates the scenarios Dr. Apsel claims are "mutually exclusive" are, in fact, compatible. Figure 18 meets every element of claim 12 because the switching circuits of the first and second boosting cell rows **906** share a common NT well with the first **120** and second **121** elements of the analog comparison circuits, respectively.







<u>**Figure 15 does not satisfy claim 12.**</u>

<u>**Figure 18 satisfies claim 12.**</u>

The Court should accordingly reject SK hynix's indefiniteness arguments because a POSITA can reasonably understand the meaning of "share a common first well region."

### 4. "Switching circuit"

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "switching circuit" | **’557:** 12 | No construction required: plain and ordinary meaning | Indefinite |

SK hynix argues the term "switching circuit" in claim 12 is indefinite because other claims in the ’557 Patent use the phrase "switching *element*," and claim 12 alone refers to "switching circuit." But this argument conflates breadth with indefiniteness, and "breadth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).

A POSITA would reasonably understand a "switching circuit," as opposed to a "switching element," to refer to *multiple* switching elements. Indeed, SK hynix's own expert confirmed that a circuit "typically refers to more than one element or transistor," Apsel Dep. Tr. at 131:10-14, and conceded that a POSITA "may" have understood the meaning of the allegedly indefinite term. Apsel Decl., at ¶ 50.

Dr. Apsel also provided testimony showing that several embodiments of the ’557 Patent are consistent with this meaning. Dr. Apsel stated that the embodiment in Figure 7 depicts "more than one transistor in a boosting cell," and the one in Figure 9 depicted what "could be interpreted as a switching circuit." Apsel Dep. Tr. at 135:3-6, 138:15-17. The latter concession is fatal to SK hynix's argument for indefiniteness. *See WAPP Tech Ltd. P'ship v. Bank of Am., N.A.*, 2022 WL 2463569, at *7 (E.D. Tex. July 6, 2022) (rejecting indefiniteness where term "may refer to a broad class of structures" but "the claim tethers [it] to the particular context").

Black letter law defeats SK hynix's next argument—that the term is so broad it must be indefinite. *See Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) ("[A] claim is not indefinite just because it is broad."). When pressed on the term's boundaries, Dr. Apsel stated she was unclear on whether the term had "any boundary at all," not

that it lacked any discernible meaning. *Id.* at 139:14-17. Dr. Apsel's testimony that "switching circuit" has "a very broad definition" as "any circuit that …has a switch in it" confirms the term has an understood meaning; it is simply broad. Apsel Dep. Tr. at 134:12-22. Because a POSITA would reasonably understand the phrase "switching circuit" in the '557 Patent, it is not indefinite.

#### 5. "The at least one boosting cell of the first and second boosting cell rows"

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "the at least one boosting cell of the first … boosting cell row[]" | **'018:** 1 | No construction required: plain and ordinary meaning | "the boosting cell on the i-th stage of the first boosting cell row" |
| "the at least one boosting cell of the … second boosting cell row[]" | **'018:** 1 | No construction required: plain and ordinary meaning | "the boosting cell on the i-th stage of the second boosting cell row" |

SK hynix asks this Court to read two negative limitations into claim 1 of the '018 Patent that have no support in the claim language and that would improperly exclude embodiments expressly described in the specification. The Court should decline to do so.

SK hynix's construction would turn a condition for the **input** potentials into a requirement for the **output** potential**.** Before reaching the disputed term, claim 1 of the '018 Patent introduces "at least one analog comparison circuit for outputting a well bias." '018 Pat. 11:62-63. It states that the output well bias is generated from the **input potential** of a boosting cell on either (a) the *i*-th stage of the first boosting cell row or (b) the *i*-th stage of the **second** boosting cell row. *Id.* at 11:62-66. Once the analog comparison circuit selects the well bias potential, it applies that bias to the first well region of a given switching element. *Id.* at 12:8-11. Although the claim states that *inputs* to the analog comparison circuit (*i.e.*, the two input potentials) come from "the *i*-th stage," it does not require the *output* to be applied at the *i*-th stage, which disproves SK hynix's argument.

