# EXHIBIT H

**IN UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ADVANCED MEMORY TECHNOLOGIES, LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>SK HYNIX INC.,<br><br>*Defendant*. | Case No. 2:24-cv-01078-JRG<br><br>**JURY TRIAL DEMANDED** |

**EXPERT DECLARATION OF DR. ALYSSA APSEL**
**IN SUPPORT OF SK HYNIX'S CLAIM CONSTRUCTION**

I, Alyssa Apsel, declare as follows:

## I. INTRODUCTION

1. My name is Alyssa Apsel, Ph.D. I have been asked to submit this declaration on behalf of defendant SK hynix Inc. ("SK hynix") in connection with a claim construction proceeding in the above-captioned matter. Specifically, I have been asked to share my opinions regarding the meaning of certain terms of U.S. Patent Nos. 7,777,557 (the "'557 patent"), 7,920,018 (the "'018 patent"), and 7,969,231 (the "'231 patent") (collectively, the "Asserted Patents"), as understood by a person having ordinary skill in the art (a "POSITA"). I have been told SK hynix intends to submit this declaration to the Court in support of their arguments regarding the proper construction of these terms. My opinions and the bases for my opinions are set forth below. I reserve the right to offer rebuttal and/or additional opinions regarding claim constructions or other issues on behalf of SK hynix for this matter.

2. I am being compensated at the rate of $700 per hour for my time spent on this case. No part of my compensation depends upon the outcome of this matter. My compensation is in no

way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

3. In reaching the conclusions stated in this declaration, I have relied upon my own personal knowledge and experience.

## II. BACKGROUND

### A. Qualifications

4. A full description of my educational background, professional achievements, qualifications, and publications in the past at least 25 years is set forth more fully in my curriculum vitae, which is attached to this declaration as Exhibit 1. Here, I provide a brief summary of my background and qualifications.

5. I am currently the Director of the School of Electrical and Computer Engineering at Cornell University in Ithaca, New York, where I am also the IBM Professor of Engineering.

6. Throughout my career, I have garnered expertise in the technologies used in various forms of integrated circuits and systems including circuitry and design of complementary metal-oxide semiconductor ("CMOS") systems for low power IoT systems as well as radio frequency ("RF") and wireless communications.

7. I earned my Bachelor of Science degree in Electrical Engineering, with distinction, from Swarthmore College in 1995. I then received a Master of Science degree in Electrical Engineering from California Institute of Technology in 1996. I earned my Ph.D. in Electrical Engineering from Johns Hopkins University in 2002, where my studies focused on electrical engineering, including analog and mixed signal circuit design for high-speed communications systems.

8. I completed all of my coursework at Johns Hopkins—including between two and three years' worth of graduate courses in circuitry and devices—and passed the Ph.D.

Comprehensive Exam (equivalent of a Master Degree, and required for advancement) by 2000. By that time, I had also completed significant independent research on receiver circuitry in CMOS systems and published numerous conference papers.

9. By the time I completed my Ph.D. at Johns Hopkins in 2002, I had published three journal papers and ten conference papers, and I had accumulated five years of experience in integrated circuit design, including work completed for the Army Research Laboratory. My Ph.D. dissertation, submitted in August 2002, focused on the architecture and design of receivers using CMOS technology.

10. From August 2002 until May 2008, I served as an Assistant Professor of Electrical and Computer Engineering at Cornell University. My research during this time focused on various technologies, including low power RF circuits and CMOS systems.

11. From January until June of 2009, I worked as a consultant for Intel Research, where I developed process invariant calibration blocks for high speed I/O circuits. These circuits were designed to monitor and maintain high quality operation conditions of high-speed receivers and transmitters.

12. From June 2008 until 2015, I was an Associate Professor of Electrical and Computer Engineering at Cornell University. During this time, I continued researching various topics relating to integrated circuits, including high speed RF communication and low power radio design and networking, in addition to optoelectronic CMOS. Additionally, I served as the Director of Graduate Studies at Cornell University during a portion of this time, from June 2014 until June 2016.

13. In November 2015, I became a full Professor of Electrical and Computer Engineering at Cornell University. My primary research interests involve, among other things, IoT systems, disruptive RF design, software defined radio, and ultra-low power RF networking.

14. From September 2016 until June 2018, I was a visiting Professor at Imperial College in London, UK. During that time, I worked on low power interfaces for implantable devices, including devices that relied upon inductive coupling and magnetic fields to convey information to a reader device.

