# EXHIBIT M

**In the Matter Of:**

*Advanced Memory Technologies, LLC vs*

*SK Hynix Inc.*

---

*MARWAN HASSOUN*

*February 13, 2025*

---

LEXITAS™

Volume: 1
Pages: 1-127
Exhibits: 1-3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

- - - - - - - - - - - - - - - - - - - x
ADVANCED MEMORY TECHNOLOGIES, LLC
Plaintiff,

v. Civil Action No. 2:24-CV-1078-JRG-RSP

SK HYNIX INC,
Defendant.
- - - - - - - - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION of MARWAN HASSOUN
Friday, February 13, 2025 - 9:37 AM
Quinn Emanuel Urquhart & Sullivan
111 Huntington Avenue
Boston, Massachusetts

Court Reporter: Katherine A. Tevnan, CSR #129093
Registered Merit Reporter



APPEARANCES:

ON BEHALF OF PLAINTIFF:
ANDREW NASSAR, ESQ.
SUSMAN GODFREY, LLP
One Manhattan West
New York, New York 10001
anassar@susmangodfrey.com.

ON BEHALF OF DEFENDANT:
BRIAN SAUNDERS, ESQ.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street, NW, Suite 600
Washington, DC 20004
briansaunders@quinnemanuel.com

ALSO PRESENT:
Craig Fear, Videographer
Robert Saurez, Zoom monitor



I N D E X


| Deposition of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MARWAN HASSOUN | | | | |
| By Mr. Nassar | | | | |


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Expert Declaration of Marwan Hassoun, PhD in Support of Defendant's Claim Construction for US Patent No. 8,400,835 | 12 |
| Exhibit 2 | Declaration of Sunil P. Khatri in Support of Patent Owner's Preliminary Response on the Merits and others Non-discretionary Considerations | 19 |
| Exhibit 3 | US Patent No. 8,400,835 | 41 |


** Documents quoted on the record are transcribed as read.



P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We are now on the record. My name is Craig Fear. I'm the videographer retained by Lexitas.

This is a video deposition for the U.S. District Court for the Eastern District of Texas, Marshall Division, Case No. 2 -- 2024-CV-01078-JRG-RSP.

Today's date is February 13th, 2026, and the video time is 9:37 a.m. This deposition is being held at the offices of Quinn Emanuel at 111 Huntington Avenue, Suite 520, in Boston, Massachusetts, in the matter of Advanced Memory Technologies, LLC, versus SK Hynix Inc. The deponent today is Marwan Hassoun.

Will counsel please voice identify themselves, beginning with the taking attorney.

MR. NASSAR: Good morning. Andrew Nassar from Susman Godfrey for Plaintiff.

MR. SAUNDERS: Good morning. Brian Saunders from Quinn Emanuel on behalf of Defendant SK Hynix Inc. and on behalf of the witness, Dr. Marwan Hassoun.

THE VIDEOGRAPHER: The court reporter today is Kathy Tevnan and will now swear in the witness.

MARWAN HASSOUN

a witness called for examination by counsel for the Plaintiff, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NASSAR:

Q. Good morning, Dr. Hassoun.
**A. Good morning.**
Q. My name's Andrew Nassar. I represent the plaintiff, which I will sometimes refer to as AMT, but probably I won't refer to them much.
Could you please state your full name for the record?
**A. Marwan Hassoun.**
Q. Have you ever been deposed before?
**A. I have.**
Q. How many times have you been deposed?
**A. I'm not exactly sure, but between 15 and 20 times.**



Q. And have you -- have you been deposed as an expert witness only?
**A. I believe so, yes.**
Q. And you understand that you are testifying under oath today, correct?
**A. I do.**
Q. Is there any reason why you can't give full and accurate testimony today?
**A. No.**
Q. If I ask a question and you don't understand it because it's unclear or I've used the wrong technology or anything, do you agree to ask me to clarify the question?
**A. I do.**
Q. And since you've been deposed many times before, I don't need to go over all of the ground rules, but I will say that I'll try to take a break about once every hour. If you need a break sooner than that, just let me know. And let's try not to speak over one another. I will try my best as well. I can be guilty of that.
Does that sound okay to you?
**A. It's sounds okay. I'll give it my best shot.**



Q. Me too.
In the other cases in which you've been deposed, have they all been patent infringement cases?
**A. No.**
Q. What kinds of cases have they been?
**A. I've testified on trade secret cases. I've testified in a contract arbitration case. And I believe one was a bankruptcy case, but the testimony was about the technology involved in the bankruptcy.**
Q. Have you ever testified on behalf of SK Hynix?
**A. No.**
Q. Have you ever testified for purposes of a claim construction proceeding in a patent infringement case?
**A. I've written declarations, but I don't recall ever being deposed on the -- on a claim construction declaration.**
Q. Approximately how many claim construction decorations have you prepared?
**A. I really haven't counted, paid attention to those. Maybe five or six, but I'm not really**



**sure without going through the CV and checking.**
Q. When were you first retained by SK Hynix for this matter?
**A. I want to say -- I mean, it was last year, so maybe last summer. But I -- without going and looking at my records, I really don't have an exact date. But about six months maybe.**
Q. Okay. And what is the scope of your engagement?
MR. SAUNDERS: I would just caution the witness, to the extent, you know, the answer to the question encroaches on attorney-client privilege and anything you've been asked to do by lawyers, I'd advise you just to take that into account when you answer. But otherwise you can answer the question.
**A. So specifically, I was asked to write a declaration regarding the claim construction for the patents. I was also asked to look at some material, study the patents, and potentially serve as a testifying expert.**
Q. Are you aware that there are seven patents -- excuse me, not seven patents. There's more than one patent asserted in this lawsuit,

9

correct?
**A. I think I am. I've been asked to look at more than one patent, so I assume there's more than one involved.**
Q. Other than serve as an expert witness in cases like this, do you have any other employment activities?
**A. Sadly, yes. Too many. But yes, I have two employment positions. One, I'm the director of partnerships at the Massachusetts Institute of Technology, MIT. And I also am the president of Intellectual Inspiration, which my consulting for patent cases falls under that, but the firm does some consulting that's not strictly expert witnessing.**
Q. Are you also affiliated with a group called Green Semiconductor?
**A. Yes. That's the same as Intellectual Inspiration. It's Green Semiconductor Inc. d/b/a Intellectual Inspiration, so it's the same -- it's the same entity.**
**Initially, I think incorporated that in 2008, which was a bad year to do semiconductors, and the company eventually morphed into more of consulting rather than building chips. So that's the name -- or the d/b/a.**

10

Q. You're being compensated in this case, correct?
**A. Yes.**
Q. Does your compensation depend on the outcome of the case?
**A. No.**
Q. You are being compensated hourly?
**A. That is correct.**
Q. Did you prepare in any way for your deposition today?
**A. I did.**
Q. What did you do to prepare?
**A. So I read the '835 patent. I also read my declaration. I've looked at some of the references that I referenced in my declaration. I did meet with a couple of the Quinn attorneys. I think -- that's what I remember doing.**
Q. Who were the Quinn attorneys with whom you met?
**A. I met with Kevin Jang and Brian Saunders.**
Q. And other than those documents you identified and meeting with a few lawyers, did you do anything else to prepare for the deposition?

11

**A. Not that I recall.**
Q. About how much time did you spend preparing for the deposition?
**A. I'm not sure, but I would say 10 to 15 hours over the last four days.**
Q. Do you know someone named Alyssa Apsel?
**A. The name sounds familiar, but -- it does sound familiar. She might be one of the experts. But I -- no, I can't place exactly what she did.**
Q. Do you know if she's an expert in this litigation?
**A. I'm not quite sure. A lot of names have been thrown out, but I'm not sure.**
Q. So you haven't reviewed any declaration prepared by Dr. Apsel in this case?
**A. Is -- well, if she's the one that wrote that IPR declaration for the '835, then I did take a look at that IPR document.**
Q. Did you review any other expert declarations other than that IPR declaration?
**A. I don't believe so.**
Q. Is the individual who prepared the IPR report named Dr. Khatri?

12

**A. I heard that name as well. I'm not really good with conjuring up names, so it might be. If you show me the document, I can tell you if that's the document I looked at.**
Q. So I -- just to be clear, you reviewed the -- you reviewed an expert declaration from the IPR proceedings, but you don't remember the name of the expert who wrote that declaration; is that fair?
**A. That is fair.**
Q. And you didn't review any declarations relating to claim construction in this district court case, correct?
MR. SAUNDERS: Object to the form of the question.
**A. I don't recall seeing a claim construction declaration, no.**
Q. You submitted a declaration in this case, correct?
**A. I did.**
Q. I'm going to hand you now a copy of what should be marked as Exhibit 1.
(Exhibit 1, Expert Declaration of Marwan

Hassoun, PhD in Support of Defendant's Claim Construction for US Patent No. 8,400,835, marked for identification.)
Q. Do you recognize the document I've provided?
**A. Yes.**
Q. Is this the declaration you've prepared for this case?
**A. That is correct.**
Q. If you turn to the last page -- excuse me, not the last page, page 16, do you see your signature on that page?
**A. I do.**
Q. Approximately how many hours did you spend preparing this declaration?
**A. Hard -- hard to pin that down. Over the last six months, there's -- there have been discussions, you know, about the patents. So -- so I -- it's really hard to give you a -- the number of hours, unless -- I mean, are you asking specifically about the writing of the declaration, the drafting of the declaration?**
Q. Well, how much time did you spend before putting pen to paper on this declaration,



preparing for it?
MR. SAUNDERS: Object to the form of the question.
**A. I -- again, it's hard to say. As I said, I've been retained a few months ago, and there were discussions, you know, about claim terms I'm sure during that period. So I really couldn't give you a -- with any accuracy, a time on that.**
Q. How much time did you spend writing this declaration, are you able to answer that?
**A. Yeah. I think I can estimate that. Maybe 15 to 20 hours, thereabouts, you know, the pen-to-paper process.**
Q. Was anyone else involved in your preparation of this declaration?
**A. Yes. I worked with the attorneys from Quinn on -- they helped with the preparation of this document.**
Q. Other than the attorneys, did anyone else help in the preparation of this document?
**A. No.**
Q. Did you exchange multiple drafts before finalizing this declaration?
**A. Most definitely, yes.**



Q. This declaration relates to Patent 8,400,835, correct?
**A. That is correct.**
Q. If I refer to it as the '835 patent, will you understand I'm referring to the patent I just read?
**A. Yes.**
Q. In preparing this declaration, what materials did you review?
**A. So I reviewed, of course, the '835 patent itself. I did look at the file history for the patent. As I said, I did look at a -- an IPR declaration related to the '835. There were a few references that I referenced in the declaration, so those are -- I looked at those. I think that's what comes to mind.**
Q. If you turn to paragraph 23 on page 6. Let me know once you're there.
**A. Yup, I see it.**
Q. So on page 6, do you see two references, Murakami and Yu?
**A. I do.**
Q. And in the same paragraph on page 7, do you see an additional reference, Varkony?



**A. I do.**
Q. Other than those three references, did you review any other patents?
MR. SAUNDERS: Object to the form of the question.
**A. So for the purpose of -- I mean, I did look at a lot of references along the -- while working on this, on this patent. But for the purposes of this declaration, those are the ones that I considered.**
Q. And sitting here today, is there anything about your declaration that you wish to change?
**A. No.**
Q. Please turn to page 9, paragraph 27. Paragraph 27 states that you "reviewed and relied upon the '835 Patent, its prosecution history, and the parties' competing proposed constructions." Do you see that?
**A. Yes, I do.**
Q. You al- -- mentioned earlier that you also reviewed declaration in an IPR proceeding?
**A. Correct.**
Q. And that declaration is not identified among the materials you reviewed in paragraph 27.

17

**A. That's correct. It wasn't material for my opinion that I stated here.**
Q. Are there any other documents that you reviewed in preparation -- excuse me. Let me start over.
So other than the materials in paragraph 27 and the IPR declaration, did you consider any other documents when you prepared this declaration?
**A. As I said, there were the references we had looked at that were in paragraph 23, I believe. Those were part of it.**
**But again, in forming my opinion, it's -- I relied on the '835 patent, prosecuting -- prosecution history, and the proposed constructions.**
Q. So other than the categories of materials we just went through, did you review anything else?
**A. Not that I recall.**
Q. You stated that the IPR declaration was not material to your opinion; is that right?
MR. SAUNDERS: Object to form.
**A. I didn't use it. There was nothing from**

18

**it that I used to form my opinion that are stated here.**
Q. Why not?
**A. Well, in that IPR, I did not see any arguments related to claim construction, so I -- it wasn't material to the opinion I wrote here. My opinions here are about the claims -- you know, claim constructions for '835 patent, and the IPR did not have that.**
Q. What do you mean -- what do you mean by arguments related to claim construction?
**A. There wasn't an opinion in the IPR related to claim construction that I could ascertain for particularly these two terms.**
Q. These two terms on which you opined are discussed in the expert IPR declaration though, correct?
MR. SAUNDERS: Object to the form of the question.
**A. I don't recall seeing a claim construction argument or discussion for these two terms.**
Q. What do you recall as the discussion presented in the IPR declaration?

19

MR. SAUNDERS: Object to the form.
**A. Exactly what I said before, I didn't see a claim construction opinion in that declaration.**
Q. Did you see any opinion in that declaration?
MR. SAUNDERS: Object to form.
**A. What was in that IPR declaration, there was a mapping to prior art references that were in there. But again, no claim construction opinion in there.**
Q. Since we're talking about the declaration, I'll give you a copy.
(Exhibit 2, Declaration of Sunil P. Khatri in Support of Patent Owner's Preliminary Response on the Merits and others Non-discretionary Considerations, marked for identification.)
MR. NASSAR: I will now provide the witness with what I've marked as Exhibit 2.
Q. Do you recognize what I've just handed you, Dr. Hassoun?
**A. Yes.**
Q. Does this appear to be the declaration you reviewed from the IPR that we were discussing?

20

**A. I have, yes.**
Q. This is -- this looks to be that declaration, right?
**A. Yes.**
Q. If you turn to the table of contents, on the second page, in Roman numeral XIII, there are three prior art references identified, Murakami, Kobayashi, and Yu. Do you see that?
**A. I do.**
Q. Your declaration referred to Murakami and Yu, but not Kobayashi; is that right?
**A. Correct. In the background section of my declaration.**
Q. Did you review Kobayashi?
**A. I don't remember if I did or not. I don't have a recollection.**
Q. And in your opinion, this declaration expresses no opinion as to claim construction?
MR. SAUNDERS: Object to the form of the question.
**A. What this declaration did not have an opinion on is claim construction for the two terms I was considering -- I considered in my declaration.**

21

Q. Did it have an opinion on any other term in the '835 other than those two terms?
MR. SAUNDERS: I'm going to object to form and outside the scope.
**A. I was looking for those specifically, for those two terms, so I couldn't tell you without reading it again.**
Q. Are you aware that institution was denied on the '835 patent?
MR. SAUNDERS: Form and scope.
**A. I don't know what the right term is, but I'm aware that the IPR did not continue.**
Q. You can set that aside. I'm done asking you about that. Did you review any technical -- let me start over.
Did you review any dictionaries when you were preparing your declaration?
**A. I did not feel -- I did not determine it was necessary to do so, so no.**
Q. Why did you -- why was it not necessary to do so?
**A. Because, as I've stated in my declaration, the claim and the intrinsic evidence were pretty clear as to what the definition of**

22

**these two terms were, or one of them is indefiniteness and the other one is the definition of the term.**
Q. So you didn't look to any extrinsic evidence in forming your opinions in the declaration; is that correct?
MR. SAUNDERS: Object to form.
**A. So in -- the evidence I presented here in the declaration are all intrinsic evidence. So to the extent that's what you mean, the answer is yes.**
**I did look at the other references that are referenced in paragraph 23, but as I said, that was just for the background section to explain the technology.**
Q. Did you review any academic publications in preparation -- in drafting your declaration?
MR. SAUNDERS: Object to form.
**A. So I can't recall over -- since I've been engaged what particular publications I looked at. But for the purposes of this declaration, what I relied on is the intrinsic evidence, the patent and the prosecution history and the proposed constructions.**

23

Q. When you say prosecution history, are you referring to the entire prosecution record or only select portions of the record or something else?
MR. SAUNDERS: Object to form.
**A. So the file history of the '835 patent. So I can't say I read every word of the prosecution history, but the relevant portions of it, again, in order to see if there was anything in there regarding the terms, the two terms I opined on in my declaration.**
Q. And was there anything in there related to the two terms?
**A. Nothing that I referenced here in my declaration.**
Q. You mentioned -- you mentioned that you opined on claim construction in other cases, correct?
**A. Yes.**
Q. So this is not your first time construing a patent claim term, fair?
MR. SAUNDERS: Object to form.
**A. Not my first time opining on construction of a claim term.**

24

Q. Could you describe your approach to opining on the claim term for purposes of claim construction?
MR. SAUNDERS: Object to form.
**A. My -- I don't know if I have an -- a defined approach to doing research and analysis, which is what's required here. But for this particular engagement, there was a request that I opine on these two terms. So I was given these two terms, and I was asked to write a declaration regarding my opinion. So that's -- was the process for this one.**
Q. Other than the two terms in the declaration, do you have an opinion on any of the other terms used in the '835 patent?
MR. SAUNDERS: Object to form.
**A. I was not asked to opine on any other terms other than these terms. So for now, these are the two terms I have -- I have formed an opinion on.**
Q. Could you please turn -- please turn to page 5, paragraph 17 of your declaration.
In the second sentence, you state your understanding that "the words of a claim are

generally given their ord- -- excuse me, their ordinary and customary meaning with respect to a POSITA at the time of the invention." Do you see that?

**A. I do.**

Q. And what is your understanding based on?

**A. This is under the legal standard, and my understanding is based on what the attorneys told me is the legal standard.**

Q. So when you say your understanding is that they're generally given their ordinary and customary meaning, do you have an understanding of when they are not given their ordinary and customary meaning?

MR. SAUNDERS: Object to form.

**A. So if you look at my -- paragraph 18, there is an explanation of my understanding of that situation.**

Q. And in paragraph 18, the second sentence states your understanding that "the specification is often times the best source of evidence in the claim construction process."

When is the specification not the best source of evidence in the claim construction



process?

MR. SAUNDERS: Object to form.

**A. It's always the first place to look. Look at the claim itself, then look at the specification, and then the file history. So if it's clear from there, then that's what you rely on.**

Q. So if the specification is clear, then it's the best source of evidence; am I understanding that correctly?

MR. SAUNDERS: Object to the form.

**A. If it's -- if the definition is clear to a person of ordinary skill in the art from the specification, then yes, that is the place to go.**

Q. What if the term is clear in the claims themselves, is there any reason to consult the specification?

MR. SAUNDERS: Object to the form.

**A. I will always consult the specification, but if it's clear in the claim, then I would look at -- look at the claim. But I also would need to look at the specification to understand the embodiments, to understand how the term is used.**

**So I would need to look at both in order**



**for me to determine the claim construction -- or to form my opinion regarding claim construction.**

Q. And embodiments are examples of ways the patents can be practiced; do you agree with that?

MR. SAUNDERS: Object to the form.

**A. They are examples, and they explain how the term is being used, yes.**

Q. Is it your opinion that embodiments represent the only ways in which patents can be practiced?

MR. SAUNDERS: Object to form. Scope.

**A. No. The embodiments on their own is not. But you have to look at not only the embodiments, there's also a description usually in the patents of generally describing what the invention is about as well, so...**

**But, again, it depends on the specific case you're talking about. I wouldn't -- each patent is the written differently. Whether there's disclaimers, whether there's explanation. That's some things I have to take into consideration when I'm reading -- or forming an opinion.**

Q. If I use the term POSITA, will you



understand that I'm referring to a person of ordinary skill in the art?

**A. Yes.**

Q. So I think you mentioned that it's -- that you have to look at the claim terms from the perspective of a POSITA; is that right?

