# EXHIBIT N

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ADVANCED MEMORY TECHNOLOGIES, LLC,<br><br>Plaintiff,<br>v.<br><br>SK HYNIX INC.,<br><br>Defendant. | Case No. 2:24-CV-1078-JRG-RSP |

**EXPERT DECLARATION OF MARWAN HASSOUN, PH.D. IN SUPPORT OF DEFENDANT'S CLAIM CONSTRUCTIONS FOR U.S. PATENT NO. 8,400,835**

I, Marwan Hassoun, Ph.D., hereby declare as follows:

## I. INTRODUCTION

1. I am over the age of 18 and am competent to submit this declaration. The statements and opinions herein are based on my personal knowledge and upon my background, education, research, training, and experience relating to the subject matter discussed.

2. I have been asked by counsel for Defendant SK hynix, Inc. (SK hynix or Defendant) to provide opinions and expert testimony in the above-captioned case regarding certain claim construction positions for disputed claim terms in U.S. Patent No. 8,400,835 ("the '835 Patent"). If called upon to do so, I am prepared to testify as an expert witness in this regard.

## II. BACKGROUND AND QUALIFICATIONS

3. I set forth my education, experience, and qualifications in my curriculum vitae ("CV"), attached as Exhibit 1 to this report. My work in industry and academia has included more than 30 years of experience in integrated circuits and systems-on-chip (SOC) design and products including hardware and software for digital and analog systems including memories, processing and networking devices. This covered all levels of engineering and management including as an engineer, director of engineering, senior director of engineering, vice president of engineering, senior vice president of engineering, CTO, president and CEO (spanning small companies as well as large semiconductor companies). My experience also includes academic positions as assistant professor, associate professor and professor of the practice, all in electrical and computer engineering.

4. I am currently the President of Green Semiconductor, Inc. (DBA Intellectual Inspiration) and I am also the Director of Partnerships for the Sandbox Innovation Fund Program at the Massachusetts Institute of Technology (MIT). My responsibilities as Director of Partnerships includes supervising and advising startups with their technology innovation for both hardware and

software and intellectual property management strategies through the years. Over the course of my career, I have founded, co-founded, launched, and managed multiple technology startups (both venture capital and privately funded). I have assisted in several merger and acquisition transactions for technology companies; my assistance has extended to both sides of the transaction.

5. In 1983, I earned a Bachelor of Science degree in electrical engineering from South Dakota State University. In 1984 and 1988 respectively, I earned a Masters and Ph D. in Electrical Engineering from Purdue University with a specialization in software and algorithms for computer aided design of electronic circuits.

6. I was a Professor of Electrical and Computer Engineering at Iowa State University from 1988 to 2000, where I taught and conducted research in very-large-scale integration (VLSI) integrated circuits including memories, processing and high-speed networking devices. From 2020 to 2021, I was a Professor-of-the-Practice in the Electrical and Computer Engineering department at Tufts University teaching integrated circuits design. I also serve as an external advisor for Ph. D candidates at the University of Texas at Austin.

7. I have received several awards for my work, including the Innovation of the Year award at Xilinx, Inc.; the Distinguished Engineer Award at South Dakota State University; the Faculty of the Year award at Iowa State University; and the Warren Bost Teaching Award at Iowa State University. I have been nominated for a number of other distinguished awards as well. I also am a senior member of the Institute of Electrical and Electronics Engineers (IEEE).

8. I am a named inventor on 59 issued patents and 4 pending patent applications related to highly integrated circuits with novel functionality in the areas of multi-gigabit serial transceivers, power conversion, memories, analog-to-digital converters (ADCs), digital-to-analog converters, RF devices, FPGAs, robotics, and digital signal processor filters. Additionally, I have

over 70 technical publications that include papers on analog and digital circuit design including memory circuits.