SK hynix's construction is also incompatible with the specification, which contemplates the application of the well bias potential to boosting cells at stages *other than* the *i*-th stage, including the boosting cell "on the (*i*+1)-th stage" or "on the less than *i*-th stage." *Id.* at 2:62-3:5; *see also id.* at 3:16-26. Adopting SK hynix's construction would effectively eliminate these embodiments from the claim scope, a result the Federal Circuit has rejected. *See Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1025 (Fed. Cir. 2020) ("Construction[s] that render[] all embodiments inoperable" are viewed "skeptically"); *see also* '018 Pat. at 2:62-3:5, 3:16-26 (describing application of well bias potential to the (*i*+1)-th stage, the *i*-th stage, or boosting cells on stages less than *i*).

SK hynix's expert opinion on this term is unreliable because it is based on an incorrect understanding of the law. Dr. Apsel reasoned "the '018 patent already includes a separate claim [**dependent** claim 8] that expressly covers the application of a well bias potential to boosting cell stages other than the *i*-th stage," so **independent** "claim 1 is limited to application of the well bias potential to the boosting cell on the *i*-th stage." Apsel Decl. ¶ 56. That is *backwards*. Claim 8 (which Apsel understands to *permit* the output of the analog comparison circuit to be applied to a different stage) is dependent on claim 1. The concession that claim 8 discloses instances where the well bias potential is output to a boosting cell at a stage ***different* from *i*** necessarily requires claim 1 to permit that too.

Finally, SK hynix's construction is undermined by its selective and inconsistent treatment of identical claim language: SK hynix has not contended that the materially identical phrasing in asserted claim 1 of the related '557 Patent requires construction, let alone its proffered construction here. This inconsistency alone reveals that SK hynix's construction is outcome-driven rather than rooted in any genuine textual ambiguity.

### B. Charge Pump Circuit Patent ('231 Patent)

| AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|
| "a DC-DC converter controlled by at least one clock signal consisting of at least one capacitor and at least one switch network" | "a circuit that provides a boosted voltage at an output node of the internal voltage generating circuit" |

Both parties agree that the phrase "charge pump circuit" in claims 3 and 4 of the '231 Patent requires construction. The Court should adopt AMT's proposed construction, which understands charge pump circuit by reference to its necessary constituent elements, as a POSITA would. And the Court should reject SK hynix's construction because it conflates a "charge pump circuit" with a *boost* circuit, thus ignoring a distinction the claims themselves made between these two types of circuit. *See* '231 Pat. at claim 1 ("boost circuit") and claim 3 ("charge pump circuit"). SK hynix also ignores the structural elements that distinguish charge pumps from other voltage-boosting circuits and imports limitations from the preferred embodiments.

#### 1. The Court Should Adopt AMT's Proposed Construction

AMT's proposed construction accurately describes a charge pump circuit—and nothing else. Charge pumps work as follows (AMT's proposed construction bolded): A charge pump converts one voltage to another (making it a **DC-DC converter**) and is **controlled by capacitors** (as opposed to inductors), **switches**, and a **clock signal**. The **clock signal** toggles the **switches** to alternate between two circuit configurations, where (1) a **capacitor** is charged using some input voltage, and then (2) the circuit is reconfigured so that the stored charge is transferred to a load (another **capacitor**). Repeating the switching process over multiple clock cycles produces an output voltage that is different from (*e.g.*, higher than) the input voltage.

The specification and technical literature confirm this understanding. Every charge pump circuit disclosed uses capacitors and switches controlled by clock signals. *See* '231 Patent at Figs. 4, 10, 11. For example, Figure 4 shows "the structure of the second charge pump circuit 104,"

which includes **capacitors** and transistors operating as **switches** in response to **clock signals**. *Id.* at 6:19-39.