15. In July 2018, I was made the Director of the School of Electrical and Computer Engineering at Cornell University. I led the school for an initial five-year term, and was subsequently reappointed to another three-year term, which ends in June 2026.

16. In 2023, I was elected the IBM Professor of Engineering by the College of Engineering at Cornell University.

17. From 2014 to 2016, I served on the Board of Governors of the Institute of Electrical and Electronics Engineers ("IEEE") Circuits and Systems Society. From January 2016 to December 2017, I was the Senior Editor of the IEEE Journal on Emerging and Selected Topics in Circuits and Systems. I also served as the Deputy Editor in Chief of IEEE Circuits and Systems Magazine during that time. From 2018 to 2019, I served as a Distinguished Lecturer for IEEE Circuits and Systems Society. And in January 2020, I was named a Fellow of IEEE.

18. I have authored or coauthored over 100 refereed publications in the fields of RF circuit design, ultra-low power radio, photonic integration with VLSI, and circuit design techniques, as reflected in my curriculum vitae. I also lecture and teach on these topics, including on integrated circuit design and radio networks.

19. I am also named as an inventor on a number of patents relating to integrated circuit design and wireless communications. For example, U.S. Patent No. 8,543,068 discloses pulse-coupled oscillator synchronization for transceivers comprised of integrated circuits and including RF front-end components. As another example, U.S. Patent No. 8,062,919 discloses a monolithic silicon-based photonic receiver, including the manufacture of an integrated circuit utilizing multiple components.

### B. Materials Considered

20. As part of my preparation for writing this declaration, I reviewed the '557, '018, and '231 patents, their prosecution histories, and the parties' proposed constructions.

## III. LEGAL STANDARD FOR CLAIM CONSTRUCTION

21. I have the following understanding of the applicable law based on my discussions with various counsel in my past experience and with counsel here.

### A. Claim Construction

22. I understand that the words of a claim are generally given the ordinary and customary meaning that the term would have to a POSITA at the time of the invention (as defined below).

23. I understand that both "intrinsic evidence" and "extrinsic evidence" may be considered in construing the meaning of claim terms.

24. I understand that "intrinsic evidence" is the most important evidence when construing claim terms and includes the claims, specification, and prosecution history. I understand that the starting point for the claim construction analysis is the actual language of the claims. I understand that the claims must be read in the context of the entire patent, including the specification, because the specification is the best source for understanding a technical term in a patent claim. I understand that claims should be construed so as to give meaning to all claim terms,

i.e., to avoid interpretations that render terms superfluous or read out limitations. I further understand that the prosecution history is also relevant to the claim construction analysis because it may provide evidence of how the applicant and the United States Patent and Trademark Office understood the scope of the claims, and how the terms would be understood by a POSITA.

25. I understand that "extrinsic evidence" may also be considered in construing claim terms, but that such evidence is given less weight than the intrinsic evidence. I understand that extrinsic evidence includes dictionaries, treatises, and expert testimony such as mine.

**B. Indefiniteness**

26. I understand that the standard for indefiniteness is whether a POSITA would understand what is claimed when the claim is read in light of the specification and prosecution history. A claim is indefinite if, viewed in light of the specification and prosecution history, it fails to inform one skilled in the art about the scope of the invention with "reasonable certainty." The definiteness requirement must take into account the inherent limitations of language; reasonable certainty in light of the subject matter, and not absolute precision, is required.

27. I understand that a patent must be precise enough to afford clear notice of what is claimed and apprise the public of what subject matter is still open to them in a manner that avoids a zone of uncertainty. I am informed that a claim does not provide clear notice of its scope if a claim term may be reasonably interpreted to refer to multiple different methods, which provide different results, and the intrinsic evidence offers no guidance regarding which method should be used.

28. I understand that indefiniteness is an invalidity defense, and that the defendant or accused infringer bears the burden to demonstrate a term is indefinite by clear and convincing evidence.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

29. I understand that terms in the Asserted Patents must be read as they would have been understood by a POSITA at the time of the invention.

30. I have also been advised that a POSITA is a hypothetical person to whom the claimed subject matter pertain with the capability of understanding the scientific and engineering principles applicable to the pertinent art. I understand that the following factors may be considered in determining the level of ordinary skill: type of problems encountered in the art; prior art solutions to those problems; speed with which innovations are made; sophistication of the technology; and educational level of active workers in the field. I also understand that not every factor may be present and that one or more factors may predominate.

31. In my opinion, a POSITA would have had (*i*) at least a master's degree in electrical engineering, computer engineering, physics, or a related field; and (*ii*) at least two years of experience in the field of integrated circuits and/or memory devices. Additional education could substitute for work experience, and vice versa. In view of my education and experience, I exceeded this definition by the priority dates of the Asserted Patents.