**A. Correct.**

Q. In paragraph 35 -- excuse me, paragraph 25 of your declaration on page 8, you define a POSITA for purposes of the '835 patent; is that fair?

**A. Yes.**

Q. And the POSITA you define has "at least a Bachelor of Science in electrical engineering, computer engineering, or similar fields and at least two years of experience in the field of computer memory technology," correct?

**A. That is correct.**

Q. And you also state that "More education can supplement for less experience and vice versa," correct?

**A. Correct.**

Q. So that means these are not hard-and-fast criteria, there's some flexibility, depending on

the particular person?
MR. SAUNDERS: Object to form.
**A. Yes. I mean, degrees vary from one institution to another institution, so you -- that's why I opine that two years of experience in the field of computer memory technology was necessary or extra education that compensates for that.**
Q. Do you have an opinion on whether the same -- the same qualifications are sufficient to -- well, let me start over.
Do you -- do you have an opinion on whether the POSITA you described here would be a POSITA for purposes of the other patents you reviewed for this case?
MR. SAUNDERS: Object to form and scope.
**A. You -- just so I -- to make sure I understand the question, so you're asking me if the POSITA here for this particular patent applies to other patents; is that --**
Q. I'll ask it -- it was not a clear question.
**A. Okay.**
Q. I believe you said earlier that you



reviewed other patents that the plaintiff has asserted against SK Hynix in this case. Do I have that right?
**A. Yes.**
Q. And in reviewing those patents, is it your opinion that the POSITA you describe here is a POSITA with respect to those patents?
MR. SAUNDERS: Object to form. Scope.
**A. Okay. So I did understand your question. My answer is, I have not formed an opinion regarding what the level of a POSITA is for other patents.**
Q. The '835 patent, generally speaking, is about non-conventional -- excuse me, non-volatile memory, correct?
MR. SAUNDERS: Object to the form.
**A. If -- so may I have a copy of the patent, please?**
Q. Well, I'll ask a different question because I -- we're going to get there, and --
**A. Okay.**
Q. -- now I just want to speak generally about memory. So do you know what non-volatile memory is?



**A. I do.**
Q. And what is non-volatile memory?
**A. Non-volatile memory generally is one that keeps its state when no power's applied, when there's no power to the chip or to the memory.**
Q. And that's in contrast to volatile memory, which loses the content once power is turned off, correct?
**A. Yes. That's generally the terms that are used, volatile and non-volatile.**
Q. Are there any other kinds of memory other than those two categories?
MR. SAUNDERS: Object to the form of the question.
**A. I guess on that category level then, that those are the two general categories.**
Q. And within non-volatile memory, there are different types of non-volatile memory, correct?
MR. SAUNDERS: Object to form.
**A. There's different technologies that are used to implement that, yes.**
Q. Flash is one of those technologies?
**A. Flash is an example.**
Q. Is flash -- does flash mean something



different from NAND flash?
MR. SAUNDERS: Object to form.
**A. Again, speaking generally, there are NAND flashes. There are NOR flash memories. Again, types of flash memories.**
Q. What does flash memory mean?
**A. It's just a different term for non-volatile memory. So one would understand it's non-volatile.**
Q. What is NAND flash memory?
**A. So it's a construction of a memory array where the memory array is constructed to look like a NAND structure. So that's why it's called a NAND flash. And opposed -- as opposed to a NOR flash memory, which is -- has a different structure, and the cells look more of a NOR.**
**Both implementations have their advantages and disadvantages, and it depends on the applications, you would construct them one way or another. So it's quite involved.**
Q. Are you familiar with floating-gate transistor?
**A. I am.**
Q. Is that one way that non-volatile memory

33

is implemented?
MR. SAUNDERS: Object to the form of the question.
**A. A flash -- a floating-gate transistor is a type of transistor that you're able to trap a charge in its gate oxide region and therefore change the threshold voltage of that particular transistor. It could be applied to memory circuits, yes.**
Q. How does the floating-gate transistor trap the charge?
MR. SAUNDERS: Object to form.
**A. So as the '835 explains how it's done in the background of the invention, it's usually by applying certain types of voltages for certain periods of time to the gate, and thus what you create is a hot electron effect, where the electrons can penetrate the -- an insulation layer and get trapped in that trapping layer between the two plates, the insulation plates on the floating-gate.**
Q. What's that trapping layer made of?
**A. Some kind of silicone oxide, silicone dioxide, but I would have to go look that up to**

34

**tell you what kind of material is used. But there are several materials that could be used as a trapping layer.**
Q. But in -- it's going to be an insulating layer, meaning the electrons will be captured in it; is that a fair description?
**A. That is a fair description, yes. It is an insulating layer. But just to be clear, there are several layers of insulating layers in order to get to create that trapping layer. So you'll have an -- usually you'll have an insulator, the trapping layer, and another insulator, is the structures I've seen.**
Q. Was the floating-gate transistor mechanism, was that how non-volatile memory was initially designed?
MR. SAUNDERS: Object to the form of the question.
**A. I don't -- I don't remember. I would have to go look back as to how it started. But I know the floating-gate was mech- -- one mechanism to do that. But there are other mechanism. As a matter of fact, I have a few patents on that technology, alternating technology.**

35

Q. Is one of those other mechanisms called a charge-trapping layer?
MR. SAUNDERS: Object to the form.
**A. It's -- floating-gate transistor, charge trapping, it's all generally the same mechanism where you're trapping a charge in the layer and therefore changing the threshold voltage of that particular transistor.**
Q. Are there any differences among the -- a floating-gate transistor and a charge-trapping layer?
MR. SAUNDERS: Object to form.
**A. I -- you're -- I'm not sure those are equivalent answer, but -- equivalent structures or equivalent things to compare. But a floating-gate transistor has -- as described in the '835, has a trapping layer. And that trapping layer, what it's trapping is a charge.**
**So to the extent that's what you're talking about, then charge trapping is a mechanism used in this particular floating-gate transistor.**
Q. Okay. I see. So a charge-trapping layer and a floating-gate transistor are not two

36

different mechanisms. They're -- they have some relationship to each other; is that correct?
MR. SAUNDERS: Object to form.
**A. So a floating-gate can or cannot have a charge-trapping layer. You can use a different kind of insulator in there. But now we're getting into the device physics of these transistors, and I'm sure there's all kinds of material you can put in there that are not necessarily charge trapping.**
Q. So a charge trap is a particular type of insulator; is that -- do I have that right?
**A. It's a mechanism to trap a charge, and you need a specific type of material that is able to do that given certain conditions on the transistor itself.**
Q. Not all non-volatile memory relies on a charge-trapping layer; is that correct?
MR. SAUNDERS: Object to form.
Q. Let me rephrase that. That's a lot of negatives.
Do all non-volatile memory rely on a charge-trapping layer?
**A. No. As I said, I've got a few patents on**

**magnetoresistive memories, and these are -- don't use charge trapping in order to store bits non-volatilely.**
Q. And how do they work?
MR. SAUNDERS: Object to form.
**A. They work using -- relying on a particular spin direction of the electrons. And depending on the spin one way or another, the resistance changes in a particular material, and as such, you're able to detect different states that are stored in there.**
Q. Does the spinning -- so you said that you're able to detect different states that are stored in there. But how are the states -- how do you accomplish the storage?
MR. SAUNDERS: Object to form.
**A. You do it by applying a certain amount of voltages to a particular material in order to change the resistance of that material.**
Q. And if voltage stops being applied because the power is off, how is the memory captured?
MR. SAUNDERS: Object to form.
**A. You've changed the orientation of the**



**electrons in there, and as such, you've changed the resistance in the current path through that particular piece of material. So you effectively changed the resistance in there.**
Q. And what did you say this mechanism is called?
**A. Magnetoresistive memory. So MRAM for short.**
Q. MRAM?
**A. Yes.**
Q. So compared to this charge-trapping layer, the MRAM stores memory by changing -- let me start over.
MRAM, unlike charge-trapping memory, doesn't affect the number of electrons stored in one place, it just reorients them, and that's how you're able to measure the storage?
**A. Generally speaking, yes.**
Q. So other than a memory device that captures a certain amount of electrons that need something, there are other ways, such as this orientation MRAM method, to design non-volatile memory?
MR. SAUNDERS: Object to the form.



**A. There -- there are, yes.**
Q. So going back to the floating-gate charge-trapping layer type of non-volatile memory, how is memory written to a device?
MR. SAUNDERS: Form.
**A. Can -- can you explain what you mean by device?**
Q. Sure. Well, I guess, how is memory written when you're talking about a charge-trapping layer?
MR. SAUNDERS: Form.
**A. So -- I mean, I'll talk about the '835 patent. The '835 patent explains that you write the memory by applying a certain voltage on the gate and then a certain voltage on the drain and a certain voltage on the source. And that combination of voltages will write the memory to that bit, to that -- sorry, to that transistor.**
Q. And depending on the voltage, the memory that is written will vary?
MR. SAUNDERS: Object to the form.
Q. Let me ask it differently.
**A. Yeah.**
Q. The amount of voltage that's applied



impacts the memory that is stored, correct?
MR. SAUNDERS: Object to form.
**A. Well, if I understand correctly, that the voltages are important to the process of writing, so you do need to put enough voltage to exceed a particular threshold in order for you to be able to write to the memory.**
Q. But does the amount of voltage -- assuming it exceeds the threshold voltage, does the amount of voltage matter when writing to memory?
MR. SAUNDERS: Form.
**A. It depends on the memory. You know, the '835 is talking about particular voltages that you put in there, so it's going to depend on the memory itself and the structure of the transistor.**
Q. How does it depend on the memory?
**A. It depends on the physics of the transistor, what kind of thresholds were built in to start with when the device is designed.**
MR. NASSAR: Now is a good time for a break, if you'd like to take a break.
THE VIDEOGRAPHER: One moment.

This is the end of Media No. 1. We are going off the record. The time is 10:35 a.m.

(Recess taken)

THE VIDEOGRAPHER: This is the beginning of Media No. 2. We're going back on the record. The time is 10:48 a.m.

BY MR. NASSAR:

Q. Welcome back, Dr. Hassoun.

**A. Thank you.**

Q. I'm handing you a document that I've marked as Exhibit 3.

(Exhibit 3, US Patent No. 8,400,835, marked for identification.)

Q. This document is the '835 patent, correct?

**A. Yes.**

Q. Does this appear to be a true and correct copy of the patent?

**A. It looks like it.**

Q. What does the patent purport to solve?

MR. SAUNDERS: Object to the form of the question.

**A. So if you look at column 2 and in particular lines 30 to 39, it explains what it purports to solve. It says, "In the conventional**



**technique, however, a plurality of memory cells are simultaneously written under write conditions (a drain voltage and a drain supply period) which are common to the memory cells. Therefore, variations in write speed between the memory cells which are simultaneously written cannot be reduced, leading to a degradation in the reliability of the memory cells. Moreover, because the write time depends on the memory cell having a low write speed, the write line increases due -- the write time," sorry, "increases due to variations in write speeds [sic]."**

**So that's what it -- the problem is purporting to solve.**

Q. So it solves an issue that arises when multiple memory cells are written at the same time using the same voltage; is that a fair characterization?

MR. SAUNDERS: Form.

**A. It just says "simultaneously," not necessarily the same voltage.**

Q. Okay. So what kind of problem arises when memory cells are written simultaneously?



MR. SAUNDERS: Form.

**A. So I -- let me find it in the patent where it talks about it, since we're talking about the patent.**

Q. And to be clear, you can -- my question is not limited to the patent. I'm generally asking what kind of problem arises if you're writing memory cells simultaneously.

MR. SAUNDERS: Form and scope.

**A. Yeah. I have done that analysis on the '835, so I -- I'll answer it in light of the '835 patent. I'm sorry. I forgot the question.**

Q. So when memory cells are written simultaneously, does any problem arise?

MR. SAUNDERS: Form and scope.

**A. So one problem that arises is the write speed between those memory cells.**

Q. What do you mean by that?

**A. As it states on column 2, line 33, it talks about "Therefore, variations in write speed between the memory cells which are simultaneously written cannot be reduced, leading to a degradation in the reliability of the memory cells."**



**So the speed in which one memory cell and another memory cell that are being written simultaneously is a problem that is purported to be solved by the -- by the patent.**

Q. And the degradation that's described, that's degradation because the memory is not accurately written, or is it because the memory degrades over time? What is your understanding of the degradation?

MR. SAUNDERS: Object to form.

**A. So as explained in column 2, line -- approximately line 13, it's talking about "the length of the [sic] bit lines provided in the memory cell array has also increased. Therefore, in write operation, the drain voltage varies depending on the position of the memory cell in the memory cell array because of a voltage drop caused by the resistance of the bit line, resist -- resulting in variation [sic] in write speed."**

**So it's describing here that the fact that you have a longer line, the position of the memory cell results in the variation in resistance and therefore the speed in which it's**

**written. So a degradation can come from having a voltage that's not quite what you intended to be on the memory cell, and therefore you're not programming it correctly.**

**Reliability, degradation could be -- depending on the memory cell, could be the fact that you're not writing it correctly, could result into degradation.**

Q. So the longer the bit line, the more -- let me start over.

As the bit line becomes longer, according to this patent, the reliability historically increased because it was difficult to control the voltage as intended to the longer cells in the bit line?

MR. SAUNDERS: Object to the form.

**A. The reliability decreased, rather than increased, because of the variation in voltage on that line or the variation in the duration of the application of that voltage.**

Q. So these two factors that are important here are the strength of the voltage and the period during which the voltage is applied; is that correct?



MR. SAUNDERS: Form.

**A. So the patent does talk about the value of the voltage that gets there and about the period or the length at which the voltage is applied to a memory cell.**

Q. And the patent purports to address this issue by allowing the voltage value and/or the voltage -- the duration over which the voltage is applied, the patent addresses this is issue by allowing you to select the value for each memory cell individually; is that correct?

MR. SAUNDERS: Object to form.

**A. So, generally, the patent talks about those issues that you mentioned. The particular -- what's claimed in particular is in the claims, and I would be happy to discuss that.**

**But generally speaking, it's trying to solve the problem of simultaneously writing to these memory cells, given that their position varies as the technology has advanced, and therefore it wants to solve the problem of the resistance drop due to the distance, so it's going to vary the voltage or vary the resistance in order to be able to write simultaneously to**



**those memory cells that are selected to be written or by changing the duration of the -- how long the voltage is applied to allow more electrons to be trapped, for example.**

Q. If you look at column 1, the -- line 21, that paragraph, it describes -- well, it refers to a non-volatile semiconductor memory. Do you see that?

**A. I do.**

Q. And it states on line 23 now, in this non-volatile semiconductor memory that there is -- that "each memory cell includes a gate electrode connected to a word line, a drain connected to a bit line, a source connected to a source line, and a floating gate or a charge-trapping layer." Do you see that?

**A. I do.**

Q. So it says "a floating gate or a charge-trapping layer." Do you know why it refers to them dysjunctively?

**A. Not particularly. As we've discussed before, a floating gate can have and it describes it having a trapping layer inside, you know, in the -- in the middle of it, so...**



Q. So does that mean they can mean the same thing?

**A. They can mean the same thing.**

Q. But not necessarily?

**A. Not necessarily. There are several technologies out there.**

Q. In this patent, is it your opinion that they refer to the same thing, a floating gate and a charge-trapping layer?

MR. SAUNDERS: Form.

**A. They are talking about -- as I opined in my declaration, they are talking about a memory cell that is able to store two or more bits and a memory cell where the programming is happening using voltages and voltage lines that are applied to the memory cell.**

Q. Okay. But I want to make sure I'm using -- that we're referring to terms in the same way, and so I am just asking whether a floating gate and a charge-trapping layer in your opinion mean the same thing as each other in this patent.

MR. SAUNDERS: Form.

**A. Not necessarily. There could be**

**different mechanisms other than charge trapping or having a trapping layer. But the particular discussion is about a floating gate or a gate that does have a trapping layer in it -- underneath it.**

Q. And so you said earlier that this is about a memory cell that's able to store two or more bits; is that correct?

MR. SAUNDERS: Object to form.

**A. I did say the memory cell is -- can score -- store two or more bits.**

Q. So this is one of the terms that you've construed, correct, memory cells?

**A. Correct.**

Q. And your opinion is that memory cells refers to elements that are capable of storing two or more bits of data, correct?

**A. So the memory cell in the '835 patent, yes, it is. My opinion is, it is specifically talking about cells that can store two or more bits.**

Q. So in your opinion, the '835 patent excludes memory cells that can store only one bit of data?



MR. SAUNDERS: Object to the form.

**A. The -- the -- the problem that the patent is trying to solve is related to memory cells that store two or more -- two or more bits in them. So the claims use the word "memory cell" in them, and the patent contemplates memory cell as having two or more bits. So that's the problem it's addressing. Those are the kind of memory cells it is addressing in this patent.**

Q. So it's your opinion that the claims don't cover memory cells when they only have a single bit, correct?

MR. SAUNDERS: Object to form.

**A. The claim requires that the memory cell store two or more bits. That's my opinion.**

Q. What is a bit?

**A. A bit is a state of -- that can store a 0 or a 1 or a mechanism where -- well, a bit is a binary construct that can store false or true, 0 or 1. It depends on how you want to represent those particular states.**

Q. So a memory cell that can only store one bit means it can only store a 0 at one time or it can only store 1 at one time; is that correct?



MR. SAUNDERS: Form.

**A. It's a -- logically speaking, it has these two states, either a 0 or a 1. The structure itself can have varying voltages in there, but the representation or the interpretation of the data is either a 0 or a 1, true or false, two states.**

Q. And in a two-bit memory cell, there can be a 0 and a 0 or a 0 and a 1, basically you can have a combination of a 0 and a 1 and a combination of a 0 and a 1 [sic]?

MR. SAUNDERS: Form.

**A. So a -- so a single bit can have a 0 or a 1. Again, the two states. And then a second bit can have another set of states, a 0 and a 1. That's what makes it two bits.**

Q. So in your opinion, a bit contains a state, but a bit is not the state itself?

MR. SAUNDERS: Form.

**A. The bit can have two states, either a 0 or a 1 and -- or true or false, it depends on how you want to represent it. But it has a -- two states.**

Q. And a single-bit memory cell has only one state at a time?



**A. Yes.**

MR. SAUNDERS: Object to the form.

**A. It will store either a 0, or it will store a 1.**

Q. How many states can a two-bit memory cell store?

MR. SAUNDERS: Form.

**A. So it -- it depends on how you logically interpret what -- what the data is. But it can be -- one bit is the a 0 or a 1, and the other bit is either a 0 or the 1. You want to look at them in combination. You can have the four combinations that are possible amongst those four. But it's still storing two bits individually.**

Q. In terms of the evolution of memory technology, single-bit memory cells preceded two-bit memory cells; is that correct?

MR. SAUNDERS: Form and scope.

**A. You're really getting into the history of the development of this technology. I mean, before digital, there was analog, and analog gave you several states before that. And then the**

53

**advent of digital gave you the 0 and 1. But I don't -- I couldn't tell -- sitting here today, I couldn't tell you what the evolution, which direction it went.**
**But 0 logically would be that you started with 0 or 1, you know, two state, and then you went to multiple states. But I -- I would have to go look and to see how the history evolved for that.**
Q. Is the reason why you say logically it would go from one bit to two bits, is that because multi-bit memory cells are more complex?
MR. SAUNDERS: Form.
**A. I couldn't -- I couldn't tell you why. I mean, in my thinking, again, we're going back to history, is the state of technology where you can ascertain two states versus four states from a voltage that exists somewhere.**
**It depends on your sense amp, you know, your sense amplifiers, that can detect the various thresholds, so -- so it depends on that technology as well as to the state of the memory.**
**But -- what was the question again? There was complexity.**

54

Q. Yeah. I guess I'm trying to understand why you said it would logically make sense that you would start with a single-bit memory cell before moving on to invent a multi-bit memory cell.
MR. SAUNDERS: Form.
**A. Well, I'm -- it -- it's -- yeah, because it's -- again, the sense amp technology can detect two voltage levels versus detecting more than two voltage levels within the -- you know, within -- stored within a memory cell or generated by a memory cell. So that's why I said it.**
Q. And just to be clear, it's possible for a memory cell -- I'm not talking about the '835 right now. It's possible for a memory cell to contain a single bit, correct?
MR. SAUNDERS: Form.
**A. Outside of the '835 patent, yes.**
Q. If you look at column 1, line 33. Let me know when you're there. So --
**A. I'm there.**
Q. So line 33 says, "The value of information (data) stored in the memory cell is determined to be '0' or '1' based on the threshold level of the memory cell."