9. I have held various senior professional positions, including Senior Vice President of Engineering at KeyEye Communication, Inc.; Senior Director of Engineering for the Communications Technology Division at Xilinx, Inc.; President & Managing Partner in TraCHip, LLC; Co-Founder of MadMax Optics, Inc.; and Vice President of Wired Products at RocketChips, Inc. I have worked as both a software and a hardware engineer during my career.

10. I have been involved in building analog, digital, and mixed-signal integrated circuits products that involve communications, networking (optical and wired), processors and co-processors, memories, analog-to-digital converters, digital-to-analog converters, and serializers-deserializers (and their integration into large complex integrated SOCs), FPGAs, boards and multi-chip modules with multiple analog and digital subcomponents.

11. During my tenure at RocketChips, Xilinx, and KeyEye Communications, I was involved in building Integrated Circuits products that involve hardware and software for communications, networking (optical and wired), memories, and processor and co-processor design and integration on large complex integrated System-on-Chips (SOCs) with multiple analog and digital subcomponents. I have been involved in all aspects of the integrated circuits product lifecycle, including planning, design, licensing, verification, integration, synthesis, physical design (including layout), testing, qualification, fabrication, yield enhancement, software, debug, fixing, revisions, ECOs (Engineering Change Orders), and customer support. My involvement included performing these tasks myself, managing large engineering groups that cover the entire spectrum of the product cycle, outsourcing design services and intellectual property (IP) from third parties, as well as licensing IP to various clients including SONY, INTEL and OKI Semiconductor. The

chips developed were incorporated into various customer products such as computers, servers, networking equipment, and mobile devices.

12. I have authored chapters in several books: The Circuits and Filters Handbook, first, second and third editions, and Analog CAD Tools: Symbolic Techniques And Applications in 1995, 2003, 2009 and 1998, respectively. The chapters I authored relate to the use of software algorithms to analyze circuits and systems used in electronic devices.

## III. LEGAL STANDARDS

13. In connection with the opinions that I am offering herein, I am relying upon the legal standards and understandings that Defendant's attorneys have provided and/or explained to me, which I summarize below.

14. I understand that any analysis of patent infringement involves two steps. I understand that the first step is to determine the meaning and scope of the asserted patent claims from the perspective of a person having ordinary skill in the art ("POSITA"), *i.e.,* what I understand is called claim construction.

15. I understand that each claim must be analyzed from the perspective of a POSITA at the time of invention. Defendant's counsel has asked me to consider the state of the art from the perspective of a POSITA during the time period shortly before the earliest date of invention. Here, the earliest claimed priority date for the '835 Patent is February 6, 2009. This is the date that I have considered in rendering my opinions set forth in this declaration.

16. I understand that several factors should be considered in determining the ordinary level of skill in the art including (1) the types of problems encountered in the art; (2) the prior art solutions to those problems; (3) the rapidity with which innovations are made; (4) the sophistication of the technology; and (5) the educational level of active workers in the field of the patent.

17. I understand that claim construction is a matter of law for the court to decide. I understand that construction of patent claims begins with the actual language of the claims, and that the words of a claim are generally given their ordinary and customary meaning with respect to a POSITA at the time of the invention.

18. I understand that such claim interpretation must be made in light of and in reference to the patent specification and prosecution history. I understand that, the specification is often times the best source of evidence in the claim construction process. I also understand that where the patentee intended for the claims to include such limitations or have special meaning or definitions, those should be given weight in the meaning of the claim terms themselves. I understand that the prosecution history can inform the meaning of the claim language by demonstrating how the inventor understood the invention during the prosecution, including how the inventor may have distinguished the claims from the prior art.

19. I understand that a patent must include claims particularly pointing out and distinctly claiming the subject matter which the inventor regards as the invention. I understand that a claim fails that requirement, and is therefore invalid as indefinite, when the claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the claimed invention.

20. I understand that a party challenging a claim based on indefiniteness must prove indefiniteness by clear and convincing evidence.