Publications in the industry also confirm AMT's construction. Ex. J ("Boost Converters," in *Power Supplies for LED Driving*), at *1381 ("A charge pump has many capacitors and switches, which are used to raise the output voltage above the supply voltage."); Ex. K ("Creating High Voltage" in *MSP430–Based Robot Applications: A Guide to Developing Embedded Systems*), at *1366 (referring to a charge pump as a "DC-DC converter" that "uses capacitors"); Ex. L ("Op Amp Power Supply Systems," in *OP AMP Applications Handbook*), at *1430–31 (Charge pump circuits "accomplish energy transfer and voltage conversion using charges stored on capacitors," using "an array of low resistance switches, a clock for timing, and a few external storage capacitors" with "no inductive components."). A charge pump's reliance on capacitors, instead of inductors, has practical significance because it allows the power supply circuit to take up less area, leaving more room for memory storage. *See* Op Amp Power Supply Systems, at *1431 ("Because there are no inductors, the final PCB height can generally be made smaller than a comparable inductance-based switching regulator.").

The criticisms that SK hynix's expert levies are unwarranted. First, Dr. Apsel argues that AMT's construction improperly permits a charge pump to be driven by a *single* clock signal,

whereas the embodiments in the ’231 Patent are controlled by *two or more* clock signals. *See* Apsel Decl. ¶ 75. But that argument would transform features of the embodiments into claim elements, which the specification, not to mention the Federal Circuit, expressly rejects: “**the number of elements** connected in parallel and elements connected in series in the charge pump circuits and **are only for illustrative purposes**.” *Id.* at 8:56-59 (figure citations omitted); *see also Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (“[P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.”).

Second, Dr. Apsel claims a charge pump must output a “boosted” voltage and that AMT’s construction would include circuits that reduce voltage. Apsel Decl. ¶ 74. But during her deposition, Dr. Apsel conceded the opposite: charge pumps *can* generate negative voltages—voltages that are lower in absolute terms but greater in magnitude—and that “[t]here’s plenty of charge pump circuits that do that.” Apsel Dep. Tr. at 83:3-4.

The Court should adopt AMT’s proposed construction because it embodies a POSITA’s understanding of a charge pump circuit by construing the term as simply the sum of its parts.

#### 2. SK hynix’s Construction Is Wrong

SK hynix’s construction, on the other hand, is incorrect for several reasons. To start, SK hynix’s construction is over-inclusive: It effectively defines “charge pump circuit” as synonymous with “boost circuit” by describing it as “a circuit that provides a boosted voltage.” That is inconsistent with the patent, which uses both terms to mean different things. *Compare* ’231 Pat. at claims 1, 6, & 7 (“boost circuit”), *with* claims 3 and 4 (“charge pump circuit”).

SK hynix’s own expert also confirmed that “a boost circuit is . . . a more general term” and that “the charge pump is a more specific example.” Apsel Dep. Tr. at 49:8-10, 89:17-90:6. Despite acknowledging the uniqueness of charge pumps, SK hynix’s definition omits a defining

characteristic: their use of capacitors rather than inductors. As Dr. Apsel testified, circuits "that use like an inductor to store . . . energy" are "not really considered to be a charge pump. That's a different kind of boosting circuit." Apsel Dep. Tr. at 90:11-20. AMT's construction—not SK hynix's—captures precisely this distinction.

SK hynix has also committed one of the "cardinal sins of patent law" by importing limitations from the preferred embodiments into the claims. *See Phillips*, 415 F.3d at 1323. Its definition would rewrite claims 3 and 4 to *require* charge pump circuits to be located "at the output node of the internal voltage generating circuit." Once again, the specification expressly disclaims such limitations: "Although the preferable embodiments of the present disclosure have been described above, **the present disclosure is not limited to those**." '231 Pat. at 9:40-43. There is no basis for SK hynix's importation of a limitation from the embodiments into the construction of "charge pump circuit," and its proposed definition is inaccurate.

## C. Simultaneous Writing Patent ('835 Patent)

### 1. "Memory Cells"

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "memory cells" | **'835:** 1 | No construction required: plain and ordinary meaning | "elements that are each capable of storing 2 or more bits of data" |

SK hynix's proposed construction would narrowly define "memory cell" in the '835 Patent as "elements capable of storing two or more bits," excluding single-bit memory cells from the claims. This construction is not justified by intrinsic or extrinsic evidence. The patentees did not "set out a definition and act[] as [their] own lexicographer" or "disavow[] the full scope" of the term in the specification or during prosecution. *Thorner*, 669 F.3d at 1365.