## V. OVERVIEW OF THE PATENT SPECIFICATIONS

### A. The '557 and '018 patents

32. The '557 and '018 patents share a common specification. For simplicity, this section cites to the '557 patent specification, although the '018 patent contains the same disclosures.

33. The '557 and '018 patents are directed to a two-row booster circuit comprising at least one boosting cell stage and an analog comparison circuit that outputs a well bias potential that is applied to a deep N-well. '557 patent, Abstract. Each boosting cell stage comprises two boosting cells: one boosting cell for the top row and a separate boosting cell for the second row.

*Id.* at 7:12-13. Each boosting cell utilizes a switching element and a capacitor to respectively transmit and store charges as part of the voltage amplification process. *Id.* at 1:21-41, 7:47-54. The boosting cells further utilize a deep N-well for the switching elements. *Id.* at 1:30-41. An analog comparison circuit is used to compare the voltages of the boosting cell of the first and second rows, and to apply either the higher or lower of the two voltages to the deep N-well of the boosting cells. *Id.* at 7:54-8:11, 8:19-42. These elements are highlighted in Figure 1 of the '557 patent shown below. *Id.*, Fig. 1.

FIG. 1




## B. The '231 Patent

34. The '231 patent is directed to an internal voltage generating circuit that supplies boosted voltage for chips such as non-volatile semiconductor memory devices. '231 patent at 1:14-23. The internal voltage generating circuit includes two

boost circuits, each of which includes a charge pump circuit, shown in red and blue annotations below, respectively. *See id.* at 5:35-41. The first boost circuit receives a power source voltage VDD as an input and generates first boosted voltage VPUMP1. *See id.* at 2:24-28. "[A] second charge pump circuit [] receives the first boosted voltage VPUMP1 of the first boost circuit 901 as an input voltage and generates the second boosted voltage VPUMP2." *Id.* at 5:55-59. The power source voltage VDD, first boosted voltage VPUMP1, and second boosted voltage VPUMP2 are labeled in green below as the "first voltage," "second voltage," and "third voltage," respectively, in accordance with claim 3 of the '231 Patent.



## VI. THE ’557 PATENT

### A. “switching elements having the same potential of” (claims 10, 11)

35. In my opinion, a POSITA would not have been able to ascertain the meaning of the phrase “switching elements having the same potential of” with reasonable certainty. The phrase “switching elements having the same potential of” is not a commonly known phrase in the art, and neither the claims nor the specification provide any guidance as to its scope.

36. As a threshold matter, a “switching element” in the context of the ’557 patent would have been understood to be a transistor-based device, such as an NMOS transistor. Such a device is not a single-node component; rather, it is a multi-terminal semiconductor structure comprising at least four electrically distinct terminals, including a source, a drain, a gate, and a body or well (sometimes referred to as a “base”). ’557 patent at 9:60 (“. . . the gates of the transistors 126 and 127 . . .”); 10:39-42 (“[T]he P well of the Nch transistor . . . is connected to the N well, the potential of the P well is supplied by switching the potentials of the drain and the source.”); Fig. 1 (labelling the source “S,” drain “D,” P-well “PW,” and deep N-well “NT”). Each of these terminals may be, and in typical operation is, at a different electric potential. Because of this, a POSITA would understand that a switching element does not inherently possess a single, unitary potential attributable to the entire switching element.

37. The claim language, however, does not identify which terminal or region of the switching element is required to have “the same potential” as the first well region. It is unclear whether the claim refers to the source potential, the drain potential, the gate potential, the body or well potential, or some combination of those nodes. Nor does the claim explain whether the phrase “having the same potential of” requires a direct electrical connection, a transient condition, or a steady-state condition. Without such clarification, the phrase is ambiguous in multiple, materially different ways.

38. This ambiguity is particularly problematic in the context of the ’557 patent’s two-row booster circuit architecture, where different nodes within a boosting cell—including the transistor terminals (*i.e.*, source, drain, gate, and body)—are intentionally driven to different voltages as part of normal operation. In such circuits, it is common for the source, drain, and gate of a transistor to be at different potentials that vary dynamically during the pumping operation. Against this technical backdrop, a POSITA would not reasonably infer that an entire “switching element” could meaningfully be described as “having” a single potential without further explanation.