55

Did I read that correctly?
**A. Yes.**
Q. This is referring to a single-bit memory cell, isn't it?
MR. SAUNDERS: Form.
**A. No.**
Q. It -- the value of information in a memory cell, according to this sentence, is 0 or 1, correct?
**A. Again, that's -- that's a different question than you asked me before. But it's -- it's dissecting how a bit is stored. It's a 0 or 1 in the memory cell.**
**But if you read actually from line 21 all the way to column 2, line 12, it's talking about the type of non-volatile memory cell that the patent is addressing. It's talking about the background of the technology, and in particular, it is talking about the memory -- the non-vol- -- conventional non-volatile memory cell that have -- that store two bits of information.**
**So you've got to read it all in context rather than just that one sentence.**

56

Q. But this one sentence provides two options for the value of information stored in the memory cell, correct? It doesn't provide four?
**A. But it --**
MR. SAUNDERS: Form.
**A. It's -- it's talking about how a bit is represented as a 0 or 1, but the discussion, again, in that whole column that we talked -- you know, that I mentioned, from line 21 all the way to column 2, line 22, it is talking about the conventional non-volatile semiconductor memory that it's described.**
**So it explained to you how the data is stored, as a 0 or a 1, depending on the threshold, and then it explains to you a structure, which is Figure 9, is how to create those two bits.**
**And it concludes on column 2, line 11, "As a result, the memory cell can store two bits of data."**
Q. So in your opinion, the sentence I was reading about the value of information, that's

the one in column 1, in your opinion, that sentence does not speak to how many bits are stored in the memory cell?

MR. SAUNDERS: Form.

**A. It does not speak to how many bits, but rather is how the bit is stored, as a 0 or a 1, depending on the threshold of the memory cell.**

**And then the conventional non-volatile memory cell it's talking about is understood from the entire description of the conventional non-volatile memory cell it's talking about.**

Q. Is the memory cell capable of storing two bits, that's described in column 2, lines 11 through 12, is that memory cell referring only to the example in that same paragraph, or is it referring to all memory cells referred to in this patent?

MR. SAUNDERS: Form.

Q. Let me ask it -- that's a bad question.

So column 2, the first full paragraph on the page, do you see that?

**A. Yes.**

Q. And the last sentence of that paragraph is, "As a result, the memory cell can store



two bits of data," correct?

**A. Correct.**

Q. The memory cell that it is referring to is specific to the non-volatile semiconductor memory described in this paragraph, correct?

MR. SAUNDERS: Form.

**A. So it is talking about what's described in column -- columns 1 and 2, but my opinion is not only dependent on that. My opinion is dependent on other statements -- embodiments and general statements made about this technology or this patent that clearly defines a memory cell as one that has two or more bits of data.**

**For example, let me -- let me point you to column 1, line 36. It says -- and this is after the sentence that you pointed out to me. It says, "The principle of the write operation will be described hereinafter." And that description concludes with "As a result, the memory cell can solve -- can store two or -- two bits of data."**

Q. Why did you stop at that line? That's not where the background section ends, is it?

**A. No, it does not end there. But I was**



**trying to explain to you the -- how the statement you were pointing to me, which is -- talks -- that said, "The value of information (data) stored in the memory cell is determined to be '0' or '1' based on the threshold level of the memory cell," and you were asking me, does that refer -- does that -- doesn't that mean the memory cell has only one bit, and I was trying to explain to you my understanding of this -- both these paragraphs -- or there's one, two, three -- four paragraphs explaining the memory cell. And line 36 says, "The principle of the write operation will be described hereinafter."**

**So it's all related to the fact that "As a result" -- now I'm reading line -- column 2, line 11, "As a result, the memory cell can store two bits of data."**

Q. Okay. So is -- "the memory cell can store two bits of data," is that referring to Figure 9?

**A. It's referring to Figure 9, and it's referring to a non-volatile semiconductor memory including a trap layer, which is line -- column 1, line 26. So collectively, that's what**



**it's talking about.**

**First, it gave you generally the non-volatile memory it's talking about, and then it explained in Figure 9 a way for you to store those two bits.**

Q. Okay. So if I -- so would it make sense to understand this description as you're describing it to me, does it make sense to start at column 1, line 27, and then continue to line 12 of column 2? I guess I'm trying to understand what the bounds are of the memory cell that this is describing are [sic].

**A. You -- they're tied together starting from at least 27. Because at the end of paragraph that starts at 27, there's an explanation of the principles of how that memory cell would operate.**

**So the description is about two bits or more, and that was confirmed by reading the rest of the patent specification that continuously talks about two bits or more. That's the problem it's purporting -- that's the memory cell that has the problem it's purporting to solve.**

Q. Do memory cells with one problem --

excuse me. Do memory cells with a single bit experience the same problem that this patent purports to solve?
MR. SAUNDERS: Form. Scope.
**A. The concept -- so as I've stated in my declaration, the concept of trying to control the voltage to a memory cell, whether one bits or more, or changing the duration to memory cells existed in the prior art, and I referenced a few of them in there. So that -- in general, doing that, it -- that technology, that already existed.**
**All I'm saying is, the patentee are trying to solve this problem for memory cells that have two or more bits. And my understanding from that doesn't just come from that section we've been reading, but from many other declarations or disclosures in this specification that continuously define a memory cell as two or more bits.**
**A person of ordinary skill in the art would understand that's the problem this patent is trying to solve.**
Q. So I understand your opinion that this



patent is trying to solve the problem for memory cells with two or more bits, but my question is whether it is technically possible for a single-bit memory cell to experience the same problem.
MR. SAUNDERS: Form.
**A. So this -- I'm going to be a little repetitive, I apologize, but just to make sure we're -- we're on the same page.**
**This patent only talks about memory cells with two or more bits. The prior art, I think I put examples of that, does talk about varying voltages or varying duration of application of voltage for memory cells that have -- could have one bit or more. This patent is specific to a memory cell that has two or more bits.**
**So to the -- to the extent there -- memory cells with one bit have this problem, there's been solutions out there to address that.**
**Perhaps what it sounds like to -- my opinion is that the patentee here is focusing on memory cells with two or more, and therefore these techniques or what they're claiming is for memory cells with two or more bits.**



Q. So I understand your opinion about the scope of what this is claiming. My question is really just to understand the functioning of memory cells.
So you said, "So to the extent there are memory cells with one bit that have this problem, there's been solutions out there to address that."
That means you agree that memory cells with one bit can have the problem that this patent, according to you, addresses for two or more bit memory cells?
MR. SAUNDERS: Form.
**A. They could have variations in voltage due to their location in a memory array, so yes. And my explanation for that is: Look at some of the prior art I referenced.**
Q. So the prior art addressed this issue for single-bit memory cells; is that what you're saying?
**A. It purports to have a solution to that, yes.**
Q. Is it possible for multiple patents to address the same issue in different ways?



MR. SAUNDERS: Form. Scope.
**A. It depends on what the claims are and where the innovation is, so I'd have to look at the claims to give you an answer. But there are different claims that -- it really depends on the scope of the problem, so I'd rather not generally make that statement.**
Q. But you would agree that problems are not patented, solutions to problems are subject to patents?
MR. SAUNDERS: Form and scope.
**A. I'll -- some -- sometimes the problem is part of the claimed subject matter in order to be able to describe -- you know, claim a solution. So you're asking me to give a blanket statement on a claim or how claims are written, and I would have to look at the claim.**
**But I'm not sure I would phrase it the way you did. It -- a claim might need to describe a problem and a solution in order to be a claim. But I'd have to look at the particular claim you're talking about.**
Q. Okay. But you don't have an opinion about whether multiple patents can exist to

address the same problem?
MR. SAUNDERS: Form.
**A. Again, that -- it depends on the claim, and a claim can apply to -- can have a different technique for addressing the same subject matter.**
Q. And in your opinion, the technique of this patent does not address single-bit memory cells?
MR. SAUNDERS: Form. Scope.
**A. That's not what I said at all.**
Q. What -- so --
**A. That's not what I said at all. I -- my opinion here is: This patent is talking about addressing two bits or more -- memory cells of two bits or more. That's what this patentee recognized as the problem they want to solve for.**
**And their techniques could be more accurate than other techniques to solve this particular problem. Regardless, the scope of my opinion relates to what this patent is talking about, and it's two bits or more.**
Q. So I want to make sure that I'm understanding. Do you have an opinion about whether the technique described in this patent



can be applied to single-bit memory cells?
MR. SAUNDERS: Object to form.
**A. It could be implemented for arrays that have bits -- memory cells that only store one bit. But again, I'm pointing to the fact that this patent talks about memory cells that store two or more patents -- sorry, two or more bits.**
Q. Could you please turn to column 5, line 15. And actually, before we turn to that, did you review the figures of the '835 patent?
**A. Yes.**
Q. All of them?
**A. Yes.**
Q. Are you able to point to any figure -- well, let me start over.
Is it possible to observe a memory cell with two or more -- sorry. I'm starting over again.
Does anything in the figures confirm or deny that memory cells in this patent must have two or more bits?
MR. SAUNDERS: Form.
**A. Can you ask the question again?**
Q. So looking at the figures, does anything



in the figures confirm or deny that memory cells in the patent have to have two or more bits?
**A. But the patent says all the embodiments are two or more bits.**
Q. Where does --
**A. So everything I'm look at is memory cells that store two or more bits, and the mechanisms described allow the storage of two or more bits in those memory cells.**
Q. So where does it say that all of the embodiments have two or more bits?
**A. So -- so if you look at, for example, column 6, it talks about all of -- it talks about all of the embodiments and --**
Q. I'm sorry. Where are you looking?
**A. So column 6, line 10. If you go to line -- let's go to line 13. "Also, in the non-volatile semiconductor memory having the trapping layer, it is assumed above that each memory cell can store two bits of data."**
**So it's describing -- it's talking about the embodiments, and it's talking about two bits or more in the memory cell.**
Q. So all of the embodiments have the



trapping layer?
MR. SAUNDERS: Form.
**A. That's -- that's what it's describing here. It's describing those embodiments.**
Q. It doesn't say all embodiments have memory cells that can store two bits of data though, does it?
**A. Can you repeat the question?**
Q. So it -- the patent does not state that all of the embodiments have two or more bits of data, correct? It says "the non-volatile semiconductor memory having the trapping layer ... can store two bits of data."
MR. SAUNDERS: Form.
**A. Well, it -- the whole paragraph is talking about the embodiments above, so it is referring to the embodiments that are here. So the embodiments are talking about memory cells that store two or more bits.**
Q. So is -- let me make sure I have this argument correct because I might not.
Is it your argument that because all of the embodiments have memory cells with two or more bits, then the term "memory cells" in this

69

patent refers to those with two or more bits
only?
MR. SAUNDERS: Form.
**A. That is not the extent of what I'm relying on. I am -- that's part of what I'm relying on, but also on the background of the invention that is stating the problem, as we talked at length, it's talking about memory cells with two or more bits stored into them, and as well as the other statements -- as well as the embodiments that only discuss two or more memory cells. So that's the basis of my opinion.**
Q. So the word "assumed" in that paragraph we're looking at, does that suggest a working assumption for the embodiments in the patent or a mandatory requirement for all embodiments?
MR. SAUNDERS: Form.
**A. It's talking -- it's -- it's referring to at least the embodiments. And again, that combined with the description in the background section, where it's talking about conventional non-volatile memory cell, tells me it is talking about two bits or more.**
Q. So that -- that sentence alone doesn't

70

tell you that it's talking about two bits or more; is that right?
MR. SAUNDERS: Form.
**A. It is talking about two bits or more for at least the embodiments.**
Q. Okay. So then how do you get from the embodiments having memory cells with two or more bits to the conclusion that the claims require memory cells with two or more bits?
MR. SAUNDERS: Form.
**A. So in my report, I explain everywhere that I relied on to reach that conclusion, so I'm happy to walk you through it.**
Q. That's -- that's fine. I guess, just to clarify, my question is broader than that. It's how do you get from a conclusion that all the embodiments in a patent reflect some commonality -- sorry.
How do you get from the observation that all embodiments in a patent have something in common to the conclusion that the patent requires them to have that?
MR. SAUNDERS: Form.
**A. I thought that's what I was answering**

71

**you. You know, you -- you want me to go beyond the embodiments, and I'm saying the basis for my opinion is not only reference to the embodiments, but also other parts of the intrinsic record.**
**And I was going to go to the section -- I mean, I'm pretty sure you don't want me to just memorize everything that's in the patent. So I was going to go and actually enumerate for you the basis of my opinion beyond just that statement that's referring to the embodiments.**
Q. Okay. So you agree that just because all of the embodiments have something in common, the patent doesn't need to be exclusively -- excuse me.
So you would agree that just because all of the embodiments have something in common, that doesn't mean the patent necessarily requires that, you've relied on the specification and other parts of it, right?
MR. SAUNDERS: Form.
**A. For my opinion here, I relied on the whole specification to come up with my conclusion.**
Q. Do you understand that embodiments are

72

just examples of how a patent can be practiced?
MR. SAUNDERS: Form.
**A. Absolutely.**
Q. And the embodiments are not exhaustive examples of how the patent can be practiced?
MR. SAUNDERS: Form.
**A. They do not have to be exhaustive, but they bring to life understanding of what the patent is about combined with other parts of the specification, and that's what I relied on.**
Q. So it's possible for there to be an embodiment of a patent other than those explicitly articulated in the patent itself, correct?
MR. SAUNDERS: Form.
**A. Well, I will -- you're going to have to show me the specific example you're talking about. But my opinion is, a person of ordinary skill in the art looking at this particular patent, the '835, the description of the embodiments and the remaining parts of the specification, the patent discusses memory bits of -- that store two bits or more of data. That's my opinion.**

Q. I understand. My question is though, there are more embodiments of the '835 patent than the embodiments expressly described in the patent?
MR. SAUNDERS: Form.
**A. There are -- forgive me, but it sounds like an obvious question, so yes, there are. But a person of ordinary skill in the art, to form the opinion, would need to look at the embodiments and look at the rest of the patent.**
**So an embodiment that has one bit, a memory cell with -- that stores one bit is not an embodiment of these claims because it doesn't have the memory cell of two or more bits.**
Q. Looking at column 6, the sentence that begins on line 26 states that "The present disclosure is particularly useful for non-volatile semiconductor memories which include a trapping layer and in which each memory cell can store a plurality of bits of data."
Do you see that?
**A. I do.**
Q. It doesn't say that the present disclosure is exclusively useful for non-volatile



memory with two or more bits of data, correct?
**A. That's not what it says. It says "a plurality of bits." But if you read what this couple of paragraphs are talking about, you can go to line 15 -- line 16, for example, I believe -- 15 of column 6.**
**After talking about the embodiments, which we discussed here, it says, "Alternatively, the present disclosure is applicable to a case where each memory cell can store three or more bits of data if the memory cell can be written by changing the voltage relationship between the first and second impurity [sic] of the memory cell."**
**So the plurality here will include three or more. So taking that sentence in isolation, it says "plurality of bits." But it's an explanation, a continuation of what it's -- it starts with two or more, alternatively you can have three or more, and then it's saying here it's particularly useful for memory cells that have even more bits because you -- you're -- well, it's in the paragraph before it, because you can change the voltage relationship between**



**the first and second impurity layers.**
**So the control this patent is providing allows you to change that -- those relationship. That's what the inventor envisioned for this patent.**
Q. Are you saying that plurality is referring to three or more bits here, it's particularly useful for three or more bits?
**A. It's --**
MR. SAUNDERS: Form.
**A. It's two or more. Plurality is two or more.**
Q. Right.
**A. So it's talking about two or more.**
Q. Okay.
**A. And I was addressing the question, which I forgot now, that you are -- you asked me, does -- if you could repeat the question, I can go back to my train of thought.**
**But you rephrased that sentence, and you asked me, doesn't it say that? So if you can tell me what "that" is, maybe I can connect it all together at the end.**
Q. My question was, this sentence does not



say it's applicable only -- excuse me. The sentence doesn't say it is exclusively useful for non-volatile memory in which each memory cell can store a plurality of bits of data, correct?
**A. Right, that sentence doesn't say that.**
Q. So what I'm trying to get at, so this sentence is among one of several pieces of evidence that you cite in your report for your conclusion that there are two or more bits in the memory cells, correct?
**A. Correct.**
Q. And I understand that your opinion is based on these various -- looking at all of these different parts of the patent.
My question is, what does this sentence contribute to your opinion that the other parts of your declaration doesn't address?
MR. SAUNDERS: Form.
**A. So it's the combination of evidence that I'm relying on here in order to show this is what the patent is talking about, memory cell is two or more.**
**Just to use your same logic, this thing didn't say where each memory cell can store one**

**or more bits of data. It did not say that. It said "plurality," which is two or more.**
**So, again, all I can do -- I can't go back and get into the head of the inventor, what they intended, but what I can do is look at the evidence they presented to me here. And one after the other after the other is telling me that they're talking about two or more bits, a memory cell that has two or more bits.**
Q. I hear that. But the phrase "particularly useful" suggests it is a specific application. So particularly useful if you have two or more bits, but it's still useful if you have one bit. What -- that doesn't make sense to you?
MR. SAUNDERS: Form.
**A. Not -- but again, you want to take that in isolation, look at why they got to that point, is because they're saying: We talked about the two bits per memory cell, but you can even do more, three or more.**
**So he's explaining here -- he's saying here, my understanding is he's -- there's no conflict. I don't see any conflict with this**



**saying it can -- it's particularly useful if you want to even store more bits per memory cell.**
Q. But it doesn't say that. It says "a plurality." It's particularly useful if you want to store a plurality, right? And plurality doesn't mean two. I mean, excuse me, plurality is it not limited to three or more?
**A. Not at all. It's two -- plurality is two or more. And the reason -- my understanding, that's in there to, again, affirm that alternatively -- alternatively -- you can store more than two bits in here, and it's saying it's particularly useful in those situations.**
**That's why the patent -- one of the reasons why the patent is talking about two bits or more in a memory cell.**
Q. So the particularly useful part is in storing the more than two; do you agree with that?
**A. No. It's two or more. The patent is -- it really reaffirms why this patent is about two or more. That's why the inventor is -- the inventor is focusing on solving the problems for two or more bits per memory cell, more than one.**



Q. If someone says that baking soda is particularly useful for cleaning, would you interpret that to mean it is exclusively useful for cleaning?
MR. SAUNDERS: Form.
**A. Again, you -- you're -- you're isolating -- I think I've given you my opinion on this, but I'm -- I'll repeat it again. I don't know about baking soda.**
**But about this particular patent, the '835, that sentence is very consistent with the disclosure that a memory bit -- a memory cell is two bits or more. There's nothing inconsistent that I see. And it's particularly useful for these situations, and thus you have this patent.**
Q. Would it have made sense to say in this sentence that the patent is particularly useful for instances where there are three or more memory cells -- excuse me, three or more bits?
MR. SAUNDERS: Form.
**A. This -- so -- so you want to rewrite this sentence?**
Q. Not at all.
**A. You asked me if -- what would it mean if**



**it was written differently, so we're changing what's written here. And given what's written here, I explained that even further solidifies my opinion that this patent is about two or more.**
**I did not take that sentence on its own and render my opinion based on that. I rendered my opinion based on all the intrinsic evidence that I listed, which includes that statement at the end.**
Q. So this sentence supports your opinion, it doesn't contradict it; is that your testimony?
MR. SAUNDERS: Form.
**A. As I put it in there, it does -- it does support my opinion because it's taken in context with all the other disclosures in the patent.**
MR. NASSAR: We can take a break now. Does that work for everyone?
MR. SAUNDERS: Yeah.
MR. NASSAR: Okay.
THE VIDEOGRAPHER: One moment.
This is the end of Media No. 2. We're going off the record. The time is 12:01 p.m.
(Lunch recess taken)

A F T E R N O O N S E S S I O N

THE VIDEOGRAPHER: This is the beginning of Media No. 3. We're going back on the record. The time is 12:27 p.m.