## IV. BACKGROUND OF THE TECHNOLOGY

21. Conventional non-volatile flash memory devices were well-known and well-understood semiconductor technologies that have been in commercial existence for many decades, predating the ’835 patent. ’835 Patent at 1:21-2:12 (recognizing background and prior art nature of “flash memory,” “memory cells arranged in a matrix,” and “write voltage [being] applied

simultaneously to memory cells in the group" to reduce write time). Non-volatile memory (NVM) refers to memories that continue to hold information after power is removed from the device, making them essential for persistent storage of essential system data, user files, and settings in computing systems. The foundational technology in NVM includes the floating-gate transistor, first developed by Bell Labs in 1967. *See* https://ieeexplore.ieee.org/document/6771407

22. Programming individual memory cells in NVM is accomplished by selectively applying voltage to these cells, where the precision (*e.g.*, voltage levels and timing) of voltage application enables the precise control of data storage. Traditional and well-understood forms of NVM, including EPROM, EEPROM, and flash (NOR, and NAND) have long used word/bit line addressing to deliver voltages for read, write, and erase operations. The floating gate transistor is an essential component of NVM because these transistors are able to retain information (*i.e.*, 0 or 1) even with no power present. *See* '835 Patent at 1:21-37. The memory cells are typically arranged in row-column arrays, with each cell at the intersection of a word line (WL) and bit line (BL). This arrangement enables selective voltage delivery to isolate and manipulate individual cells without disturbing others.

23. It has likewise been well-understood before the '835 Patent's alleged invention that the "voltage applied to the drain of a memory element" could be modulated by adjusting the magnitude, the duration, or both. *See* SKH_00009503 ("Murakami"), ¶[0003]; SKH_00014081 (Yu), abstract. To this end, POSITAs recognized that a cell's location within a semiconductor array impacted the voltage it received during programming, with the distance along which a voltage needed to be applied imparting varying impedance/resistance. Known and well-documented solutions to this problem included, among other things, boosting write voltage for more distant cells or lengthening programming pulses to offset these disparities. *See e.g.*

SKH_00009503 ("Murakami"), ¶¶Abstract, Claim 1, [0003], [0006]-[0007], [0016]-[0017], [0032]; SKH_00014081 (Yu), abstract, ¶[0020]; SKH_00009594 ("Varkony"), ¶¶[0023]-[0028], [0101],[0165]-[0166]. These types of solutions were actually implemented, with success, across NOR, NAND, EPROM, and EEPROM systems in the prior art to improve memory efficiency, including by maintaining consistent write depth, improving data storage, and preventing wear on the memory cells from overprogramming. *See e.g.* SKH_00009503 ("Murakami"), ¶¶ Abstract, Claim 1, [0003]-[0004], [0016]-[0017], [0032]; SKH_00014081 (Yu), ¶[0002]–[0004], [0020], [0025], [0035]–[0036]; JP2003109389 ("The level of the bit line voltage supplied to the bit line at the time of writing is changed according to the wiring distance through the bit line.")

## V. THE '835 PATENT

24. The '835 Patent relates to NVM technologies and includes a background section that details conventional NVM arrangements. The specification discloses a typical arrangement of "a group of memory cells" where information can be written to the memory cells all at once, where a "write voltage is simultaneously applied to memory cells in the group" to reduce write time. '835 Patent at 1:16-20, 1:66-2:3. The background section also details the structure and arrangement of transistors in a non-volatile memory cell, including how voltages may be applied to the "gate electrodes" as well as the "drain . . . source . . . and substrate" electrodes of that transistor to store information—in the form of "0"s and "1"s—on the typical "byte-by-byte" or "word-by-word basis." '835 Patent at 1:26- 2:3. The specification goes on to describe various embodiments of non-volatile memory cells using conventional components and circuitry, such as using a "column address signal" to interconnect data lines DIO to bit lines ('835 Patent at 3:32-40, 5:15-28), a "drain voltage generation circuit" to supply voltage via a "drain voltage supply line" VD to the transistors in the memory array 100 ('835 Patent at 5:15-37), and "switches" SW1-SWn

(*i.e.*, transistors) within "switch circuits" that are operated by "switch control circuits" in performing the operations of the non-volatile semiconductor memory. '835 Patent at 5:29-37.