The plain and ordinary meaning of "memory cell" is independent of its bit capacity. A memory cell can store a single bit (*e.g.*, "0" or "1"), two bits (*e.g.*, "00," "01," "10," or "11"), or

more bits. Indeed, SK hynix's other expert Dr. Hassoun acknowledged as much, conceding that it is "possible for a memory cell to contain a single bit," notwithstanding his views on the '835 Patent. *See* Ex. M (Deposition Transcript of Dr. Marwan Hassoun), at 54:5-19. There is no reason to depart from this plain meaning here.

The specification does not disavow single-bit memory cells; it confirms that "memory cell" is not limited to multi-bit cells. As early as the introduction, the patent expressly describes single-bit memory cells: "The value of information (data) stored in the memory cell is determined to be '0' or '1' based on the threshold level of the memory cell." '835 Pat. at 1:33-35. Dr. Hassoun also admitted the invention is compatible with single-bit memory cells, conceding that the '835 Patent "could be implemented for. . .memory cells that only store one bit." Hassoun Dep. at 66:3-7.

Moreover, when the patent intended to describe *multi*-bit memory cells, it expressly said so. *See, e.g.*, '835 Pat. at 2:11-12 (describing an embodiment where "the memory cell can store two bits of data."); *see also id.* at 5:27-28 (in another embodiment: "[e]ach memory cell can store two bits of data"). These qualified references demonstrate that the unqualified term "memory cell" encompasses all memory cells, including single-bit cells. If "memory cell" inherently meant multi-bit cells, there would be no need for the patent to specify "two bits of data."

The remaining arguments presented by SK hynix's expert are unpersuasive. Dr. Hassoun relies heavily on the specification's statement that the "present disclosure is *particularly useful* for non-volatile semiconductor memories. . .in which each memory cell can store a plurality of bits of data." '835 Pat. at 6:26-29. But that portion of the specification cuts the other way. "Particularly useful" does not mean "exclusively useful," especially when the claims and specification nowhere disavow single-bit cells.

Similarly, SK hynix's reliance on the specification's statement that "it is assumed above that each memory cell can store two bits of data" is also misplaced because it refers to an embodiment, not the claims. '835 Pat. at 6:13-15. A preferred application does not define the outer bounds of claim scope. *IQRIS Techs. LLC v. Point Blank Enters., Inc.*, 130 F.4th 998, 1004 (Fed. Cir. 2025) ("[T]here is no evidence suggesting that the ordinary meaning of pull cord is limited to a cord that is directly pulled, we are not inclined to import limitations from the preferred embodiments into the claimed invention."). There has been no disavowal or lexicography that would justify departing from the plain and ordinary meaning of "memory cell."

#### 2. "Each of the M switch circuits includes N switches, where N is an integer of one or more"

| **Claim Term** | **Claim** | **AMT's Proposed Construction** | **SK hynix's Proposed Construction** |
|---|---|---|---|
| "each of the M switch circuits includes N switches, where N is an integer of one or more" | **<u>'835:</u>** 1 | No construction required: plain and ordinary meaning | Indefinite |

SK hynix asserts that claim 1 of the '835 Patent is indefinite because it simultaneously permits an embodiment with a single switch yet also, according to SK hynix, requires at least two switches within a switch circuit. This argument rests on SK hynix's rigid, and wrong, assumption about how the term "common point" must be construed. The Court should reject SK hynix's indefiniteness argument because the intrinsic evidence shows that a POSITA "would reasonably understand [the] claim to be one that is entirely possible to perform." *Indect*, 2026 WL 41173, at *5.

Claim 1 expressly permits a configuration where N equals one—that is, a single switch per switch circuit. The claim defines N as "an integer of one or more." '835 Pat. at 6:48. In the same claim, and just a few lines earlier, the patent also defines the number of switch circuits, M, as "an

integer of *two* or more." *Id.* at 6:32-37. Had the patentees intended to require multiple switches per circuit, they knew precisely how to say so.