39. The intrinsic record does not resolve this ambiguity. The specification does not describe a switching element as having a single potential, and does not identify any specific transistor terminal whose potential is intended to correspond to the “first well region.” Likewise, the specification does not explain how or why a switching element’s potential, however defined, would need to be the same as the potential of the first well region, nor does it describe any structural or electrical relationship that would clarify this requirement. The figures similarly fail to label or annotate transistor terminals in a way that would inform a POSITA how to interpret the phrase.

40. As a result, a POSITA is left to speculate as to the scope of the ’557 patent’s claims 10 and 11: whether it requires the bodies of the multiple switching elements to be tied to a common well, whether it requires certain transistor terminals to be biased at a particular voltage, or whether it imposes some other, unstated electrical constraint. It is my opinion that the phrase “switching elements having the same potential of” is indefinite because the claim language of claims 10 and 11, read in light of the specification, fails to inform a POSITA with reasonable certainty what it means for “switching elements” to “have the same potential of the first well region.”

**B. "share a common first well region" (claim 12)**

41. The claim phrase "share a common first well region" in claim 12 is indefinite because it fails to inform a POSITA with reasonable certainty which "first well region" is shared and by which circuit elements.

42. Claim 12 recites two parallel limitations. The first states that "the at least one switching circuit of the boosting cell on the i-th stage of the first boosting cell row and a first element of the at least one analog comparison circuit share a common first well region." The second states that "the at least one switching circuit of the boosting cell on the i-th stage of the second boosting cell row and a second element of the at least one analog comparison circuit share a common first well region." Although each limitation uses identical language—"share a common first well region"—the claim does not specify whether these two limitations refer to the same well region or to two different well regions.

43. As written, the claim is susceptible to multiple, mutually exclusive interpretations. Under one reading, the "common first well region" referenced in both limitations is a single, shared well region common to components associated with both the first and second boosting cell rows. Under another reading, each boosting cell row has its own separate "common first well region," such that the "common" sharing occurs only within each row and its corresponding analog comparison circuit element, and not across rows. The claim language does not resolve which interpretation is correct, nor does it provide any structural or electrical distinction that would allow a POSITA to determine whether the "first well region" is common to both rows or is instead row-specific.

44. This ambiguity is significant in the context of integrated circuit design. Whether circuit components from different rows share the same physical well region or are instead isolated in separate wells affects layout, latch-up behavior, circuit behavior, and circuit fabrication. A

POSITA would therefore expect the language of claim 12 to clearly indicate whether the well region is shared globally or only locally within each boosting cell row. The phrase "share a common first well region," however, does not provide that clarity.

45. The specification does not resolve this ambiguity. While it defines what a "first well region" is, it does not explain whether that well region is intended to be a single physical region shared across both boosting cell rows or whether two instances of such a region may exist—one for the first boosting cell row and another for the second boosting cell row. The figures likewise do not provide clarity because they illustrate arrangements in which the same first well region is used for both boosting cell rows or separately for each boosting cell row. *Compare* '557 patent, Figs. 15-19 (first well regions shared by both boosting cell rows) *with id.*, Figs. 20, 21, 24 (separate first well region for each boosting cell row).







46. For the reasons above, it is my opinion that the phrase "share a common first well region" is indefinite because the claim language of claim 12, read in light of the specification, fails

to inform a POSITA with reasonable certainty whether the "common first well region" is shared globally across both boosting cell rows or separately within each row.

**C. "switching circuit" (claim 12)**

47. The term "switching circuit," as used in claim 12, is indefinite because the intrinsic record fails to inform a POSITA with reasonable certainty what structure is encompassed by that term, particularly in light of the '557 patent's inconsistent use of the distinct term "switching element" in claims 1, 2, 7, 8, 10, 11, 13, and 14.

48. Throughout the '557 patent, the claims consistently refer to a "switching element" when describing the transistor-based components (*e.g.*, NMOS and PMOS switches) used within the boosting cells and analog comparison circuit. Claim 12 departs from that usage and instead recites a "switching circuit" without explanation or definition. Nothing in the claims indicates that a "switching circuit" is synonymous with a "switching element," and the '557 patent nowhere else uses the term "switching circuit" other than the single instance where it parrots the limitations of claim 12 ('557 patent at 4:54-61). This unexplained change in terminology creates ambiguity as to whether claim 12 is referring to the same structure described elsewhere as a "switching element" or to a different circuitry.

49. The specification does not define "switching circuit," does not describe its constituent components, and does not explain how a "switching circuit" differs from (or relates to) the "switching element" recited elsewhere in the claims. As a result, a POSITA is left to speculate whether claim 12 merely uses different words to describe the same structure, or whether it instead expands or alters the scope of the claimed invention.