BY MR. NASSAR:

Q. Welcome back.

**A. Thank you.**

Q. I would like to switch to the second term that you opine on in your declaration. So this is the term about N equals one. So to make sure we're on the same page, you offer an opinion about the claim term, "each of the M switch circuits includes N switches, where N as an -- is an integer of one or more," correct?

**A. Yes.**

Q. In your opinion, this claim term is indefinite; is that right?

**A. That is correct.**

Q. What is your understanding of indefiniteness?

MR. SAUNDERS: Form.

**A. So paragraph 19 of my report on page -- of my declaration, on page 5, "I understand that a patent must include claims particularly**



**pointing out and distinctly claiming the subject matter which the inventor regards as the invention. I understand that a claim fails that requirement, and is therefore invalid as indefinite, when the claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the claimed invention."**

**So that's the standard I used for indefiniteness.**

Q. So in your opinion, the claim we are looking at here fails to inform with reasonable certainty those skilled in the art about the scope of the claimed invention?

**A. Correct.**

Q. If you turn to paragraph 37 of your report on page 13. So you write that portions of the specification contradict the possibility that N equals 1.

What portions of the specification contradict that possibility?

**A. I'm sorry. Ask the question again. I was reading this -- this sentence.**



Q. Sure. What portions -- well, I'm going to ask a different question.

If N were equal to 2, would the claim still be indefinite?

MR. SAUNDERS: Form.

**A. But the -- but that's not what the claim says. The claim says -- so the claim says "where N is an integer of one or more." And your question is if N equals -- so if the claim is written differently?**

Q. So my question is whether the claim would -- whether the claim is indefinite if N equals two or more.

MR. SAUNDERS: Form.

**A. So rewrite the claim so it says "where N is an integer of two or more"?**

Q. Well, before we talk about rewriting, I'm just -- so my question is, imagine a situation, a specific application, and in that application, N is equal to two or more. Is there any issue with construing the claim language in that situation?

MR. SAUNDERS: Form and scope.

**A. That's not -- that's -- that's really not the way I looked at it. So the way I looked at**



**this term, I looked at what the claim says. The claim says "where N is an integer of one or more."**

**So what I've documented here is for -- N equal one or more would be inconsistent for a POSITA with the claim elements of claim 1, that require the common point and thus require multiple switches. So that's -- that's what I looked at.**

**So then, again, I needed to look at and say, okay, what did the -- what is the inventor trying to claim over here? So going back to the specification, there are at least two more instances where they clearly used "N is an integer of one or more." So the patent -- the specification do talk about contemplating a situation where N is an integer of one or more. So I can't just say, well, they meant to put two or more in here.**

**So looking further, for example, Figure 6, as I document, is an embodiment where there's only one transistor, and there are no common points in that embodiment that were described. So for the case where N equal one,**

**they did not discuss common points for Figure 6. So, again, I'm trying to understand what this -- what the patentee is trying to do here.**

**But then I looked further. Okay. So which is it? Is -- are they trying to do a situation where there are multiple switches, or do they want to really cover a situation where N is an integer of one or more?**

**So then furthermore, you look at, for example -- as I said, the claim 6 embodiment -- sorry, claim 5 embodiment, Figure 6 embodiment, has just the one transistor. So -- okay? So you can have a situation where you have N equal one. But that embodiment is talking about extending the period, changing the period.**

**So then I look at -- more into the claim -- in the specification, and I look at claim 5. And -- I believe it's claim 5. Claim 5 talks about controlling the period. I believe -- yes, claim 5 talks about "the M switch control circuits control on-state periods of the N switches."**

**So again, that one is referring to a situation where the embodiment for that, there's**



**a switch of -- just one switch and no common points.**

**So my conclusion is, I cannot tell and a POSITA would not be able to tell what is it that the inventor is trying to capture in this claim, and that's how I reached my conclusion of indefiniteness. What's in there is an explanation of all of that.**

Q. Thank you for that explanation. We're going to take these various parts one by one.

First, would it be helpful to have another copy of the patent to see the claims and the figures at the same time?

**A. Sure. Thank you.**

MR. NASSAR: We don't need to make that one an exhibit.

Q. Okay. So let's take a few steps back first. What is a switch?

MR. SAUNDERS: Form.

**A. So in the embodiments, a switch is a transistor. And in the embodiment shown, it could be an NMOS or PMOS transistor.**

Q. So in Figure 2, do you see the figure labeled "201"?



**A. Yes.**

Q. That's a switch control circuit?

**A. Correct.**

Q. And the switch control circuit 201 connects to the switch circuit 200?

**A. The switch circuit 200, yes.**

Q. Where are the switches depicted in Figure 2?

**A. So it would be transistor P1 and transistor P2.**

Q. Are there switches depicted in 201?

MR. SAUNDERS: Form.

**A. What -- 201 is the switch control circuit, and there's two NAND gates inside them. There are transistors. But the switches of the claim are in 200.**

Q. So the switches are the transistors, not the NAND gates?

MR. SAUNDERS: Form.

**A. Correct.**

Q. What function do the NAND gates play in Figure 2?

MR. SAUNDERS: Form and the scope.

**A. So -- so it's explained in paragraph --**



**sorry, column 3, line 68 it starts. It talks about -- I will start reading at column 4, line 3. It says, "The switch control output signals SWOUT1 and SWOUT2 are connected to gate terminals of the P-type transistors [sic] P1 and P2, respectively, of the switch circuit ...."**

**And then in reference to Figure 3, it explains, starting at line 12, what the function is of those outputs. And it goes from line 12 through at least line 17 as to what the switch circuit does. I'm happy to read it if you like.**

Q. Thank you. That's okay.

So I would like to talk about how the different parts in Figure 2 work in tandem. So do you see the VD line in Figure 2?

**A. Yes.**

Q. That's the drain voltage supply line, correct?

**A. That is -- yes.**

Q. And the drain voltage supply line supplies the voltage required to write to the cells, right? This is where the energy is coming from to perform the memory operations?

MR. SAUNDERS: Form and scope.

**A. It provides a voltage to the M data lines that then go to the memory cell.**
Q. And between -- well, okay. At the top of Figure 2 that DIO annotation, what is that line?
**A. So that is one of the M bit line, or that is an -- a bit line. Let me confirm that terminology.**
**They are M data lines. So it's a data line.**
Q. So between the voltage supply line and the data line, there are these switches shown in Figure 2, correct?
**A. There is a switch circuit shown 200 that includes two switches within it.**
Q. And the left side, 201, the switch control circuit, that is controlling whether the switches are -- well, whether the switches are on or off, correct?
**A. Yes. That's what Figure 3 and the explanation in column 4 is describing.**
Q. And it's your opinion that if there were only one switch here, then the portion of the claim that discusses common points would be nonsensical, correct?



MR. SAUNDERS: Form and scope.
**A. Repeat the question, please.**
Q. So Figure 2 shows two switches. You opine that the claim term is -- the claim term that we're talking about is indefinite because, at least in part, of this common point language, correct?
MR. SAUNDERS: Form.
**A. There -- there is an inconsistency because you couldn't have a common point from one transistor to one transistor, to the same transistor.**
Q. A transistor can't have a common point with itself?
**A. It's -- exactly. It's one transistor.**
Q. Okay. In paragraph 38 of your report, so this is the end of the third line, you write, "A POSITA would understand that a 'common point' is a junction between multiple elements," correct?
**A. Correct.**
Q. So if two or more elements meet at a junction, that would be a common point according to this definition, correct?
**A. Yes.**



Q. And what do you mean by junction in this context?
**A. So if you look, for example, in Figure 3, if you look at the dark point on the top, that's a junction where the two lines meet, the two -- that is the common point.**
Q. Is a junction similar to an intersection?
MR. SAUNDERS: Form.
**A. Sure. As long as it's electrically -- as long as you mean by that they're electrically connected. It's the same voltage.**
Q. So going back to your definition that a common point's a junction between multiple elements, is a switch an example of an element here?
MR. SAUNDERS: Form.
**A. That's what I'm explaining here, is that there's two switches, P1 and P2, and they're both connected to a common point, which is on the top there, the dark point on the top.**
Q. So what -- what is an element?
**A. So in this case, I'm referring to the switches.**
Q. Is an element -- there are types of



elements that aren't switches, correct? Like in the general, we're talking about integrated circuits, a switch isn't the only type of element, for example?
MR. SAUNDERS: Form.
**A. Sure. But I'm specifically discussing switches here.**
Q. Is a data line an element?
MR. SAUNDERS: Form.
**A. Not in the context I'm talking about. I'm talking about the switches having a common point, so I'm just talking about the switches.**
Q. I understand that. But generally -- let me start over.
The data line carries the voltage to the bit lines; is that right?
MR. SAUNDERS: Form.
**A. Yeah. It's a wire that connects the transistor -- the switches to the bit lines through a decoder, a column decoder.**
Q. And you would not refer to the data line as an element, correct?
**A. Not in paragraph 38. 38, I'm really talking about the switches because the claim**

93

**distinctly is talking about the switches having a common point. So I'm specifically talking about the switches.**
Q. But, I mean, it says, "A POSITA would understand that a 'common point' is a junction between multiple elements," not multiple switches. So why -- if this is only talking about switches, why did you use the term "elements"?
**A. I was just trying to explain the fact that the switches connect at a common point, so the patent is talking about what a common point is, and I am referring to switches here.**
Q. So it's your opinion that a transistor connecting to a data line, the point at which they connect is not a junction?
**A. Well --**
MR. SAUNDERS: Form.
**A. -- it's -- I'm talking about -- for the purposes of this explanation, I'm talking about two switch -- the claim is talking about two switches connecting at a common point. So the common point is the connection of the -- it's a common point between the two switches.**

94

Q. But according to this statement about what a POSITA would understand a common point to mean, a POSITA would understand a common point to be a junction between multiple elements, not necessarily multiple switches?
**A. And in this case, I am talking about the switches.**
Q. If you turn to Figure 6, the -- I'm looking at the right side, the box labeled "400." So this is -- in this figure, there's a single switch, correct?
**A. Correct.**
Q. And the switch is connected to the data line DIO, correct?
**A. It's -- it labels that wire DIO, that -- the terminal of the switch.**
Q. Is the -- well, are they two different things, the terminal of the switch and the DIO or is --
**A. Voltage-wise, no. They're the same.**
Q. What do you mean?
**A. They're the same voltage.**
Q. Okay. But are they -- they have the same voltage, but they're distinct elements?

95

MR. SAUNDERS: Form.
**A. It's -- it's -- there's -- there's no other switches connected there, so there's no common point between the switches here. Since you only have one switch, you cannot have a common point per the claim.**
Q. I understand. I understand that portion of your opinion. I guess I'm just trying to understand. We have the transistor P1 and then we have something labeled "DIO." Are they the same thing?
**A. No. One is a terminal of the transistor P1. So DIO is connected to the terminal of the transistor P1.**
Q. And they connect at a junction?
**A. There's no junction shown here.**
Q. How do they connect?
**A. They're -- it depends on the layout, how this thing was laid out.**
Q. But they do connect?
**A. Yes. You need to connect a wire to the transistor.**
Q. And that connection is not necessarily a junction?

96

**A. It's not a junction between multiple switches.**
Q. But is it a junction?
**A. It's a junction -- it's a via. It would be on a via on transistor P1 connected to a wire.**
Q. What do you mean?
**A. It's -- it's a physical contact to the device, so you have to physically contact the device to a particular wire.**
Q. Would you call that physical contact a junction?
**A. I don't think I would.**
Q. Why not?
**A. Because it's a -- it's a -- I would call it a via.**
Q. What's the difference between a via and a junction?
**A. Or even a contact or a via.**
Q. Oh, excuse me. I didn't mean to interrupt you.
**A. No, no. That's fine.**
Q. Sorry. Can you explain what the difference between a via and a junction is?
**A. So a junction is, you know, a general**

**term perhaps, but I was -- again, I was explaining the common point is a junction between -- a connection between two switches. That's what makes it a common point. It's very clear from the claim is what it is.**

**So whether you want to call DIO connecting to the transistor through a contact or a via a junction, it doesn't affect my statement that -- what a common point is. It's the connection between two switches.**

Q. So it would be -- setting aside your definition of a common point, I understand your definition of common point relates to switches, but just talking about the word "junction." The two switches in Figure 3, you agree that they connect at a common point, correct?

MR. SAUNDERS: And just, Counsel, I think you're referring to Figure 3, which I think is a table. And just for a clean record, you mean Figure 2, right?

MR. NASSAR: Thank you. Yes, Figure 2.

**A. So, yes, they do connect at a common point. And just for clarification, your question said my definition of common point. That's the**



**definition of what the claim defines common point as.**

Q. Well, the claim doesn't explicitly define common point.

**A. It's described as the point where two switches connect with each other.**

Q. Can you point to where it says that?

**A. So it -- in the claim -- I can read it in the patent.**

**So it's column 6 about line 50. So it says "the first terminals of the N switches of each of the M switch lines [sic] are connected to [sic] a common point," and then "to a corresponding one of the M data lines."**

Q. Sorry. I think -- just to clarify the language here, it says, they "are connected at a common point to a corresponding one of the M data lines," correct?

**A. Right.**

Q. So -- so does this mean that the switches are connected to each other and are then connected to the M data line?

MR. SAUNDERS: Form.

**A. They're all connected together. So the**



**common -- the commonality is between the two switches. So the two switches is what gives rise to the fact that it's common between them.**

Q. And the point at which they connect, the two switches and the data line, would you call that point a junction?

**A. Sure.**

Q. So the junction between the two switches is also a junction between the switches and the data line?

MR. SAUNDERS: Form.

**A. But the common -- the rise of the common point is because the -- it's a common point between the two switches, and that's what the paragraph is talking about.**

Q. So unless there are two switches connected to each other, there can be no common point, according to your interpretation of the patent?

MR. SAUNDERS: Form.

**A. In the context of the claim, what gives rise to the common point is the two switches connecting together there. So if you only have one switch, you're not going to have a common**



**point between two switches.**

Q. So I guess I still don't -- I'm having trouble understanding then why the POSITA's definition in paragraph 38 uses the word "elements" instead of switches.

**A. The elements I'm talking about in that whole paragraph are the switches. So I'm talking about the switches.**

Q. So the data lines referred to in that paragraph are not elements?

**A. Not in the context that I'm talking about. I'm talking about the switches. It's pretty clear what I'm talking about there.**

Q. So going back to Figure 6, am I remembering correctly that earlier you stated that Figure 6 embodies claim 5?

MR. SAUNDERS: Form.

**A. Figure 6 and 7 is a description of -- well, in my opinion it's -- it's -- it's -- it can't embody claim 5 because of the indefiniteness of claim 1. But the description in claim 5 regarding the period -- the on period is described in Figure 6, and it's accompanying Figure 7.**

Q. Is it fair to say it purports to embody claim 5?
MR. SAUNDERS: Form.
**A. It's a description. I would have to do further analysis. I'm not sure how to do it if claim 1 is indefinite. Then I can't get to claim -- to claim 5. But all -- I'm going to stick with, it's a description of the on-state period that is claimed in claim 5.**
Q. And it's -- is it your opinion that Figure 6 demonstrates that claim 1 is indefinite because there's no common point at which two switches connect?
MR. SAUNDERS: Form.
**A. Ask the question again.**
Q. Is it your opinion that Figure 6 shows that claim 1 is indefinite because there's no common point in Figure 6 where two switches connect to each other?
MR. SAUNDERS: Form.
**A. No, that's -- that's not -- that's not my opinion, that Figure 6 shows that a claim is indefinite. Claim 6 -- Figure 6 is an embodiment.**



**But my use of Figure 6 in here is to show that the case of N equals one or more is contemplated in the specification, and it's also explicitly written a couple of places in the specification.**
**So the intent of the inventor, that N equals one or more, is based on an embodiment and the description that's in the patent. So I can't dismiss it as a -- the inventor didn't mean to say N equals one or more.**
**So I -- my analysis is, given that that's the case and the case that there's a dependent claim that talks about that on-state period, which I only see an embodiment thereof in Figure 6 or a description of it, leads a person of ordinary skill in the art to the conclusion that this is indefinite.**
**So 6 -- Figure 6 on its own doesn't make me conclude that the patent -- the claim is indefinite. It's the collection of thinking and evidence that gets me to that point.**
Q. Okay. So is it your opinion that claim 1 is indefinite because the patent seems to contemplate situations where N equals one, which



are inconsistent with other parts of the patent where N can't be equal to one?
MR. SAUNDERS: Form.
**A. No. The -- I think -- that's -- that's not what I'm saying. It's inconsistent with the claim itself.**
**So the claim itself is inconsistent. It has one place one element requires that N equals one or more. Yet it also requires that the switches, the Ns, have a common point. If N -- N is equal to one, that situation would not have a common point, so that's where it starts as to the inconsistency.**
**So now my analysis goes beyond that. I said, okay, I'll examine the N as one or more, and I'll examine the common point. And I -- that's what I -- I know it's a long answer, and I'm sorry, but it does explain how I reach my conclusion of indefiniteness.**
**So I look at the N equal one or more, and I realize that is contemplated in the patent, the specification, embodiment, and there's a claim that's dependent on it. But also the common point, where there's multiple switches is also**



**contemplated in the patent and the claims. And so that's where I reach my indefinite conclusion. One of ordinary skill in the art would not be able to consolidate those.**
Q. Thank you. That was helpful to lay it out, so I appreciate the answer regardless of its length.
So in a nutshell, N equals one and a -- having a common point with two or more switches are inconsistent, you can't have both in the same claim?
MR. SAUNDERS: Form.
**A. That is part of my opinion, yes, the inconsistency.**
Q. So if we go to the -- let's start with N as an integer. Column 6, 40 -- line 47. So I'm just going to read the claim term. So "each of the M switch circuits includes N switches, where N is an integer of one or more."
This is where you start in the analysis, right?
MR. SAUNDERS: Form.
**A. Well, sure. I mean, the analysis covers that claim, but that is one of the elements I did**

**consider.**
Q. And then when you keep reading the claim after that line, that's when we encounter the discussion of a common point, correct?
**A. Correct.**
Q. And it's your opinion that the common point -- a common point is defined by two switches connecting, correct?
MR. SAUNDERS: Form.
**A. Yes. What gives rise to the common point is the two switches connected together.**
Q. And I understand that you disagree with this interpretation, but if a common point referred to a connection between any two elements, not just two switches, that would resolve the ambiguity here, correct?
MR. SAUNDERS: Form.
**A. I don't -- I don't -- I don't believe -- I don't believe so. The common point has to be between the two switches. So if it's not there, there is no common point. There's no other definition or usage of common points in this patent, so...**
Q. Okay. I guess I -- I understand why it



has to be between two switches. Can you explain why it must be between two switches?
**A. Sure. Because the claim says it and the embodiment says it. It's -- a POSITA would absolutely understand that that's what it means.**
Q. But Figure 6 is an embodiment that doesn't say it, correct?
**A. Because it doesn't have a common point. That's -- you've just made my point actually, and that's -- I discuss that in my -- my declaration. That was one of the things I did discuss in the declaration, is Figure 6, absolutely silent on the use of common points. Yet Figure 2 -- let me get my figures right. Yet Figure 1 -- at least Figure 1 and I believe it's Figure 8 discuss the common points.**
**So the fact that Figure 6 is silent about it, it's yet further evidence that there is no common points because there are no two switches.**
Q. So because Figure 6 in the -- as described in the specification -- let me start over.
Because the specification does not mention a common point in its discussion of