FIG. 1




*Id.* at Figure 1

## VI. LEVEL OF ORDINARY SKILL IN THE ART

25. A POSITA at the time of the '835 Patent had at least a Bachelor of Science in electrical engineering, computer engineering, or similar fields and at least two years of experience in the field of computer memory technology. More education can supplement for less experience, and vice versa.

26. As set forth in my Background and Qualifications, Section II above, and in my attached CV (Exhibit 1), I met and exceeded this definition from before the priority date of each of the '835 Patent.

## VII. MATERIALS CONSIDERED

27. In the course of preparing this declaration, I have reviewed and relied upon the '835 Patent, its prosecution history, and the parties' competing proposed constructions.

## VIII. PROPOSED CLAIM CONSTRUCTION

28. As to the '835 Patent, Defendant has proposed that the term "memory cells" should be construed. Defendant has further proposed that the phrase "each of the M switch circuits includes N switches, where N is an integer of one or more" is invalid as indefinite. I address each of these positions in the subsections below.

### A. "Memory Cells"

29. Claim 1 repeatedly recites a plurality of non-volatile "memory cells" as the elements in which voltage is applied to carry out a simultaneous "writ[e]" operation, as shown in the bolded portion of the claim below:

> 1. A non-volatile semiconductor memory in which a plurality of non-volatile **memory cells** can be simultaneously written using a plurality of bit lines, the device comprising:
>
> M data lines connected to the plurality of bit lines based on a column address signal, where M is an integer of two or more and is smaller than the number of the bit lines;
>
> a drain voltage generation circuit configured to generate a voltage which is a source of a drain voltage of each of the plurality of non-volatile **memory cells**;
>
> a drain voltage supply line connected to an output of the drain voltage generation circuit; and
>
> M switch circuits and M switch control circuits provided between the M data lines and the drain voltage supply line,
>
> wherein
>
> each of the M switch circuits includes N switches, where N is an integer of one or more,

> each of the M×N switches includes a first and a second terminal, and the first terminals of the N switches of each of the M switch circuits are connected at a common point to a corresponding one of the M data lines, and the second terminals of the N switches of each of the M switch circuits are connected at a common point to the drain voltage supply line, and
>
> the drain voltage supply line is connected to the M data lines via the M×N switches, and the M×N switches are controlled by the M switch control circuits.

30. To understand the claim scope, a POSITA would look to the specification to evaluate the components recited in the claim and how they would be understood in the context of the claimed invention. Here, a POSITA would look to the specification to understand which specific type, if any, of "memory cells" the inventors intended to claim. Based on my review, the intrinsic evidence makes clear that the term "memory cells" of the '835 Patent refers to elements that are each capable of storing *two or more bits of data*.

31. The specification repeatedly and consistently describes "memory cells" as multi-bit cells—capable of storing at least 2 bits of data—in every instance where the storage capability of the "memory cells" is described. For example, with respect to the Figure 8 embodiment, the specification explains: "FIG. 8 shows another example configuration of the non-volatile semiconductor memory of the present disclosure. The non-volatile semiconductor memory includes a memory cell array 500 including a plurality of memory cells . . . The memory cell array 500 includes memory cells including the trapping layer of FIG. 9. ***Each memory cell can store two bits of data.***" '835 Patent at 5:15–28 (emphasis added). This disclosure specifically ties the memory cells to their ability to store no less than two bits of data, and it does so while describing the memory cell array that includes a "plurality of memory cells," just as recited in claim 1.