The specification confirms this construction. For example, Figure 6 illustrates a single-switch embodiment, and the specification confirms that this embodiment falls within the scope of the invention: "While, in the above embodiments, *one* or two switches are connected to each data line, the present disclosure is not limited to this." *Id.* at 6:10-12. Dr. Hassoun admitted during his deposition that the embodiment showed a single switch. Hassoun Dep. 94:8-12. Thus, the patent expressly contemplates and claims configurations where N equals one.

SK hynix's indefiniteness theory flows entirely from its incorrect construction of "common point." SK hynix construes this term to require a junction exclusively between two or more switches within the same switch circuit. *See* Ex. N (Hassoun Decl.), at ¶ 39. Under this artificially narrow construction, when N equals one, there can be no "common point," so the claim supposedly contradicts itself. *Id.* That the embodiment in Figure 6 shows only one switch, SK hynix claims, reveals that the patent is indefinite.

SK hynix's narrow definition of "common point" is unsupported, even by its own expert. Dr. Hassoun's declaration states: "A POSITA would understand that a 'common point' is a junction between multiple elements." Hassoun Decl., ¶ 38. That definition defeats SK hynix's indefiniteness argument.

During his deposition, Dr. Hassoun confirmed that a "common point" can exist between just two elements, that a junction refers to a point where elements "meet," and that there are a variety of elements *beyond switches*. Hassoun Dep. Tr. 90:21-24; 91:1-11; 91:24-92:6. Yet when confronted with interpretations of "common point" that fit within his definition but required only one switch—such as the junction between a single switch's terminal and the data line shown in

Figure 6, or a hypothetical point where single switches from two different circuits connect—Dr. Hassoun backtracked, imposing limitations his own definition does not even require. *Id.* at 98:5-6 (contending that the claim defines a common point "as the point where two switches connect with each other"); *id.* at 115:15-116:3 (contending that the "common point" in the claim must be between more than one switch "within a switch circuit").

SK hynix's approach inverts the proper claim construction inquiry. The question is not whether Dr. Hassoun's preferred construction (unflaggingly assumed to be true) can be reconciled with every embodiment; it is whether a POSITA would understand the scope of the claim with reasonable certainty. "If there are two requirements, and it is possible to meet both, there is no contradiction." *See Maxell, Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369, 1373 (Fed. Cir. 2024) (reversing indefiniteness ruling). The existence of a disclosed single-switch embodiment demonstrates that a POSITA would understand "common point" in a manner consistent with N equaling one—*not* that the claim is indefinite.

The claim language supports such a construction of "common point." When N is greater than one, "common point" describes the junction where the first (or second) terminals of multiple switches connect at the same point to the data line (or drain voltage supply line). When N equals one, the single switch's terminal is the point of connection to these same elements—and *that* point is "common" to the switch terminals and the data line or drain voltage supply line to which they connect. *See Indect*, 2026 WL 41173, at *5 (rejecting indefiniteness argument where the challenger's position rested on an "unstated, and incorrect, assumption" about how a claim term operated, explaining that "there is a reasonable interpretation of the claims that leads to a sensible result").

### D. <u>Single Regulator Patent ('888 Patent)</u>

| Claim Term | Claim | AMT's Proposed Construction | SK hynix's Proposed Construction |
|---|---|---|---|
| "the drain terminal of the memory cell" | **'888:** 5 | No construction required: plain and ordinary meaning | "the gate of the voltage applying transistor" |

The term "the drain terminal of the memory cell" in claim 5 of the '888 Patent means what it says. This Court should reject SK hynix's proposal to substitute it with the phrase "the gate of the voltage applying transistor," which would rewrite the claim to mean something entirely different. The claim language is coherent and consistent with the specification when read in the context of the claims upon which it depends, as it must be.