50. For example, a POSITA may have speculated that a "switching circuit" refers to a collection of components arranged to perform a switching function, potentially including multiple transistors and control logic, in contrast to a "switching element" which refers to a single device

(*e.g.*, a transistor) that performs a switching function. *See, e.g.*, '557 patent at 8:19-38. Indeed, the figures in the specification depict an embodiment in which a single transistor 906 performs switching as well as an embodiment in which there are multiple components (*e.g.*, 860, 861, and 862) in lieu of the transistor 906. *Compare* '557 patent, Fig. 1 *with id*., Fig. 9. A POSITA, however, would not be able to reasonably ascertain that such a difference is what was intended by the patentee because the written description never uses the term "switching circuit" to describe the latter embodiment. Further, such an interpretation would conflict with another potential interpretation in which "switching circuit" is a typographical error for what should have been a "switching element."

51. This ambiguity is particularly problematic because claim 12 imposes specific structural requirements on the "switching circuit," including that it "share a common first well region" with elements of the analog comparison circuit. Without knowing whether the "switching circuit" is a single transistor, a group of transistor, or some other collection of components, a POSITA cannot determine which physical structures are required to reside in or share the claimed first well region.

52. For the reasons above, it is my opinion that the term "switching circuit" is indefinite because the '557 patent uses the term "switching circuit" in claim 12 without defining it, without explaining how it relates to the "switching element" used throughout the other claims, and without providing any guidance in the specification that would allow a POSITA to determine its scope with reasonable certainty.

## VII. THE ’018 PATENT

### A. “the at least one boosting cell of the first . . . boosting cell row[]” and “the at least one boosting cell of the . . . second boosting cell row[]” (claim 1)

53. It is my opinion that a POSITA would understand the phrase “the at least one boosting cell of the first . . . boosting cell row[]” to mean “the boosting cell on the i-th stage of the first boosting cell row,” as opposed to any arbitrary or unspecified boosting cell within the first row. It is also my opinion that a POSITA would understand the phrase “the at least one boosting cell of the . . . second boosting cell row[]” to mean “the boosting cell on the i-th stage of the second boosting cell row,” as opposed to any arbitrary or unspecified boosting cell within the second row. This understanding follows directly from the claim language and the technical operation described in the ’018 patent.

54. Claim 1 expressly defines the operation of the analog comparison circuit in terms of stage-specific inputs. The claim recites that the analog comparison circuit outputs a well bias potential “generated by an input potential of the boosting cell on the i-th stage (1≦i≦N) of the first boosting cell row and an input potential of the boosting cell on the i-th stage (1≦i≦M) of the second boosting cell row.” The claim does not describe a generic comparison between any boosting cells in each of the two rows. Instead, it requires a comparison between corresponding boosting cells at the same stage index “i” in the two rows. When the claim later refers to “the at least one bosting cell of the first and second boosting cell rows” to which the well bias potential generated by the analog comparison circuit is applied, a POSITA would understand that phrase as referring back to the same boosting cells already identified by stage index “i”. In other words, “the at least one boosting cell” is not an open-ended reference to any boosting cell in the row, but a definite reference to the boosting cell previously specified as being “on the i-th stage.”

55. From a technical perspective, the claimed analog comparison circuit operates on a stage-by-stage basis, comparing the input potentials of corresponding boosting cells in the two rows and selecting either the higher or lower voltage to apply as a well bias potential. All embodiments described in the specification teach the analog comparison circuit comparing the potentials of the first and second rows from the same i-th stage (*i.e.*, operating on a stage-by-stage basis). *See, e.g.*, '018 patent at 8:27-31 ("[I]n the low-voltage output analog comparison circuit 117, the Nch transistor 120 is switched ON and the Nch transistor 121 is switched OFF due to a relationship in potential between the boosted I/O terminal 114 [*i.e.*, node on the second boosting cell row] and the non-boosted I/O terminal 111 [*i.e.*, node on the first boosting cell row associated with the same stage as node 114]."). Moreover, every one of the figures illustrates an **analog comparison circuit** comparing the potentials of the **first** and **second** rows from the same i-th stage, an example of which is shown below in Figure 13. *See, e.g.*, Fig. 13.