Figure 6, you're saying that Figure 6 cannot possibly have a common point?
MR. SAUNDERS: Form.
**A. Again, that on its own is not what gives rise to my conclusion. It's further evidence of the indefiniteness of claim 1.**
**To your question about a common point, the fact that Figure 6, when it discusses a single transistor depiction, does not mention common point further supports my conclusion that the common point is the point between where two switches -- it's a common point between two switches, and the fact that there are no two switches there, there is no common point.**
Q. So -- okay. So you would -- you would agree that some of the embodiments show a common point as a connection between two switches?
**A. The common point is the connection between two switches, yes.**
Q. And some of the embodiments, namely Figure 6, do not show a common point as a connection between two switches?
**A. That is correct.**
Q. And so -- if you go to the top of



paragraph -- sorry, column 6 in the patent, line 10. So it says, "While, in the -- in the above embodiments, one or two switches are connected to each data line, the present disclosure is not limited to this."
Do you see that?
**A. Yes.**
Q. And so in addition to Figure 6 showing a single switch, this sentence also confirms -- this sentence is another example of the patent contemplating a single switch, correct?
MR. SAUNDERS: Form.
**A. It is -- it's not saying all the embodiments. It's talking about "the above embodiments, one or two switches are connected." So Figure 6 would be the one with one switch connected.**
Q. And like we just were discussing, it's true that some of the embodiments show one switch, some show two switches?
**A. Let's get specific. Figure 6 shows one switch, and Figures 3 -- 1, 3, 4, and 8 show common points.**
Q. Well --

109

**A. Show multiple switches. Thank you.**
Q. Your definition of common point -- excuse me. The -- well, no. Let me start over.
Your understanding of common point in this patent requires there to be two or more switches, correct?
MR. SAUNDERS: Form.
**A. That is what it says, yes. That's what makes it a common point.**
Q. And according to you, there's the -- the junction between a transistor and a data line, if that were a common point, wouldn't that resolve the indefiniteness?
MR. SAUNDERS: Form.
**A. Well, again, that's not a common point. The common point requires the two switches. But even then, you still are talking about the rest of the claim does talk about multiple switches.**
Q. Well, let's look at that. So are -- you're referring to the discussion in column 6, line 50, where it says "the first terminals of the N switches," is that an example of your -- your reference to multiple switches?
**A. Yes. It's talking about, first,**

110

**terminals of the N switches.**
Q. And the use of the plural here, in your opinion, must mean that there are more than one switch?
**A. And the fact that they're connected to a common point. They have to be connected together. So I can't ignore "are connected." It doesn't say "is connected." They are connected.**
**So there's -- for me, there's no ambiguity whatsoever in that one. The claim itself explains to you what needs to happen here.**
Q. So N is a defined term, correct? It's -- in line 48, N is defined as "an integer of one or more."
**A. Yes.**
Q. Okay. So if we plug in that definition of N into line 50, it would say: The first terminals of the one or more switches of each of the M switch circuits are connected at a common point. Then it continues. Do you agree with that?
MR. SAUNDERS: Form.
**A. Agree with what? I'm sorry.**
Q. Yeah. Do you -- okay. So if you plug

111

the -- if you plug the definition of N, which you agree is an integer of one or more, then this phrase in line 50 would say: The first terminals of the one or more switches, correct?
MR. SAUNDERS: Form.
**A. If you're going to rewrite the claim that way, that's what it would say, yes.**
Q. But you agree that N is defined in this claim as an integer of one or more?
**A. I do.**
Q. So is it rewriting the claim to substitute a definition?
**A. Well, you're not continuing with the reading of "each of the M switch circuits are connected at a common point to the drain voltage supply line."**
**I don't have a common point between the switches if you plug that in. I still have -- the inconsistency is still there, even to the extent you're rewriting the claim.**
**And I have -- would have to study the -- you know, that substitution that you made. But regardless of that, you still cannot consolidate that with a common point for the case where you**

112

**have one -- N equal one.**
Q. The relationship between M and N here. So M, that's the switch control circuit -- well, sorry, the switch circuit. M is the switch circuit, right?
**A. M is one or more -- two or more, sorry. M is an integer of two or more switch circuits.**
Q. So the claim requires two or more switch circuits?
**A. Yes.**
Q. And line 47 says each of those two or more switch circuits has N number of switches?
**A. Correct.**
Q. So there will -- you're always going to have at least two switches, because there will be two switch circuits or more and one switch in each of those circuits?
MR. SAUNDERS: Form.
**A. So just so I understand this correctly. You're -- you have a situation where you have two -- M is equal to two and N equal one for both?**
Q. N -- well, can N equal different things for different switch circuits --

113

**A. Yeah.**

Q. -- according to the claim?

**A. There's no -- each one of them can have different N. I don't see that they have to be the same.**

Q. Well, it says "each of the M switch circuits incudes N switches." So different switch circuits can have a different number of switches?

MR. SAUNDERS: Form. Scope.

MR. NASSAR: Why is that a scope objection?

MR. SAUNDERS: I'll withdraw the scope objection. Apologies. Form though.

MR. NASSAR: So I can ask the question again.

MR. SAUNDERS: Please.

Q. So can different switch circuits in this claim have a different number of switches?

MR. SAUNDERS: Form.

Q. Basically I'm going to ask it several ways which I intend to mean the same thing. Then you can decide which, if any of those, is clear enough to you.

114

Do all of the M switch circuits have to have the same number of switches?

MR. SAUNDERS: Form.

**A. Yeah, I believe that is the case. Because the claim says "each of the M switch circuits includes N switches." So yes, they have to be the same.**

Q. Okay. So we know that M has to be two or more according to the claim, correct?

**A. Yes.**

Q. So as an example, M equals two and N equals one. Do you agree that the definitions of M and N under the claim would allow that? I know you disagree about the definiteness, but I'm just saying, M, there -- you have two switch circuits, each of them has one switch. Is that contemplated by this claim?

MR. SAUNDERS: Form.

**A. But -- but -- it's contemplated by the portions of this claim, but there's still the issue of indefiniteness.**

Q. So in that example, it would be the claim, and I'm looking at line 50 on column 6, so "the first terminals of the N switches of each of

115

the M ... circuits are connected at a common point to a corresponding one of the M data lines."

**A. I'm sorry. Where are you reading now?**

Q. Column 6, line 50. So couldn't this mean that the one switch in each of the two switch circuits are connected to each other and then connected to the data line?

MR. SAUNDERS: Form.

**A. Just read it again for me. I'm trying to picture it.**

Q. So -- okay. So you've got two switch circuits, each of which has one switch.

**A. Okay.**

Q. Those switches are connected at a common point and then connected to a data line. Is that permissible?

MR. SAUNDERS: Form.

**A. But within -- but the N -- there's no N switches connected at a common point because the N refers to the switches within a switch circuit. So one switch circuit has N switches. Those N switches -- so when it refers to the N, it's talking about within a switch circuit. So within**

116

**a switch circuit, there's N, and they need to have a common point. So that's what -- the common point it's talking about.**

Q. Let's -- let's try it with the language about the second terminals. Do you see that, starting on line 53?

**A. Yes.**

Q. Okay. So the second terminals of the switches -- of each of the switch circuits are connected at a common point to the drain voltage supply line.

If you have two switch circuits, each of which has one switch, couldn't they be connected together and the drain voltage supply line at a common point to satisfy this?

MR. SAUNDERS: Form.

(Reporter requested clarification)

MR. NASSAR: And satisfy this.

MR. SAUNDERS: Form.

**A. But the end switches are required to be within the switch circuit, and they are connected together to a common point. And if you only had one, you don't have the common point for the N switches that are inside of the switch circuit.**

Q. So it -- the common point can't just be between any two N switches, it has to be between two switches in the same switch circuit, according to -- is that what you're saying?

**A. Yes. That's what this is saying. It's -- you have M switches, and within an M switch -- sorry, M switch circuits. And within it, you have N switches. These N switches are connected at common points.**

Q. Why does the connection have to be between switches in the same switch circuit?

**A. Because that's what the claim says.**

Q. Where?

**A. Like if you start at 49, column 6, 49, "each of the MxN switches includes a first and a second terminal, and the first terminals of the N switches ...." So that's referring to the N switches within a -- it didn't say each of the M times N switches. It says the N switches. So the N belongs to one switch here.**

**So within one switch, and then it talks about a common point between them. And if there are no N switches inside the switch circuit, there's no common point, and therefore this falls**



**apart. And that's where the indefiniteness comes from.**

Q. Well, that seems to assume that the N switches can't connect across switch circuits.

MR. SAUNDERS: Form.

**A. It's -- whether they do or do not is not the subject of this claim element. The claim element requires switch circuit must have N switches that are connected to s common point.**

**You want to create other common points outside of that, that's outside the scope of this claim. The claim is talking about switch -- a switch circuit with N switches in it connected to a common point.**

**I -- a POSITA reading this would -- could not possibly understand it any other way, in my opinion.**

Q. And that's because it says "the first terminals of the N switches," not the first terminals of the M by N switches?

**A. All I can read is what it says. It's because it says the end switches. I can't tell you why because it says something else. It started by saying "each of the MN [sic]**



**switches," and then it says "the N switches." So the N belongs to a switch circuit. Sorry. The N belongs to a switch circuit. And those have to have the common point.**

Q. So then why didn't you define common point this way in your declaration? You defined a common point as a junction between multiple elements.

**A. Read the entire paragraph. I will stand behind the entire paragraph that I wrote. I was very clear about it's -- the elements I'm talking about are the switches, and they're connected to a common point. My clarification -- my opinion is embodied in the entire paragraph.**

Q. And the opinion is not that switches are connected at a common point?

MR. SAUNDERS: Form.

**A. That's what gives rise to the common point, is the two N -- the N switches connected at a common point.**

Q. If there are -- so a common point is a connection between two switches. I think we established that earlier, if I am remembering correctly, but if I mischaracterize it, let me



know.

**A. What gives rise to the common point in the claim is N switches connected at that point, and that's what gives rise to a common point.**

Q. If you have a switch from one of the switch circuits and it's connected to a switch in a different switch circuit, how would you refer to the point at which they connect?

MR. SAUNDERS: Form.

**A. Don't know. I mean, many ways to refer to it. You'd be very clear and explicit about it if you want to explain it. But this couldn't be clearer (indicating). The common point is two switches -- two N switches, at least two, that are connected at a common point within the M circuit. That's what the claim says.**

**What I would call something outside, I would call it -- you know, there are many ways. You have common point between two M circuits. There's the claim -- if the claim wanted to do that, they would -- they would explain what that is. But they were very explicit about explaining what the common point is for this particular claim.**

121

Q. So -- okay. To make sure I understand, I'm going to try to -- I'll ask you a question.
So a POSITA would understand a common point to refer to the point where the N switches in an M switch circuit are connected. Do I have that right?
MR. SAUNDERS: Form.
**A. All right. Say it again.**
Q. So a POSITA would understand a common point to refer to the point where the N switches in an M switch circuit, I'm talking about the two switches in the same switch circuit, are connected?
MR. SAUNDERS: Form.
**A. So two switches -- two N switches within an M circuit that are connected together at the drain, that would be a common point, and connected at the source would be another common point, for example.**
Q. So a POSITA would understand a common point to be where the two N switches on the same switch circuit are connected at either the source or the drain?
MR. SAUNDERS: Form.

122

**A. I don't know why you keep trying to rephrase it, but I'll explain it one more time.**
**So within an M circuit, there has to be N switches. N could be -- have to be at least two in order to create a common point, where at a first terminal, for an NMOS, would be the drains, are connected together, if they happen to be both NMOS transistors, and a second common point where the second terminals, which could be -- in the case of NMOSs are source terminals, are connected together.**
**There are embodiments where one is an N and one is a P and the source drain definition gets swapped. But nonetheless, the first terminal is on the top, and -- in the embodiment, and the second terminal is at the bottom. Those are the common points. And they have to be between switches -- N switches within an M circuit.**
Q. Okay. So it -- so we can -- we can say they're connected at a terminal and the terminal will be a source -- sources/drains, depending whether they're PMOS, NMOS; is that correct?
**A. Correct. First terminal and second**

123

**terminal.**
Q. Do you think it was a typo to say N is an integer of one or more?
**A. So I don't think you're going to like this, but I'm going to give you my answer again.**
**So I -- the answer is no. Because I looked at that phrase where N is an integer of one or more and I looked at the specification, and the patentee did use that phrase twice to describe the patent.**
**So looking at that plus looking at embodiments, for example, claim 6, that does have N equal one, and looking also at claim 5 that would describe Figure 6, the combination of all of that would lead a POSITA to think that was intentional, not a typo, and therefore that's what -- where the rise comes for indefiniteness for me.**
Q. And the only way -- well, there's only one way to understand common point. And because -- and because you can't have N equals one and N equals two with that singular understanding of common point, that's why it's indefinite?

124

MR. SAUNDERS: Form.
**A. You've listed some of the reasons, but that describes some of the inconsistencies that are there. There's also the plurality usage of the term, and then again applying that to looking at the embodiments to understand how this is -- what this is embodying. It gives rise to the indefiniteness opinion.**
MR. NASSAR: Okay. Thank you. No further questions at this time.
MR. SAUNDERS: I don't have any questions for the witness, so I think we can end for the day.
THE VIDEOGRAPHER: One moment.
This is the end of Media No. 3, and this marks the end of today's deposition of Dr. Marwan Hassoun. We're going off the record. The time is 1:45 p.m.
THE COURT REPORTER: Can I get your orders on the record, please?
MR. SAUNDERS: Yeah. Absolutely. So we'll take a rough, and we don't need a rush on the final. It can be general, non-rush term.
MR. NASSAR: I'll take a rough, and I

would like the final by next Friday, please.

(Whereupon the deposition was concluded at 1:45 p.m.)



C E R T I F I C A T E

I, MARWAN HASSOUN, PhD, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below):

Page Line Correction

MARWAN HASSOUN, PhD

Sworn to and subscribed before me this day of , 2025.

Notary Public

My commission expires:



COMMONWEALTH OF MASSACHUSETTS)
)
SUFFOLK, SS. )

I, Katherine A. Tevnan, Registered Merit Reporter, Certified Shorthand Reporter No. 129093 and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that MARWAN HASSOUN, PhD, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 20th day of February, 2026.

*Katherine A. Tevnan*

______________________

Katherine A. Tevnan,
Registered Merit Reporter
CSR # 129093

Notary Public
My commission expires March 10, 2028

**0**

**0** 50:18,20,23 51:3,6,9,10,11,13,15,21 52:4,11,12 53:1,5,6 55:1,10,14 56:9, 16 57:6 59:4

**1**

**1** 12:23,24 41:1 47:5 50:18,20,24 51:3,6,9,10,11,14,15,21 52:5,11,12 53:1,6 54:20 55:1,11,15 56:9,16 57:1, 6 58:8,15 59:5,24 60:9 82:20 84:6 100:21 101:6,11,17 102:22 106:14,15 107:6 108:22

**10** 11:6 67:16 108:2

**10:35** 41:2

**10:48** 41:6

**11** 56:20 57:13 59:16

**111** 4:13

**12** 55:17 57:14 60:10 88:8,9

**12:01** 80:22

**12:27** 81:4

**13** 44:12 67:17 82:18

**13th** 4:10

**15** 5:23 11:7 14:12 66:9 74:5,6

**16** 13:11 74:5

**17** 24:22 88:10

**18** 25:16,19

**19** 81:22

**1:45** 124:18

**2**

**2** 4:8 19:13,18 41:5,22 43:19 44:11 55:17 56:12,20 57:13,20 58:8 59:15 60:10 80:21 83:3 86:23 87:8,22 88:14,15 89:4,12 90:3 97:20,21 106:13

**20** 5:24 14:12

**200** 87:5,6,16 89:13

**2008** 9:23

**201** 86:24 87:4,11,13 89:15

**2024-CV-01078-JRG-RSP** 4:9

**2026** 4:10

**21** 47:5 55:16 56:11

**22** 56:12

**23** 15:17 17:11 22:13 47:10

**25** 28:9

**26** 59:24 73:16

**27** 16:14,15,24 17:7 60:9,14,15

**3**

**3** 41:11,12 81:3 88:1,3,7 89:19 91:3 97:15,18 108:22 124:15

**30** 41:23

**33** 43:19 54:20,23

**35** 28:8

**36** 58:15 59:12

**37** 82:17

**38** 90:16 92:23 100:4

**39** 41:23

**4**

**4** 88:2 89:20 108:22

**40** 104:16

**400** 94:9

**47** 104:16 112:11

**48** 110:13

**49** 117:14

**5**

**5** 24:22 66:8 81:23 85:11,18,20 100:16,20,22 101:2,7,9 123:13

**50** 98:10 109:21 110:17 111:3 114:23 115:5

**520** 4:13

**53** 116:6

**6**

**6** 15:17,20 67:13,16 73:15 74:6 84:21 85:1,10,11 94:8 98:10 100:14,16,18, 23 101:11,16,18,22,23 102:1,15,18 104:16 106:6,12,17,20 107:1,8,21 108:1,8,16,21 109:20 114:23 115:5 117:14 123:12,14

**68** 88:1

**7**

**7** 15:23 100:18,24

**8**

**8** 28:9 106:15 108:22

**8,400,835** 13:2 15:2 41:12

**835** 10:15 11:19 15:4,10,13 16:16 17:14 18:8 21:2,9 23:6 24:15 28:10 30:13 33:13 35:17 39:13 40:14 41:14 43:11,12 49:18,22 54:15,19 66:10 72:20 73:2 79:11

**9**

**9** 16:14 56:18 59:20,21 60:4

**9:37** 4:11

**A**

**a.m.** 4:11 41:2,6

**absolutely** 72:3 106:5,12 124:21

**academic** 22:16

**accompanying** 100:23

**accomplish** 37:15

**account** 8:15

**accuracy** 14:8

**accurate** 6:8 65:18

**accurately** 44:7

**activities** 9:7

**addition** 108:8

**additional** 15:24

**address** 46:6 62:19 63:7,24 65:1,7 76:17

**addressed** 63:18

**addresses** 46:9 63:11

**addressing** 50:8,9 55:19 65:5,14 75:16

**advanced** 4:14 46:20
**advantages** 32:18
**advent** 53:1
**advise** 8:14
**affect** 38:15 97:8
**affiliated** 9:16
**affirm** 78:10
**agree** 6:12 27:4 63:9 64:8 71:11,15 78:18 97:15 107:16 110:20,23 111:2, 8 114:12
**al-** 16:20
**allowing** 46:7,10
**alternating** 34:24
**alternatively** 74:8,19 78:11
**Alyssa** 11:8
**ambiguity** 105:16 110:10
**amount** 37:17 38:20 39:24 40:8,10
**amp** 53:19 54:8
**amplifiers** 53:20
**AMT** 5:16
**analog** 52:23
**analysis** 24:6 43:10 101:5 102:11 103:14 104:20,23
**and/or** 46:7
**Andrew** 4:19 5:14
**annotation** 89:4
**answering** 70:24
**Apologies** 113:14
**apologize** 62:8
**applicable** 74:9 76:1
**application** 45:20 62:13 77:12 83:19
**applications** 32:19
**applied** 31:4 33:8 37:20 39:24 45:23 46:5,9 47:3 48:15 66:1
**applies** 29:20
**apply** 65:4
**applying** 33:15 37:17 39:14 124:5
**approach** 24:1,6
**approximately** 7:21 13:14 44:12
**Apsel** 11:8,17
**arbitration** 7:8
**argument** 18:21 68:21,22
**arguments** 18:5,11
**arise** 43:14
**arises** 42:16,23 43:7,16
**array** 32:11,12 44:14,17 63:15
**arrays** 66:3
**art** 19:8 20:7 26:13 28:2 61:9,21 62:11 63:17,18 72:19 73:8 82:8,14 102:16 104:3
**articulated** 72:13
**ascertain** 18:14 53:17
**asserted** 8:24 30:2
**assume** 9:3 118:3
**assumed** 67:19 69:13
**assuming** 40:9
**assumption** 69:15
**attention** 7:23
**attorney** 4:18
**attorney-client** 8:12
**attorneys** 10:18,20 14:16,19 25:8
**Avenue** 4:13
**aware** 8:22 21:8,12