32. The specification further explains the physical mechanism by which memory cells store multiple bits. In describing a "trapping layer" structure—the sole form of memory cell

described in all embodiments of the alleged invention ("While, in the above embodiments, …, in the non-volatile semiconductor memory having the ***trapping layer***, it is ***assumed above that each memory cell can store two bits of data***," '835 Patent at 6:10-20)—the specification discloses: "In the non-volatile semiconductor memory including the trapping layer, if voltages applied to the first impurity region 602 and the second impurity region 603 of the memory cell are switched, i.e., a voltage of 0 V is applied to the first impurity region 602 and a voltage of about 5 V is applied to the second impurity region 603, whereby electrons are also locally injected into the trapping layer 605 in the vicinity of the second impurity region 603. ***As a result, the memory cell can store two bits of data.***" '835 Patent at 2:4–12 (emphasis added). A POSITA would understand this as describing the fundamental operating principle of the memory cells to which the alleged invention is directed—namely, that the trapping layer supports multiple localized charge states corresponding to multiple stored bits. The specification reinforces this understanding by characterizing the alleged invention's utility as follows: "[t]he present disclosure is particularly useful for non-volatile semiconductor memories which include a trapping layer and in which each memory cell can store a plurality of bits of data." '835 Patent at 6:21–29.

33. Critically, and as the '835 Patent later confirms near the end of the specification in reference to each of "the above embodiments" previously disclosed, "***it is assumed above that each memory cell can store two bits of data. Alternatively, the present disclosure is applicable to a case where each memory cell can store three or more bits of data*** . . . ." ''835 Patent at 6:10-20. Taken together with the previous disclosures, a POSITA would understand this as defining a "memory cell" that the alleged invention is directed to. It clarifies that each "memory cell" in ***all*** disclosed embodiments can store two bits, or even three or more bits, of data.

34. On the other hand, the specification does not describe or even allude to the possibility of any embodiment in which the claimed memory cells store only a single bit of data.

35. For these reasons, and based on the intrinsic evidence as a whole, it is my opinion that a POSITA would construe "memory cells" in claim 1 to mean "elements that are capable of storing two or more bits of data."

**B. Indefiniteness: "each of the M switch circuits includes N switches, where N is an integer of one or more"**

36. Claim 1 recites that "each of the M switch circuits includes N switches, where N is an integer of one or more," as shown in the bolded portion of the claim below:

> 1. A non-volatile semiconductor memory in which a plurality of non-volatile memory cells can be simultaneously written using a plurality of bit lines, the device comprising:
>
> M data lines connected to the plurality of bit lines based on a column address signal, where M is an integer of two or more and is smaller than the number of the bit lines;
>
> a drain voltage generation circuit configured to generate a voltage which is a source of a drain voltage of each of the plurality of non-volatile memory cells;
>
> a drain voltage supply line connected to an output of the drain voltage generation circuit; and
>
> M switch circuits and M switch control circuits provided between the M data lines and the drain voltage supply line,
>
> wherein
>
> **each of the M switch circuits includes N switches, where N is an integer of one or more,**
>
> each of the M×N switches includes a first and a second terminal, and the first terminals of the N switches of each of the M switch circuits are connected at a common point to a corresponding one of the M data lines, and the second terminals of the N switches of each of the M switch circuits are connected at a common point to the drain voltage supply line, and

> the drain voltage supply line is connected to the M data lines via the M×N switches, and the M×N switches are controlled by the M switch control circuits.

37. In my opinion, a POSITA reading this language would not be able to determine the scope of the claim with reasonable certainty. The claim purports to allow N to equal 1, but other portions of the claim and disclosures in the specification contradict that possibility. This internal inconsistency leaves a POSITA unable to reconcile the claim language with the disclosed invention.

38. First, and as shown in the full language of independent claim 1 above, later limitations require that the "N switches" include two terminals that are connected at two "common point[s]," respectively to one of the data lines and to the drain voltage supply line. A POSITA would understand that a "common point" is a junction between multiple elements. A single switch cannot have a "common point" with itself, and describing a single switch as having terminals connected at a "common point" would be technically nonsensical. These structural requirements confirm that N cannot be 1.