Context is helpful to understand why. The '888 Patent's innovation is the use of a single regulator, instead of two, to supply voltages to both the voltage applying transistor and the memory cell. *Id.* at 1:40-45, 9:18-22. By using switches, the '888 Patent allows "one regulator [to be] used as both the regulator for the drain voltage of the memory cell used in the first mode" (*e.g.*, writing) and "the regulator for the gate voltage of the memory cell used in the second mode" (*e.g.*, reading). This configuration makes it possible to create "a small-area semiconductor memory device." *Id.* at 9:18-24.

The disputed term appears in claim 5, which depends on claims 3 and 1. Claim 5 recites two operation modes: in the first mode (writing), "the first and fourth switches are turned on, allowing the output voltage of the regulator to be applied to **the drain terminal of the memory cell** and the voltage different from the output of the regulator to be applied to the gate of the memory cell." *Id.* at 10:1-6. In the second mode (reading), "the second switch is turned on, allowing the output voltage of the regulator to be applied to the gate of the memory cell." *Id.* at 10:6-9.

The phrase in dispute "the drain terminal of the memory cell" does not require construction because it accurately describes where the regulator voltage is ultimately applied during the first operation mode: to the drain terminal of the memory cell. SK hynix's construction is incorrect because it describes an intermediate part of the circuit through which the output voltage passes. The output voltage of the regulator reaches the drain terminal after flowing through (1) a switch, (2) the gate of the voltage applying transistor, and (3) the drain terminal of the voltage applying transistor. SK hynix's construction would stop at item two.

The language in claim 5 intentionally refers to the voltage being applied to the memory cell drain (versus the intermediate gate of the voltage applying transistor) because the patent is concerned with programming *memory cells*. *See* '888 Pat. abstract; introduction. Throughout the patent, voltages are "applied" to memory cells, and intermediate outputs (on their way to the memory cell) are "coupled" to elements. *See, e.g.*, '888 Pat. 6:19-24 ("[T]he output of the regulator 201 is **coupled** to the inputs of a first switch 202 and second switch 203. The output of the first switch 202 is **coupled** to the gate of the voltage applying transistor 205 that **applies** a voltage to the drain side of the **memory cell**.").

Claim 5's recitation of the output voltage being "applied to the drain of the memory cell" is also consistent with the specification and other claims. It does not suggest, as SK hynix argued in its unsuccessful IPR petition, that the term is a "typographical error," claiming the voltage first flows through, and is therefore "applied to," the gate of the voltage applying transistor. Ex. O (SK hynix IPR Petition for '888 Patent). SK hynix argued—through its expert, Dr. Khatri—that "[n]either claim 1 nor claim 5 provides any connection via which the regulator output in the first operation mode is applied to 'the drain terminal of the memory cell,' let alone as a result of the first switch being 'turned on,' as claim 5 recites." Ex. P ('888 IPR Khatri Decl.).

That is incorrect; claim 1 does, in fact, describe exactly how the regulator's output is applied to the drain terminal of the memory cell. Claim 1 recites that the voltage applying transistor is "for applying a voltage to the memory cell" and then states how it does that: "a voltage is applied **from** a terminal of the voltage applying transistor **to** a drain terminal of the memory cell." '888 Pat. 8:31-33, 41-42. Claim 5's limitation that a voltage is applied to a drain terminal of the memory cell is therefore consistent with claim 1, along with ***eight other claims*** that refer to voltages being "applied to the drain terminal of the memory cell," making it even more unlikely that the term's inclusion in claim 5 is a typo. *See* '888 Pat., claims 6, 7, 13, 14, 15, 16, 17, and 18.

To the extent SK hynix claims, as it did in its IPR petition, that the Court should "correct" what SK hynix characterizes as an "obvious drafting error," that argument also fails. Ex. O (SK hynix IPR Petition for '888 Patent). A district court can correct an obvious error in a patent claim only if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (discussing *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442 (1926)). Here, the alleged "correction" SK hynix seeks is plainly "subject to reasonable debate," and the prosecution history lacks any indication to suggest a drafting error.