FIG. 13



56. A POSITA would therefore understand that the well bias potential output by the analog comparison circuit is applied to the switching elements in the boosting cell on that same i-th stage of each row. Moreover, the ’018 patent already includes a separate claim that expressly covers the application of a well bias potential to boosting cell stages other than the i-th stage. Specifically, claim 8 recites “the at least one analog comparison circuit is provided for arbitrary number of boosting cell stages in the first boosting cell row and the second boosting cell row” (*i.e.*, an analog comparison circuit whose well bias potential is applied to different boosting cell stages). This demonstrates that when the patentee intended to claim cross-stage biasing, it did so explicitly. This supports the understanding that claim 1 is limited to application of the well bias potential to the boosting cell on the i-th stage.

57. For the reasons above, it is my opinion that a POSITA would understand that the reference to “the at least one boosting cell of the first and second boosting cell rows” is anchored to the previously defined i-th stage and not any arbitrary boosting cell within the two rows. It is therefore my opinion that the claim phrases “the at least one boosting cell of the first . . . boosting cell row[]” and “the at least one boosting cell of the . . . second boosting cell row[]” would be understood by a POSITA to mean “the boosting cell on the i-th stage of the first boosting cell row” and “the boosting cell on the i-th stage of the second boosting cell row,” respectively.

**B. “share a common first well region” (claim 10)**

58. The claim phrase “share a common first well region” in claim 10 is indefinite because it fails to inform a POSITA with reasonable certainty which “first well region” is shared and by which circuit elements.

59. Claim 10 recites two parallel limitations. The first states that “the at least one switching element of the boosting cell on the i-th stage of the first boosting cell row and a first element of the at least one analog comparison circuit share a common first well region.” The

second states that "the at least one switching element of the boosting cell on the i-th stage of the second boosting cell row and a second element of the at least one analog comparison circuit share a common first well region." Although each limitation uses identical language—"share a common first well region"—the claim does not specify whether these two limitations refer to the same well region or to two different well regions.

60. As written, the claim is susceptible to multiple, mutually exclusive interpretations. Under one reading, the "common first well region" referenced in both limitations is a single, shared well region common to elements associated with both the first and second boosting cell rows. Under another reading, each boosting cell row has its own separate "common first well region," such that the "common" sharing occurs only within each row and its corresponding analog comparison circuit element, and not across rows. The claim language does not resolve which interpretation is correct, nor does it provide any structural or electrical distinction that would allow a POSITA to determine whether the "first well region" is common to both rows or is instead row-specific.

61. This ambiguity is significant in the context of integrated circuit design. Whether circuit elements from different rows share the same physical well region or are instead isolated in separate wells affects layout, latch-up behavior, circuit behavior, and circuit fabrication. A POSITA would therefore expect the language of claim 10 to plainly indicate whether the well region is shared globally or only locally within each boosting cell row. The phrase "share a common first well region," however, does not provide that clarity.

62. The specification does not resolve this ambiguity. While it defines what a "first well region" is, it does not explain whether that well region is intended to be a single physical region shared across both boosting cell rows or whether two instances of such a region may exist—

one for the first boosting cell row and another for the second boosting cell row. The figures likewise do not provide the necessary clarity because they illustrate arrangements in which the same first well region is used for both boosting cell rows or separately for each boosting cell row. *Compare* '018 patent, Figs. 15-19 (first well regions shared by both boosting cell rows) *with id.*, Figs. 20, 21, 24 (separate first well region for each boosting cell row).




63. For the reasons above, it is my opinion that the phrase "share a common first well region" is indefinite because the claim language of claim 10, read in light of the specification, fails to inform a POSITA with reasonable certainty whether the "common first well region" is shared globally across both boosting cell rows or separately within each row.

## VIII. THE '231 PATENT

### A. "charge pump circuit" (claim 3)

64. I understand that both AMT and SK hynix proposed a construction for the term "charge pump circuit," which appears in independent claim 3 of the '231 Patent. In my opinion,

a "charge pump circuit" as used in the '231 Patent is "a circuit that provides a boosted voltage at an output node of the internal voltage generating circuit."

65. Claim 3 of the '231 Patent recites:

> 3. An internal voltage generating circuit comprising:
>
> a first **charge pump circuit** configured to generate a second voltage from a first voltage;
>
> a second **charge pump circuit** configured to generate a third voltage from the second voltage;
>
> a frequency dividing circuit configured to divide a first clock signal to generate a second clock signal; and
>
> a buffer circuit configured to select the first clock signal or the second clock signal and generate a third clock signal,
>
> wherein the third clock signal is supplied to the second charge pump circuit.