**B**

**Bachelor** 28:14
**back** 34:20 39:2 41:5,8 53:15 75:19 77:4 81:3,6 84:12 86:17 91:12 100:14
**background** 20:12 22:14 33:14 55:20 58:23 69:6,20
**bad** 9:23 57:19
**baking** 79:1,9
**bankruptcy** 7:9,11
**based** 25:6,8 55:1 59:5 76:13 80:6,7 102:7
**basically** 51:9 113:21
**basis** 69:12 71:2,9
**beginning** 4:18 41:4 81:2
**begins** 73:16
**behalf** 4:22,23 7:12
**belongs** 117:20 119:2,3
**binary** 50:19
**bit** 39:18 44:13,18 45:9,11,15 47:14 49:23 50:12,16,17,18,23 51:13,15,17, 18,20 52:11,12 53:11 54:17 55:14 56:8 57:6 59:8 61:1 62:15,18 63:6,10, 12 66:5 73:11,12 77:14 79:12 89:5,6 92:16,19
**bits** 37:2 48:13 49:8,11,17,21 50:4,7, 15 51:16 52:15 53:11 55:23 56:19,21 57:2,5,13 58:1,13,21 59:17,19 60:5, 18,21 61:7,15,20 62:2,11,16,24 65:14,15,21 66:4,7,21 67:2,4,7,8,11, 20,22 68:6,10,13,19,24 69:1,9,23 70:1,4,8,9 72:22,23 73:14,20 74:1,3, 11,17,22 75:7,8 76:4,9 77:1,8,9,13,20 78:2,12,15,24 79:13,19
**blanket** 64:15
**Boston** 4:13
**bottom** 122:16
**bounds** 60:11
**box** 94:9
**break** 6:18 40:23 80:16
**Brian** 4:21 10:22
**bring** 72:8
**broader** 70:15
**building** 10:1
**built** 40:20

**C**

**call** 96:10,14 97:6 99:5 120:17,18
**called** 5:6 9:17 32:13 35:1 38:6
**capable** 49:16 57:12
**capture** 86:5
**captured** 34:5 37:22
**captures** 38:20
**carries** 92:15
**case** 4:8 7:8,9,17 10:3,7 11:17 12:14, 19 13:8 27:18 29:15 30:2 74:9 84:24 91:22 94:6 102:2,12 111:24 114:4 122:10

**cases** 7:2,4,6,7 9:6,13 23:17

**categories** 17:17 31:12,16

**category** 31:15

**caused** 44:18

**caution** 8:10

**cell** 42:9 44:1,2,14,16,17,23 45:3,6 46:5,11 47:12 48:13,14,16 49:7,10,18 50:5,6,14,22 51:8,24 52:6 54:3,5,11, 12,15,16,24 55:2,6,10,15,18,22 56:4, 21 57:3,7,9,11,12,14,24 58:3,12,20 59:4,6,7,11,16,18 60:11,17,22 61:7, 19 62:4,16 66:16 67:20,23 69:22 73:12,14,19 74:10,11,14 76:3,21,24 77:9,20 78:2,16,24 79:12 89:2

**cells** 32:16 42:1,4,6,8,17,24 43:8,13, 17,21,24 45:14 46:19 47:1 49:13,15, 20,23 50:3,9,11 52:18,19 53:12 57:16 60:24 61:1,8,14 62:2,10,14,18,22,24 63:4,6,9,12,19 65:8,14 66:1,4,6,20 67:1,6,9 68:6,18,23,24 69:8,12 70:7,9 74:21 76:10 79:19 88:22

**certainty** 82:7,14

**change** 16:12 33:7 37:19 74:24 75:3

**changed** 37:24 38:1,4

**changing** 35:7 38:12 47:2 61:8 74:12 80:1 85:15

**characterization** 42:19

**charge** 33:6,11 35:4,6,18,20 36:10, 11,13 37:2 49:1

**charge-trapping** 35:2,10,23 36:5, 18,23 38:11,14 39:3,10 47:16,19 48:9,20

**checking** 8:1

**chip** 31:5

**chips** 10:1

**circuit** 87:2,4,5,6,14 88:6,11 89:13, 16 112:3,4,5 115:21,22,24 116:1,21, 24 117:3,11,23 118:8,13 119:2,3 120:7,16 121:5,11,12,16,22 122:3,19

**circuits** 33:9 81:13 85:21 92:3 104:18 110:19 111:14 112:7,9,12,16, 17,24 113:7,8,18 114:1,6,16 115:1,7, 13 116:9,12 117:7 118:4 120:6,19

**cite** 76:8

**claim** 7:16,19,21 8:18 12:13,17 13:1 14:6 18:5,8,11,13,20 19:3,9 20:18,22 21:23 23:17,21,24 24:2,24 25:22,24 26:4,20,21 27:1,2 28:5 50:14 64:14, 16,17,19,21,22 65:3,4 81:12,16 82:3, 12 83:3,6,7,9,11,12,15,21 84:1,2,6,12 85:10,11,17,18,20 86:5 87:16 89:23 90:4 92:24 93:21 95:6 97:5 98:1,3,8 99:21 100:16,20,21,22 101:2,6,7,9, 11,17,22,23 102:13,19,22 103:6,7,22 104:11,17,24 105:2 106:3 107:6 109:18 110:10 111:6,9,11,20 112:8 113:2,19 114:5,9,13,17,20,23 117:12 118:7,12 120:3,16,20,24 123:12,13

**claimed** 46:15 64:13 82:8,15 101:9

**claiming** 62:23 63:2 82:1

**claims** 18:7 26:15 46:16 50:5,10 64:2,4,5,16 70:8 73:13 81:24 82:5 86:12 104:1

**clarification** 97:23 116:17 119:13

**clarify** 6:13 70:15 98:15

**clean** 97:19

**cleaning** 79:2,4

**clear** 12:6 21:24 26:6,8,12,15,20 29:21 34:8 43:5 54:14 97:5 100:13 113:23 119:11 120:11

**clearer** 120:13

**collection** 102:20

**collectively** 59:24

**column** 41:22 43:19 44:11 47:5 54:20 55:17 56:10,12,20 57:1,13,20 58:8,15 59:15,24 60:9,10 66:8 67:13, 16 73:15 74:6 88:1,2 89:20 92:20 98:10 104:16 108:1 109:20 114:23 115:5 117:14

**columns** 58:8

**combination** 39:17 51:10,11 52:13 76:19 123:14

**combinations** 52:14

**combined** 69:20 72:9

**common** 42:4 70:21 71:12,16 84:7, 23 85:1 86:1 89:23 90:6,10,13,18,22 91:6,13,19 92:11 93:2,5,11,12,22,23, 24 94:2,3 95:4,6 97:2,4,9,12,13,16, 22,24 98:1,4,13,17 99:1,3,12,13,17, 22,24 101:12,18 103:10,12,16,23 104:9 105:4,6,7,10,13,19,21,22 106:8,13,16,19,24 107:2,7,10,11,12, 14,16,18,21 108:23 109:2,4,9,12,15, 16 110:6,19 111:15,17,24 115:1,15, 20 116:2,3,10,15,22,23 117:1,9,22,24 118:9,10,14 119:4,5,7,13,16,18,20,21 120:2,4,13,15,19,23 121:3,9,17,18,20 122:5,8,17 123:20,23

**commonality** 70:18 99:1

**company** 9:24

**compare** 35:15

**compared** 38:11

**compensated** 10:3,9

**compensates** 29:7

**compensation** 10:6

**competing** 16:17

**complex** 53:12

**complexity** 53:24

**computer** 28:15,17 29:6

**concept** 61:5,6

**conclude** 102:19

**concludes** 56:20 58:19

**conclusion** 70:8,12,16,21 71:23 76:9 86:3,6 102:16 103:19 104:2 107:5,10

**conditions** 36:15 42:2

**confirm** 66:19 67:1 89:6

**confirmed** 60:19

**confirms** 108:9

**conflict** 77:24

**conjuring** 12:3

**connect** 75:22 93:11,16 95:15,17,20, 21 97:16,22 98:6 99:4 101:13,19 118:4 120:8

**connected** 47:13,14 88:4 91:11,19 94:13 95:3,13 96:5 98:12,16,21,22,24 99:17 105:11 108:4,15,17 110:5,6,7, 8,19 111:15 115:1,7,8,15,16,20 116:10,13,21 117:9 118:9,13 119:12, 16,19 120:3,6,15 121:5,13,16,18,22 122:7,10,21

**connecting** 93:15,22 97:7 99:23 105:8

**connection** 93:23 95:23 97:3,10 105:14 107:17,18,22 117:10 119:22

**connects** 87:5 92:18

**consideration** 27:22
**Considerations** 19:16
**considered** 16:10 20:23
**consistent** 79:11
**consolidate** 104:4 111:23
**construct** 32:19 50:19
**constructed** 32:12
**construction** 7:16,20,21 8:18 12:13, 18 13:2 18:5,11,13,21 19:3,9 20:18, 22 23:17,23 24:3 25:22,24 27:1,2 32:11
**constructions** 16:18 17:16 18:8 22:24
**construed** 49:13
**construing** 23:20 83:21
**consult** 26:16,19
**consulting** 9:12,14 10:1
**contact** 96:7,8,10,18 97:7
**contemplate** 102:24
**contemplated** 102:3 103:21 104:1 114:17,19
**contemplates** 50:6
**contemplating** 84:16 108:11
**content** 31:7
**contents** 20:5
**context** 55:24 80:14 91:2 92:10 99:21 100:11
**continuation** 74:18
**continue** 21:12 60:9
**continues** 110:20
**continuing** 111:13
**continuously** 60:20 61:19
**contract** 7:8
**contradict** 80:11 82:19,22
**contrast** 31:6
**contribute** 76:16
**control** 45:13 61:6 75:2 85:20,21 87:2,4,13 88:3 89:16 112:3
**controlling** 85:19 89:16
**conventional** 41:24 55:22 56:13 57:8,10 69:21
**copy** 12:22 19:12 30:17 41:17 86:12
**correct** 6:5 9:1 10:4,10 12:14,20 13:9 15:2,3 16:22 17:1 18:17 20:12 22:6 23:18 28:7,17,18,21,22 30:15 31:8,18 36:2,18 40:1 41:14,16 45:24 46:11 49:8,13,14,17 50:12,24 52:19 54:17 55:11 56:4 58:1,2,5 68:11,21 72:14 74:1 76:4,10,11 81:14,18 82:16 87:3,20 88:18 89:12,18,24 90:7,19, 20,23 92:1,22 94:11,12,14 97:16 98:18 105:4,5,8,16 106:7 107:23 108:11 109:6 110:12 111:4 112:13 114:9 122:23,24
**correctly** 26:10 40:3 45:4,7 55:3 100:15 112:19 119:24
**counsel** 4:17 5:6 97:17
**counted** 7:23
**couple** 10:18 74:4 102:4
**court** 4:7 5:1 12:14 124:19
**cover** 50:11 85:7
**covers** 104:23
**Craig** 4:4
**create** 33:17 34:10 56:18 118:10 122:5
**criteria** 28:24
**current** 38:2
**customary** 25:2,12,14
**CV** 8:1

**D**

**d/b/a** 9:20 10:2
**dark** 91:4,20
**data** 49:17,24 51:6 52:10 54:24 56:15,22 58:1,13,21 59:3,17,19 67:20 68:6,11,13 72:23 73:20 74:1,11 76:4 77:1 89:1,8,11 92:8,15,21 93:15 94:13 98:14,17,22 99:5,10 100:9 108:4 109:11 115:2,8,16
**date** 4:10 8:7
**day** 124:13
**days** 11:7
**decide** 113:23
**declaration** 7:20 8:18 10:16,17 11:16,19,22 12:7,9,18,19,24 13:7,15, 22,24 14:10,15,23 15:1,8,13,15 16:9, 12,21,23 17:7,9,21 18:16,24 19:3,5,7, 12,13,22 20:3,10,13,17,21,24 21:17, 23 22:6,9,17,21 23:11,15 24:10,14,22 28:9 48:12 61:6 76:17 81:9,23 106:10,12 119:6
**declarations** 7:18 11:22 12:12 61:18
**decoder** 92:20
**decorations** 7:22
**decreased** 45:17
**Defendant** 4:23
**Defendant's** 13:1
**define** 28:10,13 61:19 98:3 119:5
**defined** 24:6 105:7 110:12,13 111:8 119:6
**defines** 58:12 98:1
**definiteness** 114:14
**definition** 21:24 22:3 26:12 90:23 91:12 97:12,13,24 98:1 100:4 105:22 109:2 110:16 111:1,12 122:13
**definitions** 114:12
**degradation** 42:7 43:23 44:5,6,9 45:1,5,8
**degrades** 44:8
**degrees** 29:3
**demonstrates** 101:11
**denied** 21:8
**deny** 66:20 67:1
**depend** 10:6 40:15,18
**dependent** 58:9,10 102:12 103:23
**depending** 28:24 37:8 39:19 44:16 45:6 56:16 57:7 122:22
**depends** 27:17 32:18 40:13,19 42:9 50:20 51:21 52:9 53:19,21 64:2,5 65:3 95:18
**depicted** 87:7,11
**depiction** 107:9
**deponent** 4:16
**deposed** 5:20,22 6:1,15 7:3,19

**deposition** 4:6,11 10:12 11:2,5 124:16

**describe** 24:1 30:6 64:14,20 123:10, 14

**describes** 47:6,22 124:3

**describing** 27:15 44:21 60:8,12 67:21 68:3,4 89:20

**description** 27:14 34:6,7 57:10 58:19 60:7,18 69:20 72:20 100:18,21 101:4,8 102:8,15

**design** 38:22

**designed** 34:16 40:21

**detect** 37:10,13 53:20 54:9

**detecting** 54:9

**determine** 21:18 27:1

**determined** 55:1 59:4

**development** 52:22

**device** 36:7 38:19 39:4,7 40:21 96:8, 9

**dictionaries** 21:16

**difference** 96:16,23

**differences** 35:9

**differently** 27:19 39:22 80:1 83:10

**difficult** 45:13

**digital** 52:23 53:1

**DIO** 89:4 94:14,15,18 95:10,13 97:6

**dioxide** 33:24

**DIRECT** 5:10

**direction** 37:7 53:4

**director** 9:9

**disadvantages** 32:18

**disagree** 105:12 114:14

**disclaimers** 27:20

**disclosure** 73:17,24 74:9 79:12 108:5

**disclosures** 61:18 80:15

**discuss** 46:16 69:11 85:1 106:10,11, 15

**discussed** 18:16 47:21 74:8

**discusses** 72:22 89:23 107:8

**discussing** 19:24 92:6 108:18

**discussion** 18:21,23 49:3 56:9 105:4 106:24 109:20

**discussions** 13:18 14:6

**dismiss** 102:9

**dissecting** 55:14

**distance** 46:22

**distinct** 94:24

**distinctly** 82:1 93:1

**district** 4:7 12:13

**Division** 4:8

**document** 11:20 12:4,5 13:4 14:18, 20 41:10,14 84:21

**documented** 84:4

**documents** 10:23 17:3,8

**drafting** 13:22 22:17

**drafts** 14:22

**drain** 39:15 42:3 44:15 47:13 88:17, 20 111:15 116:10,14 121:17,23 122:13

**drains** 122:6

**drop** 44:17 46:22

**due** 42:11,12 46:22 63:14

**duly** 5:7

**duration** 45:19 46:8 47:2 61:8 62:13

**dysjunctively** 47:20

**E**

**earlier** 16:20 29:24 49:6 100:15 119:23

**Eastern** 4:7

**education** 28:19 29:7

**effect** 33:17

**effectively** 38:3

**electrical** 28:14

**electrically** 91:9,10

**electrode** 47:13

**electron** 33:17

**electrons** 33:18 34:5 37:7 38:1,15, 20 47:4

**element** 91:14,21,24 92:4,8,22 103:8 118:7,8

**elements** 49:16 84:6 90:19,21 91:14 92:1 93:6,9 94:4,24 100:5,6,10 104:24 105:15 119:8,11

**Emanuel** 4:12,22

**embodied** 119:14

**embodies** 100:16

**embodiment** 72:12 73:11,13 84:21, 23 85:10,11,14,24 86:21 101:24 102:7,14 103:22 106:4,6 122:15

**embodiments** 26:23 27:3,8,12,13 58:10 67:3,11,14,22,24 68:4,5,10,16, 17,18,23 69:11,15,16,19 70:5,7,17,20 71:2,3,10,12,16,24 72:4,21 73:2,3,10 74:7 86:20 107:16,20 108:3,14,15,19 122:12 123:12 124:6

**embody** 100:20 101:1

**embodying** 124:7

**employment** 9:6,9

**encounter** 105:3

**encroaches** 8:12

**end** 41:1 58:24 60:14 75:23 80:9,21 90:17 116:20 118:22 124:12,15,16

**ends** 58:23

**energy** 88:22

**engaged** 22:20

**engagement** 8:9 24:8

**engineering** 28:14,15

**entire** 23:2 57:10 119:9,10,14

**entity** 9:21

**enumerate** 71:8

**envisioned** 75:4

**equal** 83:3,20 84:5,24 85:13 103:2, 11,20 112:1,21,23 123:13

**equals** 81:10 82:20 83:9,13 102:2,7, 10,24 103:8 104:8 114:11,12 123:21, 22

**equivalent** 35:14,15

**established** 119:23

**estimate** 14:11

**eventually** 9:24

**evidence** 21:23 22:5,8,9,22 25:21,24 26:9 76:8,19 77:6 80:7 102:21 106:18 107:5

**evolution** 52:17 53:3

**evolved** 53:8

**exact** 8:7

**examination** 5:6,10

**examine** 103:15,16

**examined** 5:8

**examples** 27:3,6 62:12 72:1,5

**exceed** 40:5

**exceeds** 40:9

**exchange** 14:22

**excludes** 49:23

**exclusively** 71:13 73:24 76:2 79:3

**excuse** 8:23 13:10 17:4 25:1 28:8 30:14 61:1 71:13 76:1 78:6 79:19 96:19 109:2

**exhaustive** 72:4,7

**exhibit** 12:23,24 19:13,18 41:11,12 86:16

**exist** 64:24

**existed** 61:9,12

**exists** 53:18

**experience** 28:16,20 29:5 61:2 62:4

**expert** 6:2 8:21 9:5,14 11:12,21 12:7, 9,24 18:16

**experts** 11:10

**explain** 22:15 27:6 39:6 59:1,8 70:11 93:10 96:22 103:18 106:1 120:12,21 122:2

**explained** 44:11 56:15 60:4 80:3 87:24

**explaining** 59:11 77:22 91:17 97:2 120:22

**explains** 33:13 39:13 41:23 56:17 88:8 110:11

**explanation** 25:17 27:20 60:16 63:16 74:18 86:8,9 89:20 93:20

**explicit** 120:11,22

**explicitly** 72:13 98:3 102:4

**expresses** 20:18

**expressly** 73:3

**extending** 85:14

**extent** 8:11 22:10 35:19 62:17 63:5 69:4 111:20

**extra** 29:7

**extrinsic** 22:4

F

**fact** 34:23 44:21 45:6 59:14 66:5 93:10 99:3 106:17 107:8,13 110:5

**factors** 45:21

**fail** 82:6

**fails** 82:3,13

**fair** 12:10,11 23:21 28:11 34:6,7 42:18 101:1

**falls** 9:13 117:24

**false** 50:19 51:7,21

**familiar** 11:9,10 32:21

**Fear** 4:4

**February** 4:10

**feel** 21:18

**field** 28:16 29:6

**fields** 28:15

**figure** 56:18 59:20,21 60:4 66:14 84:21 85:1,11 86:23 87:8,22 88:7,14, 15 89:4,12,19 90:3 91:3 94:8,10 97:15,18,20,21 100:14,16,18,23,24 101:11,16,18,22,23 102:1,15,18 106:6,12,13,14,15,17,20 107:1,8,21 108:8,16,21 123:14