39. Second, the claim term "N switches" is written in the plural. A POSITA would understand that the plural form "switches" denotes more than one switch. Consistent with the claim's use of the plural term, the only illustrated and described embodiments in the specification having 2 common points and 2 terminals, as claimed, ***all*** have multiple switches. Specifically, Figures 1 and 8 (which are the only Figures illustrating "common points" and terminals for a "semiconductor memory") each illustrate no fewer than 3 switches (as further described below). The specification also recognizes that a single switch could not logically comprise terminals having common points with itself. For example, in Figure 6, which illustrates a "switch circuit 400 include[ing] a P-type transistor P1," the specification describes that this single switch includes first and second terminals connected to the data line and the drain voltage supply line—it

conspicuously lacks the claimed "common points," which are only present at the intersection of ***multiple*** switches (*i.e.*, more than 1), consistent with the embodiments illustrated in Figures 1 and 8. *See* '835 Patent at 3:41-49; 5:29-37; *see also id*. at Fig. 2 & 3:63-67 (common points for two transistors P1 and P2); Fig. 4 & 4:28-33 (common points for two transistors P1 and N1). The specification's consistent usage of "common point[s]" only where there are more than 2 switches present and distinctly not when there is only 1 switch present confirms that the semiconductor memory of claim 1 with N=1 is not defined with reasonable certainty.

40. Third, dependent claims 2 and 4 confirm that N cannot be 1. Claim 2 requires that the "N switches" are transistors "connected together in parallel." A POSITA would recognize that a single transistor cannot be connected "in parallel" with itself. Claim 4 requires that the "M switch control circuits control combination of on and off states of the N switches." A POSITA would understand that a "combination" of on and off states necessarily involves multiple switches—some in the "on" state and others in the "off" state. A single switch would either be on or off and would not have a "combination" of states. Taken together, and much like claim 1, these two dependent claims require the presence of multiple switches (*i.e.*, where N is 2 or more), and that N=1 is not defined with reasonable certainty..

41. The intrinsic evidence reinforces these conclusions. As noted above, the specification repeatedly describes the "N switches" as comprising two or more switches, and the figures show three or more switches in every embodiment illustrating the claimed semiconductor memory. For example, with respect to Figure 1, the patent states: **"**N switches SW1–SWn each having a first and a second terminal are provided for each data line. ***The first terminals of the N switches SW1–SWn for each data line are connected at a common point to the data line. The second terminals of the N switches SW1–SWn for each data line are connected at a common***

***point to a drain voltage supply line VD which is an output of the drain voltage generation circuit 102***. A switch control circuit 103 which controls each of the N switches SW1–SWn is provided for each data line.**”** ’835 Patent at 3:41-49. The specification provides a nearly-identical description for the embodiment of Figure 8. ’835 Patent at 5:29–37. Collectively, these illustrations of the disclosed semiconductor memory, along with their corresponding descriptions, require multiple switches; and they do not describe or permit a single-switch embodiment, *i.e.*, where N = 1. Nor do they disclose to a POSITA how, for the case where N=1, a single switch can satisfy the claim requirement that the switch’s singular first terminal “***are*** connected at a common point to a corresponding one of the M data lines,” and singular second terminal “***are*** connected at a common point to the drain voltage supply line.”

FIG. 1




FIG. 8




’835 Patent at Figures 1 and 8 (annotations added).

42. In my opinion, these contradictions in the claim language and the specification leave a POSITA unable to determine with reasonable certainty the scope of the claimed “semiconductor memory” where the number of switches N equals 1. Because the claim language expressly permits N=1 while every disclosure in the patent renders that selection implausible, the

scope of claim 1 cannot be understood with reasonable certainty. For this reason, it is my opinion that the phrase "each of the M switch circuits includes N switches, where N is an integer of one or more" is indefinite.

## IX. CONCLUSION

43. I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under § 1001 of title 18 of the United States Code.

44. I reserve the right to amend or supplement my analysis and conclusions should new information become available, including in the event AMT provides expert testimony relevant to the issues presented in this declaration, or otherwise responding to the opinions I have expressed herein.

Dated: January 16, 2026

Marwan Hassoun

Marwan Hassoun, Ph.D.