### E. <u>Neither the '835 Patent's Preamble Nor the '888 Patent's Preamble is Limiting</u>

| Claim 1, '835 Preamble | Claim 1, '888 Preamble |
|---|---|
| "A non-volatile semiconductor memory in which a plurality of non-volatile memory cells can be simultaneously written using a plurality of bit lines, the device comprising" | "A semiconductor memory device capable of erasing and writing memory contents in a memory cell using an electric signal, comprising:" |

Although the '835 and '888 Patents are not in the same family and differ in many ways, SK hynix's assertions that their preambles are limiting fail for similar reasons. Under well-

established Federal Circuit precedent, "[a]s a general rule preamble language is not treated as limiting." *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1327 (Fed. Cir. 2019) (citation omitted). Both preambles fall within this rule.

A preamble is limiting only if it "recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted). By contrast, "[a] preamble is not regarded as limiting . . . 'when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.'" *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358–59 (Fed. Cir. 2010) (citation omitted).

The common structure of the preambles of the '835 and '888 Patents shows that they are not limiting: A noun that is followed by a description of its capabilities. For the '835 Patent, the preamble describes a "non-volatile semiconductor memory" and then characterizes that non-volatile semiconductor memory as capable of what the claims state ("can be simultaneously written using a plurality of bit lines"). That is a textbook non-limiting preamble. *See Am. Med. Sys.*, 618 F.3d at 1358–59 ("If the preamble 'is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a [prior art] rejection), we do not construe it to be a separate limitation.'") (quoting *Symantec Corp. v. Computer Assocs. Int'l, Inc.,* 522 F.3d 1279, 1288–89 (Fed. Cir. 2008)).

The '888 Preamble similarly starts with a general noun ("a semiconductor memory device") and then describes it: "capable of erasing and writing memory contents in a memory cell using an electric signal." The patent's claims encompass all aspects of the preamble's descriptive phrase. The "electric signal" refers to the application of voltages, which the claims explicitly require (*e.g.*, claim 1: "a voltage is applied"). Erasing and writing operations involve the

application of different voltages, which is also squarely encompassed by the claim terms (*e.g.*, claim 3, describing the application of "a voltage *different* from the output of the regulator").

The inventions claimed in the '835 Patent and the '888 Patent are structurally complete without the disputed preamble language, and "the mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim." *In re Xencor, Inc.*, 130 F.4th 1350, 1357 (Fed. Cir. 2025) (alteration adopted) (citation omitted).

To the extent SK hynix claims that these or other portions of the preamble are limiting, "[a] conclusion that some preamble language is limiting does not imply that other preamble language, or the entire preamble, is limiting." *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348 (Fed. Cir. 2020).

Date: February 27, 2026

Respectfully submitted,

*/s/ Justin Nelson*

Justin A. Nelson – Lead Counsel
Texas State Bar No. 24034766
**SUSMAN GODFREY LLP**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
jnelson@susmangodfrey.com

Kalpana Srinivasan
California State Bar No. 237460
**SUSMAN GODFREY LLP**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

Ian M. Gore

Washington State Bar No. 54519
Kemper Diehl
Washington State Bar No. 53212
Bianca Rey
Washington State Bar No. 62422
**SUSMAN GODFREY LLP**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
igore@susmangodfrey.com
kdiehl@susmangodfrey.com
brey@susmangodfrey.com

Ravi Bhalla
New York State Bar No. 5748223
Andrew Nassar
New York State Bar No. 6162226
Stuart E. Pollack
New York State Bar No. 2952984
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
rbhalla@susmangodfrey.com
anassar@susmangodfrey.com
spollack@susmangodfrey.com

*Of Counsel:*
Claire Abernathy Henry
Texas State Bar No. 24053063
Andrea L. Fair
Texas State Bar No. 24078488
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
claire@millerfairhenry.com
andrea@millerfairhenry.com

*Attorneys for Plaintiff AMT*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3) on February 27, 2026 and are being served with the sealed additional attachments via email. Technical advisor Mr. Scott E. Woloson is also being served via email.

*/s/ Justin Nelson*
Justin A. Nelson

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that an exhibit to this document is authorized to be filed under seal pursuant to the Protective Order entered in this case because it is a document that SK hynix has designated Highly Confidential – Attorneys' Eyes Only.

*/s/ Justin Nelson*
Justin A. Nelson