66. Based on the claim language above, each charge pump circuit is configured to *output* a voltage (*e.g.*, a "second voltage" or a "third voltage"). A person of ordinary skill in the art would readily appreciate that the *output* voltages are provided at *output nodes* of the internal voltage generating circuit because the output voltages are used to drive different circuit operations outside of the internal voltage generating circuit, such as read or write operations of flash memories. *See, e.g.*, '231 patent at 1:16-24. For example, Figure 1 of the '231 Patent illustrates a representative internal voltage generating circuit that includes two such charge pump circuits 906 and 104, shown in red and blue annotations below, respectively.




67. The first charge pump circuit (annotated in red) provides the "second voltage" VPUMP1 at output node N1 of the internal voltage generating circuit, and the second charge pump circuit (annotated in blue) provides the "third voltage" VPUMP2 at output node N2 of the internal voltage generating circuit. The '231 patent specification consistently identifies N1 and N2 as "output node[s]" of the internal voltage generating circuit.[1] The arrows at VPUMP1 and VPUMP2 also indicate that these output voltages of the charge pump circuits are intended to drive circuit operations at the output of the internal voltage generating circuit 100.

---

[1] *See, e.g.*, '231 patent at 1:30-31 ("… output a first boosted voltage VPUMP1 through a first **output node N1** …"), 1:33-35 (" … output a second boosted voltage VPUMP2 through a second **output node N2** …"). *See also id.* at 1:47-48, 1:59-60, 2:12-13, 2:49-50, 2:59-60, 3:4-5, 3:9-10, 3:24-25, 3:50-67, 5:41-45, 6:54-55, 7:9-11, 7:20-22, 7:36-42, 7:46-56, 8:40-42, 8:45-50.

68. Further, each charge pump circuit is part of a "boost circuit"[2] that "performs boost operation," and the '231 patent specification identifies VPUMP1 and VPUMP2 as "boosted voltage[]"[3] at each output node N1 and N2, respectively. Therefore, in the aggregate, the claimed "charge pump circuit" in the '231 Patent refers to a circuit that provides a boosted voltage (*e.g.*, VPUMP1 or VPUMP2) at an output node (*e.g.*, N1 or N2) of the internal voltage generating circuit.

69. The '231 Patent consistently defines "charge pump circuit" in this manner, and in fact there is no embodiment of a charge pump circuit that does not provide a boosted voltage at an output node of the internal voltage generating circuit. For example, in the prior art internal voltage generating circuit in Figure 9,[4] each of the charge pump circuits provides a *boosted voltage* (e.g., VPUMP1 and VPUMP2) at an *output node* (e.g., N1 or N2) of the internal voltage generating circuit. The same is true for the internal voltage generating circuit in Figure 6.

70. Figure 4 shows the structure of the "second charge pump circuit 104" of the internal voltage generating circuit shown in Figure 1.[5] Here, the '231 Patent again makes clear "the second charge pump circuit 104 receives the first *boosted voltage* VPUMP1 of a first charge pump circuit 906 as an input voltage and generates the second *boosted voltage* VPUMP2 which has a

---

[2] *See* '231 patent at 5:37-41 ("The internal voltage generating circuit 100 includes a **first boost circuit 901** which is driven in accordance with a first control signal PPE1, and a **second boost circuit 101** which is driven in accordance with a second control signal PPE2. ").

[3] *See* '231 Patent at 1:45-46 ("a first charge pump circuit 906 which performs **boost operation** in synchronization with the first boost clock signals … "); 1:56-58 ("a second charge pump circuit 909 which performs **boost operation** in synchronization with the second boost clock signals …"); 2:24-28 ("the first and second charge pump circuits 906 and 909 receive a power source voltage VDD through first and second input terminals NIN1 and NIN2 and generate the first and second **boosted voltages** VPUMP1 and VPUMP2, respectively.").

[4] *See* '231 Patent at 1:25-27 ("FIG. 9 shows a configuration of an internal voltage generating circuit 900 which is disclosed in U.S. Pat. No. 5,999,475.").

[5] Similar structures are also shown in Figs. 10-11, which are prior art charge pumps of the internal voltage generating circuit shown in Fig. 9. This further confirms that the charge pumps of Fig. 1 and Fig. 9 have similar structures and functions.

higher voltage level than that of the first boosted voltage VPUMP1." *See* '231 Patent at 6:28-33. This disclosure further confirms that what is generated by a charge pump circuit is a "boosted voltage" (e.g., VPUMP2).

FIG. 4




71. The above understanding is also consistent with various industry dictionaries and publications. For example, the IEEE Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) defines a "charge pump" as follows:

> **charge pump** Circuitry that is used to create an on-chip voltage that is greater in magnitude than the voltage available from the device power supply. This voltage is typically used for the write operation. (ED) 1005-1998

SKH_00072218 at 72223.