**figures** 66:10,19,24 67:1 86:13 106:14 108:22

**file** 15:11 23:6 26:5

**final** 124:23

**finalizing** 14:23

**find** 43:2

**fine** 70:14 96:21

**firm** 9:13

**flash** 31:22,23,24 32:1,4,5,6,10,14,15 33:4

**flashes** 32:4

**flexibility** 28:24

**floating** 47:15,18,22 48:8,20 49:3

**floating-gate** 32:21 33:4,10,21 34:14,21 35:4,10,16,21,24 36:4 39:2

**focusing** 62:21 78:23

**forgive** 73:6

**forgot** 43:12 75:17

**form** 12:15 14:2 16:4 17:23 18:1,18 19:1,6 20:19 21:4,10 22:7,18 23:5,22 24:4,16 25:15 26:2,11,18 27:2,5,11 29:2,16 30:8,16 31:13,19 32:2 33:2, 12 34:17 35:3,12 36:3,19 37:5,16,23 38:24 39:5,11,21 40:2,12 41:20 42:20 43:1,9,15 44:10 45:16 46:1,12 48:10, 23 49:9 50:1,13 51:1,12,19 52:3,8,20 53:13 54:6,18 55:7 56:7 57:4,18 58:6 61:4 62:6 63:13 64:1,11 65:2,9 66:2, 22 68:2,14 69:3,17 70:3,10,23 71:20 72:2,6,15 73:5,8 75:10 76:18 77:16 79:5,20 80:12 81:21 83:5,14,22 86:19 87:12,19,23 88:24 90:1,8 91:8,16 92:5,9,17 93:18 95:1 98:23 99:11,20 100:17 101:3,14,20 103:3 104:12,22 105:9,17 107:3 108:12 109:7,14 110:22 111:5 112:18 113:10,14,20 114:3,18 115:9,18 116:16,19 118:5 119:17 120:9 121:7,14,24 124:1

**formed** 24:19 30:10

**forming** 17:13 22:5 27:22

**full** 5:17 6:8 57:20

**function** 87:21 88:8

**functioning** 63:3

G

**gate** 33:6,16 39:15 47:12,15,18,22 48:8,20 49:3 88:4

**gates** 87:14,18,21

**gave** 52:23 53:1 60:2

**general** 31:16 58:11 61:10 92:2 96:24 124:23

**generally** 25:1,11 27:15 30:13,22 31:3,9 32:3 35:5 38:18 43:6 46:13,17 60:2 64:6 92:13

**generated** 54:12
**give** 6:7,23 13:19 14:8 19:12 64:4,15 123:5
**Godfrey** 4:20
**good** 4:3,19,21 5:12,13 12:3 40:22
**Green** 9:17,19
**ground** 6:16
**group** 9:16
**guess** 31:15 39:8 54:1 60:10 70:14 95:8 100:2 105:24
**guilty** 6:21

**H**

**hand** 12:22
**handed** 19:19
**handing** 41:10
**happen** 110:11 122:7
**happening** 48:14
**happy** 46:16 70:13 88:11
**hard** 13:16,19 14:4
**hard-and-fast** 28:23
**Hassoun** 4:16,24 5:4,12,19 13:1 19:20 41:8 124:17
**head** 77:4
**hear** 77:10
**heard** 12:2
**held** 4:12
**helped** 14:17
**helpful** 86:11 104:5
**hereinafter** 58:18 59:13
**historically** 45:12
**history** 15:11 16:16 17:15 22:23 23:1,6,8 26:5 52:21 53:8,16 82:6
**hot** 33:17
**hour** 6:18
**hourly** 10:9
**hours** 11:7 13:14,20 14:12
**Huntington** 4:13
**Hynix** 4:15,23 7:13 8:2 30:2

**I**

**identification** 13:3 19:16 41:13
**identified** 10:24 16:23 20:7
**identify** 4:17
**ignore** 110:7
**imagine** 83:18
**impacts** 40:1
**implement** 31:21
**implementations** 32:17
**implemented** 33:1 66:3
**important** 40:4 45:21
**impurity** 74:13 75:1
**include** 73:18 74:15 81:24
**includes** 47:12 80:8 81:13 89:14 104:18 114:6 117:15
**including** 59:23
**inconsistencies** 124:3
**inconsistency** 90:9 103:13 104:14 111:19
**inconsistent** 79:13 84:5 103:1,5,7 104:10
**incorporated** 9:22
**increased** 44:14 45:13,18
**increases** 42:11,12
**incudes** 113:7
**indefinite** 81:17 82:5 83:4,12 90:5 101:6,11,17,23 102:17,20,23 104:2 123:24
**indefiniteness** 22:2 81:20 82:11 86:7 100:21 103:19 107:6 109:13 114:21 118:1 123:17 124:8
**indicating** 120:13
**individual** 11:24
**individually** 46:11 52:16
**inform** 82:7,13
**information** 54:24 55:9,23 56:3,24 59:3
**infringement** 7:3,17
**initially** 9:22 34:16
**innovation** 64:3
**inside** 47:23 87:14 116:24 117:23
**Inspiration** 9:12,19,20
**instances** 79:18 84:14
**Institute** 9:10
**institution** 21:8 29:4
**insulating** 34:4,8,9
**insulation** 33:18,20
**insulator** 34:11,12 36:6,12
**integer** 81:14 83:8,16 84:2,15,17 85:8 104:16,19 110:13 111:2,9 112:7 123:3,7
**integrated** 92:2
**Intellectual** 9:12,18,20
**intend** 113:22
**intended** 45:2,14 77:5
**intent** 102:6
**intentional** 123:16
**interpret** 52:10 79:3
**interpretation** 51:6 99:18 105:13
**interrupt** 96:20
**intersection** 91:7
**intrinsic** 21:23 22:9,22 71:4 80:7
**invalid** 82:4
**invent** 54:4
**invention** 25:3 27:15 33:14 69:7 82:3,9,15
**inventor** 75:4 77:4 78:22,23 82:2 84:11 86:5 102:6,9
**involved** 7:10 9:4 14:14 32:20
**IPR** 11:19,20,22,24 12:8 15:12 16:21 17:7,21 18:4,9,12,16,24 19:7,23 21:12
**isolating** 79:7
**isolation** 74:16 77:18
**issue** 42:16 46:7,9 63:18,24 83:20 114:21
**issues** 46:14

J

**Jang** 10:22

**junction** 90:19,22 91:1,5,7,13 93:5, 16 94:4 95:15,16,24 96:1,3,4,11,17, 23,24 97:2,8,14 99:6,8,9 109:11 119:7

K

**Kathy** 5:2

**Kevin** 10:22

**Khatri** 12:1 19:13

**kind** 33:23 34:1 36:6 40:20 42:23 43:7 50:8

**kinds** 7:6 31:11 36:8

**Kobayashi** 20:8,11,14

L

**labeled** 86:24 94:9 95:10

**labels** 94:15

**laid** 95:19

**language** 83:21 90:6 98:16 116:4

**lawsuit** 8:24

**lawyers** 8:14 10:24

**lay** 104:5

**layer** 33:19,22 34:3,5,8,10,12 35:2,6, 11,17,18,23 36:5,18,23 38:12 39:3,10 47:16,19,23 48:9,20 49:2,4 59:23 67:19 68:1,13 73:19

**layers** 34:9 75:1

**layout** 95:18

**lead** 123:15

**leading** 42:7 43:22

**leads** 102:15

**left** 89:15

**legal** 25:7,9

**length** 44:13 46:4 69:8 104:7

**level** 30:11 31:15 55:2 59:5

**levels** 54:9,10

**Lexitas** 4:5

**life** 72:8

**light** 43:11 82:5

**limited** 43:6 78:7 108:5

**lines** 41:23 44:13 48:15 57:13 89:1,8 91:5 92:16,19 98:12,14,18 100:9 115:3

**listed** 80:8 124:2

**litigation** 11:13

**LLC** 4:15

**location** 63:15

**logic** 76:23

**logically** 51:2 52:9 53:5,10 54:2

**long** 47:3 91:9,10 103:17

**longer** 44:22 45:9,11,14

**looked** 10:16 12:5 15:15 17:11 22:20 83:24 84:1,9 85:4 123:7,8

**loses** 31:7

**lot** 11:14 16:7 36:20

**low** 42:10

**lunch** 80:23

M

**made** 33:22 58:11 79:16 106:9 111:22

**magnetoresistive** 37:1 38:7

**make** 29:17 48:17 54:2 60:6,8 62:8 64:7 65:22 68:20 77:14 81:10 86:15 102:18 121:1

**makes** 51:16 97:4 109:9

**mandatory** 69:16

**mapping** 19:8

**marked** 12:23 13:2 19:16,18 41:11, 13

**marks** 124:16

**Marshall** 4:8

**Marwan** 4:16,24 5:4,19 12:24 124:16

**Massachusetts** 4:14 9:10

**material** 8:20 17:1,22 18:6 34:1 36:9, 14 37:9,18,19 38:3

**materials** 15:9 16:24 17:6,17 34:2

**matter** 4:14 8:3 34:23 40:10 64:13 65:5 82:2

**meaning** 25:2,12,14 34:5

**means** 28:23 50:23 63:9 106:5

**meant** 84:18

**measure** 38:17

**mech-** 34:21

**mechanism** 34:15,21,22 35:5,21 36:13 38:5 50:18

**mechanisms** 35:1 36:1 49:1 67:7

**Media** 41:1,5 80:21 81:3 124:15

**meet** 10:18 90:21 91:5

**meeting** 10:24

**memories** 32:4,5 37:1 73:18

**memorize** 71:7

**memory** 4:14 28:17 29:6 30:15,23, 24 31:2,3,5,7,11,17,18 32:6,8,10,11, 12,15,24 33:8 34:15 36:17,22 37:21 38:7,12,14,19,23 39:4,8,14,17,19 40:1,7,11,13,16,18 42:1,4,5,8,9,17,24 43:8,13,17,21,23 44:1,2,6,7,14,16,17, 23 45:3,6 46:5,10,19 47:1,7,11,12 48:12,14,16 49:7,10,13,15,18,23 50:3,5,6,9,11,14,22 51:8,24 52:6,17, 18,19 53:12,22 54:3,4,11,12,15,16,24 55:2,5,10,15,18,21,22 56:4,13,21 57:3,7,9,11,12,14,16,24 58:3,5,12,20 59:4,5,7,11,16,18,22 60:3,11,16,22, 24 61:1,7,8,14,19 62:1,4,10,14,16,18, 22,24 63:4,6,9,12,15,19 65:7,14 66:1, 4,6,16,20 67:1,6,9,18,20,23 68:6,12, 18,23,24 69:8,11,22 70:7,9 72:22 73:12,14,19 74:1,10,11,13,21 76:3, 10,21,24 77:9,20 78:2,16,24 79:12,19 88:23 89:2

**mention** 106:24 107:9

**mentioned** 16:20 23:16 28:4 46:14 56:11

**Merits** 19:15

**met** 10:21,22

**method** 38:22

**middle** 47:24

**mind** 15:16

**mischaracterize** 119:24

**MIT** 9:11
**MN** 118:24
**moment** 40:24 80:20 124:14
**months** 8:7 13:17 14:5
**morning** 4:3,19,21 5:12,13
**morphed** 9:24
**moving** 54:4
**MRAM** 38:7,9,12,14,22
**multi-bit** 53:12 54:4
**multiple** 14:22 42:17 53:7 63:23 64:24 84:8 85:6 90:19 91:13 93:6 94:4,5 96:1 103:24 109:1,18,23 119:7
**Murakami** 15:21 20:7,10
**Mxn** 117:15

N

**name's** 5:14
**named** 11:8 12:1
**names** 11:14 12:3
**NAND** 32:1,3,10,13,14 87:14,18,21
**Nassar** 4:19 5:11,14 19:17 40:22 41:7 80:16,19 81:5 86:15 97:21 113:11,15 116:18 124:9,24
**necessarily** 36:10 42:22 48:4,5,24 71:17 94:5 95:23
**needed** 84:10
**negatives** 36:21
**NMOS** 86:22 122:6,8,23
**NMOSS** 122:10
**non-conventional** 30:14
**Non-discretionary** 19:15
**non-rush** 124:23
**non-vol-** 55:21
**non-volatile** 30:14,23 31:2,3,10,17, 18 32:8,9,24 34:15 36:17,22 38:22 39:3 47:7,11 55:18,22 56:13 57:8,11 58:4 59:22 60:3 67:18 68:11 69:22 73:18,24 76:3
**non-volatilely** 37:3
**nonetheless** 122:14
**nonsensical** 89:24
**Ns** 103:10
**number** 13:20 38:15 112:12 113:8, 19 114:2
**numeral** 20:6
**nutshell** 104:8

O

**oath** 6:5
**object** 12:15 14:2 16:4 17:23 18:18 19:1,6 20:19 21:3 22:7,18 23:5,22 24:4,16 25:15 26:2,11,18 27:5,11 29:2,16 30:8,16 31:13,19 32:2 33:2, 12 34:17 35:3,12 36:3,19 37:5,16,23 38:24 39:21 40:2 41:20 44:10 45:16 46:12 49:9 50:1,13 52:3 66:2
**objection** 113:12,14
**observation** 70:19
**observe** 66:16
**obvious** 73:7
**offer** 81:11
**offices** 4:12
**on-state** 85:21 101:8 102:13
**operate** 60:17
**operation** 44:15 58:17 59:13
**operations** 88:23
**opine** 24:9,17 29:5 81:9 90:4
**opined** 18:15 23:11,17 48:11
**opining** 23:23 24:2
**opinion** 17:2,13,22 18:1,6,12 19:3,4, 10 20:17,18,22 21:1 24:11,14,20 27:2,8,23 29:9,12 30:6,10 48:7,21 49:15,19,22 50:10,15 51:17 56:23 57:1 58:8,9 61:24 62:21 63:1 64:23 65:6,13,20,23 69:12 71:3,9,21 72:18, 24 73:9 76:12,16 79:7 80:4,6,7,10,14 81:11,16 82:12 89:21 93:14 95:8 100:19 101:10,16,22 102:22 104:13 105:6 110:3 118:17 119:13,15 124:8
**opinions** 18:7 22:5
**opposed** 32:14
**options** 56:3
**ord-** 25:1
**order** 23:9 26:24 34:9 37:2,18 40:6 46:24 64:13,20 76:20 122:5
**orders** 124:20
**ordinary** 25:2,11,13 26:13 28:2 61:21 72:18 73:8 102:16 104:3
**orientation** 37:24 38:22
**outcome** 10:7
**output** 88:3
**outputs** 88:9
**Owner's** 19:14
**oxide** 33:6,23

P

**P-TYPE** 88:5
**p.m.** 80:22 81:4 124:18
**P1** 87:9 88:5 91:18 95:9,13,14 96:5
**P2** 87:10 88:6 91:18
**paid** 7:23
**paper** 13:24
**paragraph** 15:17,23 16:14,15,24 17:7,11 22:13 24:22 25:16,19 28:8,9 47:6 57:15,20,23 58:5 60:15 68:15 69:13 74:23 81:22 82:17 87:24 90:16 92:23 99:15 100:4,7,10 108:1 119:9, 10,14
**paragraphs** 59:10,11 74:4
**part** 17:12 64:13 69:5 78:17 90:6 104:13
**parties'** 16:17
**partnerships** 9:10
**parts** 71:4,19 72:9,21 76:14,16 86:10 88:14 103:1
**patent** 7:3,16 8:24 9:3,13 10:15 13:2 15:2,4,5,10,12 16:8,16 17:14 18:8 19:14 21:9 22:22 23:6,21 24:15 27:19 28:10 29:19 30:13,17 39:13 41:12,14, 17,19 43:2,4,6,12 44:4 45:12 46:2,6, 9,13 48:7,22 49:18,22 50:2,6,9 54:19 55:19 57:17 58:12 60:20 61:2,22 62:1,10,15 63:11 65:7,13,20,24 66:6, 10,20 67:2,3 68:9 69:1,15 70:17,20, 21 71:7,13,17 72:1,5,9,12,13,20,22 73:2,4,10 75:2,5 76:14,21 78:14,15, 20,21 79:10,15,17 80:4,15 81:24 84:15 86:12 93:12 98:9 99:19 102:8,

19,23 103:1,21 104:1 105:23 108:1, 10 109:5 123:10

**patented** 64:9

**patentee** 61:13 62:21 65:15 85:3 123:9

**patents** 8:19,20,23 13:18 16:3 27:4, 9,14 29:14,20 30:1,5,7,12 34:23 36:24 63:23 64:10,24 66:7

**path** 38:2

**pen** 13:24

**pen-to-paper** 14:13

**penetrate** 33:18

**perform** 88:23

**period** 14:7 42:3 45:23 46:4 85:15,19 100:22 101:9 102:13

**periods** 33:16 85:21

**permissible** 115:17

**person** 26:13 28:1 29:1 61:21 72:18 73:8 102:15

**perspective** 28:6

**Phd** 13:1

**phrase** 64:18 77:10 111:3 123:7,9

**physical** 96:7,10

**physically** 96:8

**physics** 36:7 40:19

**picture** 115:11

**piece** 38:3

**pieces** 76:7

**pin** 13:16

**place** 11:11 26:3,14 38:16 103:8

**places** 102:4

**plaintiff** 4:20 5:7,15 30:1

**plates** 33:20

**play** 87:21

**plug** 110:16,24 111:1,18

**plural** 110:2

**plurality** 42:1 73:20 74:3,15,17 75:6, 11 76:4 77:2 78:4,5,6,8 124:4

**PMOS** 86:22 122:23

**point** 58:14 66:14 77:18 84:7 90:6, 10,13,18,22 91:4,6,19,20 92:12 93:2, 5,11,12,15,22,23,24 94:2,3 95:4,6 97:2,4,9,12,13,16,23,24 98:1,4,5,7, 13,17 99:4,6,13,18,22 100:1 101:12, 18 102:21 103:10,12,16,24 104:9 105:4,7,10,13,19,21 106:8,9,24 107:2,7,10,11,12,14,17,18,21 109:2, 4,9,12,15,16 110:6,20 111:15,17,24 115:2,16,20 116:2,3,10,15,22,23 117:1,22,24 118:9,14 119:4,6,7,13, 16,19,20,21 120:2,3,4,8,13,15,19,23 121:4,10,17,19,21 122:5,8 123:20,23

**point's** 91:13

**pointed** 58:16

**pointing** 59:2 66:5 82:1

**points** 84:23 85:1 86:2 89:23 105:22 106:13,16,19 108:23 117:9 118:10 122:17

**portion** 89:22 95:7

**portions** 23:3,8 82:18,21 83:1 114:20

**POSITA** 25:3 27:24 28:6,10,13 29:13,14,19 30:6,7,11 84:6 86:4 90:18 93:4 94:2,3 106:4 118:15 121:3,9,20 123:15

**POSITA's** 100:3

**position** 44:16,22 46:19

**positions** 9:9

**possibility** 82:19,22

**possibly** 107:2 118:16

**potentially** 8:20

**power** 31:5,7 37:21

**power's** 31:4

**practiced** 27:4,10 72:1,5

**preceded** 52:18

**Preliminary** 19:14

**preparation** 14:15,17,20 17:4 22:17

**prepare** 10:11,14 11:1

**prepared** 7:22 11:17,24 13:7 17:8

**preparing** 11:5 13:15 14:1 15:8 21:17

**present** 73:16,23 74:9 108:4

**presented** 18:24 22:8 77:6

**president** 9:11

**pretty** 21:24 71:6 100:13

**principle** 58:17 59:12

**principles** 60:16

**prior** 19:8 20:7 61:9 62:11 63:17,18

**privilege** 8:13

**problem** 42:14,23 43:7,14,16 44:3 46:18,21 50:2,8 60:21,23,24 61:2,14, 22 62:1,5,18 63:6,10 64:6,12,20 65:1, 16,19 69:7