72. The IEEE's definition confirms that a charge pump circuit provides a *boosted* voltage, namely, a voltage "that is greater in magnitude than the voltage available from the device power supply." The IEEE's definition also confirms that the boosted voltage is provided at an *output node* of the internal voltage generator circuit by clarifying that the voltage "is typically used to provide power for the write operation," consistent with the disclosure of the '231 patent itself. *See, e.g.*, '231 patent at 1:16-24. A POSITA would have understood that, to supply a voltage used for a write operation, a charge pump circuit must generate the voltage at an output node of the

internal voltage generating circuit, as opposed to a node internal to the internal voltage generating circuit.

73. I understand that AMT's proposed definition for the term "charge pump circuit" is "a DC-DC converter controlled by at least one clock signal consisting of at least one capacitor and at least one switch network." In my opinion, this proposed definition suffers from several issues.

74. *First*, AMT's construction includes all DC-DC converters, including both boost and buck converters. A boost converter outputs a voltage higher than the input voltage, whereas a buck converter outputs a voltage lower than the input voltage. A "charge pump circuit," however, is a type of a boost converter that outputs a voltage that is pumped to a voltage higher than the input voltage. The '231 patent is also directed only to a boost converter: each charge pump circuit shown in the '231 Patent *boosts* the input voltage (*see, e.g.*, '231 Patent at Figs. 4, 10, and 11), and there is no discussion of a buck converter. Indeed, AMT's proposed construction is undermined by AMT's own extrinsic record. In a book chapter submitted by AMT in this case, "Chapter 6 – Boost Converters" of *Power Supplies for LED Driving* (2d ed. 2017), the author defines "charge pump" as a circuit that is "used to ***raise*** the output voltage ***above*** the supply voltage." AMT_SKH00001380 at 1381. As such, a POSITA would not have understood the term "charge pump circuit," whether or not viewed in light of the intrinsic record, to encompass a generic "DC-DC converter."

### *6.1 Charge Pump Boost Converters*

Low-power boost converters can use a charge pump instead of an inductor. A charge pump has many capacitors and switches, which are used to raise the output voltage above the supply voltage. This works by charging a capacitor from the supply voltage and then rearranging the switches so that this charge is moved to the next capacitor in line. This process repeats many times until the last capacitor in the chain is charged. A high-output voltage is achieved, which supplies current for the LED load. Fig. 6.1 shows a simple charge pump with 1.5 times boost ratio.

75. *Second*, AMT's construction suggests that a *single* clock signal could control the charge pump circuit, whereas the charge pump circuits of the '231 Patent are all controlled by *two or more* clock signals. In particular, Figures 4, 10, and 11 are the only embodiments of charge pump circuits discussed in the '231 patent, and each is controlled by a pair of two clock signals.

FIG. 4




FIG. 10
PRIOR ART




FIG. 11
PRIOR ART




As a person of ordinary skill in the art would have understood, the charge pump circuits in the '231 patent cannot be driven by a single clock signal. For example, if a single clock signal is used to drive the charge pump circuit in Figure 4, the output voltage VPUMP2 would, at best, be VPUMP1 minus the voltage drops created by transistors Tc1, Tc2, and Tc3. That would contradict the express disclosures in the '231 patent that "the second boosted voltage VPUMP2 which has a *higher* voltage level than that of the first boosted voltage VPUMP1." '231 patent at 6:31-33. As a further example, the internal voltage generating circuit discussed in the '231 patent all specified that at least two clock signals are used to drive each charge pump circuit, not a single clock signal.




AMT's proposed construction that permits a *single* clock signal is thus directly at odds with the express teachings in the '231 Patent specification.

76. *Third*, AMT's construction injects ambiguity by requiring that a "charge pump circuit" include "at least one switch network." The term "switch network" does not appear in the '231 Patent. It introduces a host of uncertainties in the scope of the claim term, such as the type of circuitry that is considered a switch, whether the word "network" requires any level of interconnectedness, and whether a single switch can be a switch network. No such ambiguity is necessary to define a "charge pump circuit."

## IX. CONCLUSION

77. This declaration and my opinions herein are made to the best of my knowledge and understanding, and based on the material available to me, at the time of signing this declaration. I reserve the right to amend or supplement my opinions based on new information, including any claim construction arguments or expert opinions that AMT offers in this case and/or any other

information I deem relevant to my analysis. I declare under penalty of perjury that the foregoing is true and correct.

DATED: January 16, 2026

Respectfully submitted,

A. Apsel

Alyssa Apsel, Ph.D.