**problems** 64:8,9 78:23

**proceeding** 7:16 16:21

**proceedings** 12:8

**process** 14:13 24:12 25:22 26:1 40:4

**programming** 45:4 48:14

**proposed** 16:17 17:15 22:23

**prosecuting** 17:14

**prosecution** 16:16 17:15 22:23 23:1,2,8 82:6

**provide** 19:17 56:4

**provided** 13:5 44:13

**providing** 75:2

**publications** 22:16,20

**purport** 41:19

**purported** 44:3

**purporting** 42:15 60:22,23

**purports** 41:24 46:6 61:3 63:21 101:1

**purpose** 16:6

**purposes** 7:15 16:9 22:21 24:2 28:10 29:14 93:20

**put** 36:9 40:5,15 62:12 80:13 84:18

**putting** 13:24

**Q**

**qualifications** 29:10

**question** 6:10,13 8:12,16 12:16 14:3 16:5 18:19 20:20 29:18,22 30:9,19 31:14 33:3 34:18 41:21 43:5,12 53:23 55:13 57:19 62:2 63:2 66:23 68:8 70:15 73:1,7 75:16,18,24 76:15 82:23

83:2,9,11,18 90:2 97:23 101:15 107:7 113:15 121:2

**questions** 124:10,11

**Quinn** 4:12,22 10:18,20 14:17

**R**

**reach** 70:12 103:18 104:2

**reached** 86:6

**read** 10:15 15:6 23:7 55:3,16,24 74:3 82:5 88:11 98:8 104:17 115:10 118:21 119:9

**reading** 21:7 27:22 56:24 59:15 60:19 61:17 82:24 88:2 105:2 111:14 115:4 118:15

**reaffirms** 78:21

**realize** 103:21

**reason** 6:7 26:16 53:10 78:9

**reasonable** 82:7,13

**reasons** 78:15 124:2

**recall** 7:19 11:3 12:17 17:20 18:20,23 22:19

**recess** 41:3 80:23

**recognize** 13:4 19:19

**recognized** 65:16

**recollection** 20:16

**record** 4:4 5:18 23:2,3 41:2,5 71:4 80:22 81:3 97:19 124:17,20

**records** 8:6

**reduced** 42:7 43:22

**refer** 5:15,16 15:4 48:8 59:6 92:21 120:7,10 121:4,10

**reference** 15:24 71:3 88:7 109:23

**referenced** 10:17 15:14 22:13 23:14 61:9 63:17

**references** 10:17 15:14,20 16:2,7 17:10 19:8 20:7 22:12

**referred** 20:10 57:16 100:9 105:14

**referring** 15:5 23:2 28:1 48:18 55:5 57:14,16 58:3 59:19,21,22 68:17 69:18 71:10 75:7 85:23 91:22 93:13 97:18 109:20 117:17

**refers** 47:6,20 49:16 69:1 115:21,23

**reflect** 70:17

**region** 33:6

**related** 15:13 18:5,11,13 23:12 50:3 59:14

**relates** 15:1 65:20 97:13

**relating** 12:13

**relationship** 36:2 74:12,24 75:3 112:2

**relevant** 23:8

**reliability** 42:8 43:23 45:5,12,17

**relied** 16:15 17:14 22:22 70:12 71:18,21 72:10

**relies** 36:17

**rely** 26:6 36:22

**relying** 37:6 69:5,6 76:20

**remaining** 72:21

**remember** 10:19 12:8 20:15 34:19

**remembering** 100:15 119:23

**render** 80:6

**rendered** 80:6

**reorients** 38:16

**repeat** 68:8 75:18 79:8 90:2

**repetitive** 62:8

**rephrase** 36:20 122:2

**rephrased** 75:20

**report** 12:1 70:11 76:8 81:22 82:18 90:16

**reporter** 5:1 116:17 124:19

**represent** 5:14 27:9 50:20 51:22

**representation** 51:5

**represented** 56:9

**request** 24:8

**requested** 116:17

**require** 70:8 84:7

**required** 24:7 88:21 116:20

**requirement** 69:16 82:4

**requires** 50:14 70:21 71:17 103:8,9 109:5,16 112:8 118:8

**research** 24:6

**resist** 44:19

**resistance** 37:9,19 38:2,4 44:18,24 46:22,23

**resolve** 105:16 109:12

**respect** 25:2 30:7

**Response** 19:14

**rest** 60:19 73:10 109:17

**result** 45:8 56:21 57:24 58:19 59:15, 16

**resulting** 44:19

**results** 44:23

**retained** 4:5 8:2 14:5

**review** 11:21 12:12 15:9 16:3 17:18 20:14 21:14,16 22:16 66:10

**reviewed** 11:16 12:6,7 15:10 16:15, 21,24 17:4 19:23 29:15 30:1

**reviewing** 30:5

**rewrite** 79:21 83:15 111:6

**rewriting** 83:17 111:11,20

**rise** 99:2,12,22 105:10 107:5 119:18 120:2,4 123:17 124:7

**Roman** 20:6

**rough** 124:22,24

**rules** 6:17

**rush** 124:22

**S**

**Sadly** 9:8

**satisfy** 116:15,18

**Saunders** 4:21,22 8:10 10:22 12:15 14:2 16:4 17:23 18:18 19:1,6 20:19 21:3,10 22:7,18 23:5,22 24:4,16 25:15 26:2,11,18 27:5,11 29:2,16 30:8,16 31:13,19 32:2 33:2,12 34:17 35:3,12 36:3,19 37:5,16,23 38:24 39:5,11,21 40:2,12 41:20 42:20 43:1, 9,15 44:10 45:16 46:1,12 48:10,23 49:9 50:1,13 51:1,12,19 52:3,8,20 53:13 54:6,18 55:7 56:7 57:4,18 58:6 61:4 62:6 63:13 64:1,11 65:2,9 66:2, 22 68:2,14 69:3,17 70:3,10,23 71:20 72:2,6,15 73:5 75:10 76:18 77:16 79:5,20 80:12,18 81:21 83:5,14,22 86:19 87:12,19,23 88:24 90:1,8 91:8,

16 92:5,9,17 93:18 95:1 97:17 98:23 99:11,20 100:17 101:3,14,20 103:3 104:12,22 105:9,17 107:3 108:12 109:7,14 110:22 111:5 112:18 113:10,13,17,20 114:3,18 115:9,18 116:16,19 118:5 119:17 120:9 121:7,14,24 124:1,11,21

**Science** 28:14

**scope** 8:8 21:4,10 27:11 29:16 30:8 43:9,15 52:20 61:4 63:2 64:1,6,11 65:9,19 82:8,15 83:22 87:23 88:24 90:1 113:10,11,13 118:11

**score** 49:11

**secret** 7:7

**section** 20:12 22:14 58:23 61:16 69:21 71:5

**select** 23:3 46:10

**selected** 47:1

**semiconductor** 9:17,19 47:7,11 56:13 58:4 59:22 67:18 68:12 73:18

**semiconductors** 9:23

**sense** 53:19,20 54:2,8 60:6,8 77:14 79:16

**sentence** 24:23 25:19 55:10 56:1,2,23 57:2,23 58:16 69:24 73:15 74:16 75:20,24 76:2,5,7,15 79:11,17,22 80:5,10 82:24 108:9,10

**serve** 8:21 9:5

**set** 21:13 51:15

**setting** 97:11

**short** 38:8

**shot** 6:24

**show** 12:4 72:17 76:20 102:1 107:16,21 108:19,20,22 109:1

**showing** 108:8

**shown** 86:21 89:11,13 95:16

**shows** 90:3 101:16,22 108:21

**sic** 44:13,19 51:11 60:12 74:13 88:5 98:12,13 118:24

**sic]** 42:13

**side** 89:15 94:9

**signals** 88:4

**signature** 13:12

**silent** 106:12,17

**silicone** 33:23

**similar** 28:15 91:7

**simultaneously** 42:2,6,21,24 43:8,14,21 44:3 46:18,24

**single** 50:12 51:13 54:17 61:1 94:10 107:9 108:9,11

**single-bit** 51:24 52:18 54:3 55:5 62:4 63:19 65:7 66:1

**singular** 123:22

**sitting** 16:11 53:2

**situation** 25:18 83:18,21 84:17 85:6,7,13,24 103:11 112:20

**situations** 78:13 79:15 102:24

**SK** 4:15,23 7:13 8:2 30:2

**skill** 26:13 28:2 61:21 72:19 73:8 102:16 104:3

**skilled** 82:8,14

**soda** 79:1,9

**solidifies** 80:3

**solution** 63:21 64:14,20

**solutions** 62:19 63:7 64:9

**solve** 41:19,24 42:15 46:18,21 50:3 58:20 60:23 61:3,14,23 62:1 65:16,18

**solved** 44:4

**solves** 42:16

**solving** 78:23

**sooner** 6:19

**sound** 6:22 11:10

**sounds** 6:23 11:9 62:20 73:6

**source** 25:21,24 26:9 39:16 47:14,15 121:18,22 122:10,13,22

**sources/drains** 122:22

**speak** 6:20 30:22 57:2,5

**speaking** 30:13 32:3 38:18 46:17 51:2

**specific** 27:17 36:14 58:4 62:15 72:17 77:11 83:19 108:21

**specifically** 8:17 13:21 21:5 49:19 92:6 93:2

**specification** 25:20,23 26:5,8,14,17,19,22 60:20 61:18 71:18,22 72:10,22 82:6,19,21 84:13,16 85:17 102:3,5 103:22 106:21,23 123:8

**speed** 42:5,10 43:17,20 44:1,20,24

**speeds** 42:13

**spend** 11:4 13:15,23 14:9

**spin** 37:7,8

**spinning** 37:12

**stand** 119:9

**standard** 25:7,9 82:10

**start** 17:5 21:15 29:11 38:13 40:21 45:10 54:3 60:8 66:15 88:2 92:14 104:15,20 106:21 109:3 117:14

**started** 34:20 53:5 118:24

**starting** 60:13 66:17 88:8 116:6

**starts** 60:15 74:19 88:1 103:12

**state** 5:17 24:23 28:19 31:4 50:17 51:18 52:1 53:6,16,22 68:9

**stated** 17:2,21 18:1 21:22 61:5 100:15

**statement** 59:1 64:7,15 71:10 80:8 94:1 97:8

**statements** 58:10,11 69:10

**states** 16:15 25:20 37:10,13,14 43:19 47:10 50:21 51:3,7,14,15,20,23 52:6,24 53:7,17 73:16

**stating** 69:7

**steps** 86:17

**stick** 101:8

**stop** 58:22

**stops** 37:20

**storage** 37:15 38:17 67:8

**store** 37:2 48:13 49:7,11,20,23 50:4,15,17,19,22,23,24 52:4,5,7 55:23 56:21 57:24 58:20 59:16,19 60:4 66:4,6 67:7,20 68:6,13,19 72:23 73:20 74:10 76:4,24 78:2,5,11

**stored** 37:11,14 38:15 40:1 54:11,24 55:14 56:3,16 57:3,6 59:4 69:9

**stores** 38:12 73:12

**storing** 49:16 52:15 57:12 78:18

**strength** 45:22

**strictly** 9:14
**structure** 32:13,16 40:16 51:4 56:18
**structures** 34:13 35:14
**study** 8:20 111:21
**subject** 64:9,13 65:5 82:1 118:7
**submitted** 12:19
**substitute** 111:12
**substitution** 111:22
**sufficient** 29:10
**suggest** 69:14
**suggests** 77:11
**Suite** 4:13
**summer** 8:5
**Sunil** 19:13
**supplement** 28:20
**supplies** 88:21
**supply** 42:3 88:17,20 89:10 111:16 116:11,14
**support** 13:1 19:14 80:14
**supports** 80:10 107:10
**Susman** 4:20
**swapped** 122:14
**swear** 5:2
**switch** 81:8,12 85:20 86:1,18,20 87:2,4,5,6,13 88:3,6,10 89:13,15,22 91:14 92:3 93:21 94:11,13,16,18 95:5 98:12 99:24 104:18 108:9,11,16,20, 22 110:4,19 111:14 112:3,4,7,8,12, 16,24 113:6,8,18 114:1,5,15,16 115:6,12,13,21,22,24 116:1,9,12,13, 21,24 117:3,7,11,20,21,23 118:4,8, 12,13 119:2,3 120:5,6,7 121:5,11,12, 22
**switches** 81:13 84:8 85:6,22 87:7, 11,15,17 89:11,14,17 90:3 91:18,23 92:1,7,11,12,19,24 93:1,3,7,8,11,13, 22,24 94:5,7 95:3,4 96:2 97:3,10,13, 15 98:6,11,20 99:2,5,8,9,14,16,22 100:1,5,7,8,12 101:13,18 103:10,24 104:9,18 105:8,11,15,20 106:1,2,19 107:12,13,14,17,19,22 108:3,15,20 109:1,6,16,18,22,23 110:1,18 111:4, 18 112:12,15 113:7,9,19 114:2,6,24 115:15,20,21,22,23 116:9,20,24 117:2,3,6,8,11,15,17,18,19,23 118:4, 9,13,19,20,22 119:1,12,15,19,22 120:3,14 121:4,10,12,15,21 122:4,18
**sworn** 5:7
**SWOUT1** 88:4
**SWOUT2** 88:4

**T**

**table** 20:5 97:19
**taking** 4:18 74:16
**talk** 39:12 46:2 62:12 83:17 84:16 88:13 109:18
**talked** 56:10 69:8 77:19
**talking** 19:11 27:18 35:20 39:9 40:14 43:3 44:12 48:11,12 49:20 54:15 55:17,19,21 56:8,12 57:9,11 58:7 60:1,3 64:22 65:13,20 67:21,22 68:16,18 69:8,18,21,22 70:1,4 72:17 74:4,7 75:14 76:21 77:8 78:15 85:14 90:5 92:2,10,11,12,24 93:1,2,7,12,19, 20,21 94:6 97:14 99:15 100:6,7,11, 12,13 108:14 109:17,24 115:24 116:3 118:12 119:11 121:11
**talks** 43:3,20 46:13 59:2 60:21 62:10 66:6 67:13 85:19,20 88:1 102:13 117:21
**tandem** 88:14
**technical** 21:14
**technically** 62:3
**technique** 42:1 65:5,6,24
**techniques** 62:23 65:17,18
**technologies** 4:15 31:20,22 48:6
**technology** 6:12 7:10 9:11 22:15 28:17 29:6 34:24 46:20 52:18,22 53:16,22 54:8 55:20 58:11 61:11
**telling** 77:7
**tells** 69:22
**term** 21:1,11 22:3 23:21,24 24:2 26:15,23 27:7,24 32:7 68:24 81:8,10, 12,16 84:1 90:4 93:8 97:1 104:17 110:12 124:5,23
**terminal** 94:16,18 95:12,14 117:16 122:6,15,16,21,24 123:1
**terminals** 88:5 98:11 109:21 110:1, 18 111:3 114:24 116:5,8 117:16 118:19,20 122:9,10
**terminology** 89:7
**terms** 14:6 18:14,15,22 20:23 21:2,6 22:1 23:10,13 24:9,10,13,15,18,19 28:5 31:9 48:18 49:12 52:17
**testified** 5:8 7:7,8,12,15
**testifying** 6:5 8:21
**testimony** 6:8 7:10 80:11
**Tevnan** 5:2
**Texas** 4:8
**thereabouts** 14:12
**thereof** 102:14
**thing** 48:2,3,8,21 76:23 95:11,19 113:22
**things** 27:21 35:15 94:18 106:11 112:23
**thinking** 53:15 102:20
**thought** 70:24 75:19
**threshold** 33:7 35:7 40:6,9 55:2 56:17 57:7 59:5
**thresholds** 40:20 53:21
**thrown** 11:15
**tied** 60:13
**time** 4:11 11:4 13:23 14:8,9 23:20,23 25:3 33:16 40:22 41:2,6 42:9,11,18 44:8 50:23,24 52:1 80:22 81:4 86:13 122:2 124:10,17
**times** 5:22,24 6:15 25:21 117:19
**today** 4:16 5:2 6:5,8 10:12 16:11 53:2
**today's** 4:10 124:16
**told** 25:8
**top** 89:3 91:4,19,20 107:24 122:15
**trade** 7:7
**train** 75:19
**transistor** 32:22 33:4,5,8,10 34:14 35:4,8,10,16,22,24 36:16 39:18 40:17,20 84:22 85:12 86:21,22 87:9, 10 90:11,12,13,15 92:19 93:14 95:9, 13,14,22 96:5 97:7 107:9 109:11
**transistors** 36:8 87:15,17 88:5 122:8
**trap** 33:5,11 36:11,13 59:23

**trapped** 33:19 47:4

**trapping** 33:19,22 34:3,10,12 35:5,6, 17,18,20 36:10 37:2 47:23 49:1,2,4 67:19 68:1,12 73:19

**trouble** 100:3

**true** 41:16 50:19 51:7,21 108:19

**turn** 13:10 15:17 16:14 20:5 24:21 66:8,9 82:17 94:8

**turned** 31:8

**two-bit** 51:8 52:6,19

**type** 33:5 36:11,14 39:3 55:18 92:3

**types** 31:18 32:5 33:15 91:24

**typo** 123:2,16

**U**

**U.S.** 4:7

**unclear** 6:11

**underneath** 49:5

**understand** 6:4,11 15:5 26:22,23 28:1 29:18 30:9 32:8 40:3 54:1 60:7, 11 61:22,24 63:1,3 71:24 73:1 76:12 81:23 82:3 85:2 90:18 92:13 93:5 94:2,3 95:7,9 97:12 105:12,24 106:5 112:19 118:16 121:1,3,9,20 123:20 124:6

**understanding** 24:24 25:6,8,10,12, 17,20 26:10 44:8 59:9 61:15 65:23 72:8 77:23 78:9 81:19 100:3 109:4 123:23

**understood** 57:9

**unlike** 38:14

**usage** 105:22 124:4

**V**

**variation** 44:19,23 45:18,19

**variations** 42:5,12 43:20 63:14

**varies** 44:15 46:20

**Varkony** 15:24

**vary** 29:3 39:20 46:23

**varying** 51:4 62:12,13

**VD** 88:15

**versa** 28:21

**versus** 4:15 53:17 54:9

**vice** 28:20

**video** 4:6,11

**voice** 4:17

**volatile** 31:6,10

**voltage** 33:7 35:7 37:20 39:14,15,16, 19,24 40:5,8,9,10 42:3,18,22 44:15, 17 45:2,14,18,20,22,23 46:3,4,7,8,23 47:3 48:15 53:18 54:9,10 61:7 62:14 63:14 74:12,24 88:17,20,21 89:1,10 91:11 92:15 94:22,24 111:15 116:10, 14

**Voltage-wise** 94:20

**voltages** 33:15 37:18 39:17 40:4,14 48:15 51:4 62:13

**W**

**walk** 70:13

**wanted** 120:20

**ways** 27:3,9 38:21 63:24 113:22 120:10,18

**whatsoever** 110:10

**wire** 92:18 94:15 95:21 96:5,9

**withdraw** 113:13

**witnessing** 9:15

**word** 23:7 47:13 50:5 69:13 97:14 100:4

**words** 24:24

**work** 37:4,6 80:17 88:14

**worked** 14:16

**working** 16:8 69:14

**write** 8:17 24:10 39:14,17 40:7 42:2, 5,9,10,11,12 43:16,20 44:15,19 46:24 58:17 59:12 82:18 88:21 90:17

**writing** 13:21 14:9 40:4,10 43:8 45:7 46:18

**written** 7:18 27:19 39:4,9,20 42:2,6, 17,24 43:13,22 44:2,7 45:1 47:2 64:16 74:11 80:1,2 83:10 102:4

**wrong** 6:12

**wrote** 11:18 12:9 18:6 119:10

**X**

**XIII** 20:6

**Y**

**year** 8:5 9:23

**years** 28:16 29:5

**Yu** 15:21 20:8,11

**Yup** 15:19